### UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF FLORIDA
**West Palm Beach Division**

BRITTANY ROBERSON, REBECCA
FREEMAN, BIANCA VIÑAS, and
TIFFANY KING, individually and on behalf
of others similarly situated,

     *Plaintiff(s)*,

v.

HEALTH CAREER INSTITUTE LLC (dba
HCI COLLEGE LLC and HCI
ACQUISITION LLC), and FLORIAN
EDUCATION INVESTORS LLC,
     *Defendant(s)*.

Civil Action No._____

**Jury Trial Demanded**

### CLASS ACTION COMPLAINT

Plaintiffs Brittany Roberson, Rebecca Freeman, Bianca Viñas, and Tiffany King ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated (collectively referred to as "the Proposed Class" or "Proposed Class Members") against HCI College, formerly known as Health Career Institute LLC ("HCI"); and its parent company Florian Education Investors LLC ("Florian"); and their agents (collectively with HCI, "Defendant"), and pursuant to their investigation, upon knowledge as to themselves and their own acts and otherwise upon information and belief, allege the following:

### PRELIMINARY STATEMENT

1.    This case arises from a deceitful pattern of behavior by the West Palm Beach-based for-profit nursing school HCI, which deliberately and consistently harmed its students in violation of federal and state law.

2.      HCI offers an Associate of Science in Nursing program at its West Palm Beach campus (the "RN Program"[1]), which it advertises on its website as being "designed to provide educational and clinical experiences preparing students for employment positions as a Registered Nurse (RN) in hospitals or comparable facilities." It also claims that the program is accelerated, offered at convenient schedules for working people, and includes tutoring assistance.

3.      Plaintiffs allege that to avoid having its nursing program shut down due to poor student outcomes, Defendants imposed program-wide policies to block students from graduating and sitting for the nursing licensure examination, both requirements to become a registered nurse in Florida.

4.      Since 2013, Defendants have raked in millions of dollars in federal and private student loans, and through an institutional student loan program, by convincing aspiring nurses to pay $50,000 each for the sub-par RN Program—a program from which barely half of all students who graduate, and far less than half of the students who enroll, ever go on to become licensed registered nurses.

5.      The Florida Board of Nursing ("BON") placed the RN Program on probation in 2016 and 2018 due to its graduates' low passage rates on the National Council Licensure Examination for Registered Nursing ("NCLEX-RN").

---

[1] The terms ASN (Associate of Science in Nursing) and ADN (Associate Degree in Nursing) are often used interchangeably, including by Defendant. Both degree names are encompassed by the "RN Nursing Program" designation used herein. This designation does *not* encompass HCI's four-year nursing program, which culminates in a Bachelor of Science in Nursing ("BSN") degree. Unless otherwise stated, this designation only applies to the program offered at HCI's West Palm Beach campus.

6.      When it became clear that the RN Program was at risk of termination by the BON in 2018 for failure to achieve programmatic accreditation, Defendants designed and implemented a two-pronged scheme to continue enrolling students and taking their money, without actually improving the program or meeting BON requirements.

7.      **First**, Defendants sought and received BON approval to offer a "new" nursing program at HCI's West Palm Beach campus. But there was nothing "new" about this program. It had the same instructors, curriculum, and facilities that led to it being put on probation in the first place. Both programs were run by the same Nursing Director. And both programs had nearly identical education plans and operated based on the exact same course catalog.

8.      By hiding behind this "new" program, Defendants bought themselves five more years to come into compliance with BON requirements for accreditation and appeared to wipe the slate clean on the dismal pass rates graduates of the "old" program achieved. It also did not disclose the "old" program's probationary status to prospective students.

9.      The BON terminated the "old" RN Program on August 7, 2019, for failure to obtain programmatic accreditation.

10.     On information and belief, Defendants began enrolling students in the "new" program by September 1, 2019. As required by Florida law, Defendants included in each student's enrollment agreement a mandated disclosure about NCLEX-RN passage rates. Rather than stating the truth—that in 2018, fewer than 50 percent of the RN Program's recent graduates passed the licensing exam, as compared to 76 percent of Florida takers and 86 percent of nationwide takers—each disclosure claimed that there simply were no graduate exam results to report for the "new" program.

11.     Defendants never disclosed to any nursing students enrolling after September 1, 2019, that the RN Program had failed to achieve the programmatic accreditation required by Florida law.

12.     Plaintiffs and hundreds of other working adults enrolled on the basis of these deceptive disclosures.

13.     **Second**, while HCI's website and advertising material focus on prospective students' ability to sit for the NCLEX-RN exam upon completing the RN Program, Defendants placed uniform, yet arbitrary and unannounced, obstacles in front of students that effectively blocked them from graduating from the "new" program, and therefore blocked them from sitting for the licensure exam.

14.     Defendants systematically imposed unfair and arbitrary barriers on putative class members, as shown in excerpts from complaints filed online:

   a.  "Run far away from this school. ¾ of the current graduating class is unable to graduate because of ONE test." Julie L. (5/8/21).[2]

   b.  "The most horrible experience of my academic life. I graduated 2 years ago and still unable receive my diploma . . . I'm convicted this school isn't here [sic] to help anyone especially African Americans race or nursing students period!" Fablenne B. (4/18/21).[3]

   c.  "The school advertises and markets to working class adults to attain an Associate's Degree in Nursing one day a week with one day of clinical. Educational standards were changed mid program which would cause otherwise passing ******** to fail and repeat entire semesters at their own expense. These standards were not in practice at the time of signing up for the program and is causing more than 90% of otherwise passing ******** to retake an entire semester at extra cost." Name Withheld (8/20/21).[4]

---

[2] https://nicelocal.com/florida/education/hci_college/
[3] Id.
[4] https://www.bbb.org/us/fl/west-palm-beach/profile/nursing-school/health-career-institute-0633-92008557/complaints

15.     By limiting the number of students who took the NCLEX-RN, and only graduating those students who had shown the highest likelihood of passing, Defendants were able to artificially inflate the RN Program's passage rates.

16.     Plaintiffs Rebecca Freeman and Brittany Roberson were told they would graduate in December 2021. Over 100 students were in their core nursing courses.

17.     As of the date of this Complaint, 11 months after their cohort's scheduled December 2021 graduation date, the BON's records reveal that *only nine* December 2021 graduates of the RN Program have sat for the NCLEX-RN.

18.     The RN Program's NCLEX-RN passage rates have miraculously increased to levels rarely achieved by even elite college programs, let alone a program with graduates failing at rates near 50 percent months earlier.



19.     Because the "new" program has not yet achieved programmatic accreditation, credits from HCI do not transfer to other nursing schools. As a result, students who are barred from graduating from the RN Program must begin from scratch at a new school if they want to continue pursuing their dreams of being nurses.

20.     In addition to preventing students from graduating, Defendants committed unlawful acts towards nursing students, including:

a.  Unjustly enriching themselves by charging students over $4,000 for a final "Capstone" course, which was almost entirely administered by a third party and which students could have purchased independently for the mere price of about $525;

b.  Steering students into retail installment contracts, whereby students borrowed money from Defendants and made monthly payments while in school. Neither HCI, nor the loan servicer, Tuition Options, holds the license Florida law requires to offer retail installment contracts. § 520.32(1), Fla. Stat. And such installment contracts lack the protections of federal student loans, such as forbearance, income-driven repayment, and public service loan forgiveness.

c.  Promising, but not providing, students with the clinical experience required by the Florida statute and BON regulations.

d.  Employing a faculty that is largely adjunct, with little teaching experience, and lacking the level of credentials required by Florida statute and BON regulations.

e.  Targeting for enrollment women of color by marketing towards first-generation college students and single mothers, as evidenced by the fact that 42 percent of HCI's RN Program is Black,[5] while census data for the surrounding Palm Beach County shows the area is only 17 percent Black.

f.  Withholding from prospective students the fact that HCI's credits are generally not transferable; and

---

[5] Data obtained from the Integrated Postsecondary Education Data System.

g.    Representing the RN Program as being a three- to five- semester commitment but then taking actions that extend this to a five to seven semester burden that results in no degree and no opportunity to even take the licensure exam.

21.    Through this action, on behalf of themselves and all others who enrolled in the "new" RN Program, Plaintiffs seek to hold Defendants accountable for: (i) violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*; (ii) breach of contract; (iii) unjust enrichment; and, because Defendants intentionally targeted Black students with their subpar product and predatory lending policies, (iv) violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*,, and (v) violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over Plaintiffs' federal ECOA and Title VI claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), as those state law claims are so related to the federal claims within the Court's original jurisdiction that they form part of the same case or controversy.

23.    Defendants are subject to personal jurisdiction in this Court because they are authorized to transact and do transact business in Florida and because they maintain registered agents for service of process in Florida. Furthermore, Defendants regularly do business and solicit business in Florida, engage in persistent course of conduct in Florida, and derive substantial revenue from their businesses within Florida.

24.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1) and (d). The Proposed Class consists of at least 400 individuals, and the aggregate of Proposed Class Members' damages is approximately $12,000,000 (the number of Proposed Class Members times

the average tuition for three semesters). Finally, the Parties are diverse: the Named Plaintiffs and Proposed Class Members are citizens of Florida and Ohio, and Defendants are limited liability companies whose members are citizens of Connecticut and Delaware.

25.     Venue in this district in proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

26.     Plaintiff Brittany Roberson is a resident of Amelia, Ohio. She was enrolled in HCI's "new" RN Program from July 2020 to December 2021.

27.     Plaintiff Rebecca Freeman is a resident of Port St. Lucie, Florida. She was enrolled in HCI's "new" RN Program from January 2021 to December 2021.

28.     Plaintiff Bianca Viñas is a resident of West Palm Beach, Florida. She was enrolled in HCI's "new" RN Program from January of 2021 to December of 2021.

29.     Plaintiff Tiffany King is a resident of Lake Worth, Florida. She was enrolled in HCI's "new" RN Program from February of 2020 to December 2021.

30.     Defendant Health Career Institute LLC ("HCI") is a registered limited liability company organized under the laws of Delaware. It is registered to transact business in Florida as HCI College LLC and, alternatively, HCI Acquisition LLC. HCI runs "HCI College," a for-profit college in South Florida. The school has two campuses. The main campus and corporate office are located at 1764 N. Congress Ave. Ste. 203 in West Palm Beach, Florida. Its second campus, located at 1202 W. Cypress Creek Rd. Suite 101 in Ft. Lauderdale, Florida, operated as a "branch" campus until October 2017 when it received approval from the BON to operate as an independent program. In its Annual Reports to the BON, HCI has reported its owner to be "Steve Hart" or "HCI Acquisition LLC."

31.     Defendant Florian Education Investors LLC ("Florian") is a Delaware corporation with its principal place of business in Darien, Connecticut. Florian is a managing member of Defendant Health Career Institute LLC. Florian's CEO is listed in its SEC filings as Steven W. Hart, a resident of the state of Connecticut.

32.     Florida law requires that each institution's catalog contain a "statement of legal control which includes the names of the trustees, directors, and officers of the corporation." Fla. Admin. Code R. 6E-2.004(11)(b).

33.     Under "statement of legal control," HCI's college catalogs identify HCI College as "a subsidy [sic] of Florian Education Investors LLC" and identify Steve Hart as "chairman."[6]

## BACKGROUND

### Rules Governing Nursing Programs and the Nursing Profession in Florida

34.     There are two main categories of nursing professionals with a bachelor's degree or less: RNs, or professional nurses, and licensed practical nurses ("LPNs"). In general, an RN has a broader scope of practice, can provide a higher level and more direct form of patient care, and is therefore better compensated than an LPN, who works in supportive roles and provides more basic levels of nursing care.

35.     To become an RN in Florida, an individual who is not already a licensed nurse in another state must, among other things, receive a passing score on the NCLEX-RN.[7]

---

[6] The 2017, 2018, and 2019 college catalogs listed Steve Hart and Larry Brown as "Co-CEOs"; the 2020 and 2021 college catalogs listed Steve Hart and Larry Brown as "Chairmen (Co-Chairs)"; and the 2022 college catalog lists Steve Hart as "Chairman." Upon information and belief, Larry Brown retired from HCI College in May 2022.

[7] There are two versions of the NCLEX: the NCLEX-RN is the licensure exam for prospective RNs and the NCLEX-PN is the licensure exam for prospective LPNs.

36.     To sit for the NCLEX-RN in Florida, candidates are required to graduate from a nursing education program that has been issued a program code ("NCLEX code") and that is either approved, accredited, recognized by the jurisdiction in which it is based.

37.     After graduating from one of the above nursing programs, a candidate may apply for the licensure examination, abiding by the requirements listed in Florida Statutes § 464.008.

38.     Part of the application process requires the candidate's school to transmit their official transcript to the BON. The candidate's transcript must reflect graduation from the nursing program. § 464.008(1)(c), Fla. Stat.

39.     Institutions that offer nursing programs in Florida must seek and maintain BON approval to operate and enroll students. All BON-approved nursing programs in Florida are issued a NCLEX code.

40.     In 2009, in response to a shortage of qualified nurses to serve the state's population, the Florida legislature enacted several statutory changes, through the Nurse Practice Act, with the intent to increase the number of approved nursing education programs. §§ 464.001-464.027, Fla. Stat. (2009).

41.     The 2009 amendments to the Nurse Practice Act streamlined the process for approving new nursing education programs, removing rulemaking authority from the BON and specifying the nursing education program approval process in statute.

42.     Among the new statutory provisions were, inter alia:

    a.     a requirement that the program's nursing curriculum consists of at least 50 percent clinic training and "[n]o more than 50 percent of the program's clinical training

consists of clinical simulation," [8] §§ 464.019(1)(b)(1), (2)(c), Fla. Stat.;

    b.  a requirement that "the program director and at least 50 percent of the program's faculty members are registered nurses who have a master's or higher degree in nursing or a bachelor's degree in nursing and a master's or higher degree in a field related to nursing," [9] § 464.019(1)(a)(1), Fla. Stat.; and

    c.  a requirement that a nursing program must achieve a graduate NCLEX passage rate that is not more than 10 percentage points lower than the average passage rate, during the same calendar year, for U.S.-educated graduates of comparable degree programs taking the NCLEX nationally for the first time (the "NCLEX requirement"), § 464.019(5)(a)1, Fla. Stat.

    43.    The 2009 amendments also specified when an approved program could face probation or termination. If a nursing program's graduate NCLEX passage rate does not meet the required passage rates for two consecutive calendar years, the BON places the program on probationary status. The program must remain on probationary status until it achieves a graduate passage rate that equals or exceeds the required passage rate for any one calendar year. If it fails to achieve the required passage rate for any one calendar year, the BON may extend the program's probationary status for an additional year. If the program is not granted the one-year extension or fails to achieve the required passage rate by the end of such extension, the BON must terminate the program. § 464.019(5)(a)(2), Fla. Stat.

---

[8] Under prior regulations, the BON mandated that no more than 25 percent of clinical time could consist of simulations. *See* Florida Office of Program Policy Analysis & Government Accountability, Report No. 07-04, "Florida Nurse Practice Act and Board of Nursing Rules Create No Unreasonable Barriers to Producing New Nurses," 5, Jan. 2007, *available at* https://oppaga.fl.gov/Documents/Reports/07-04.pdf.

[9] Under prior regulations, the BON mandated that 60 percent or more of cursing faculty must hold a bachelor's degree in nursing plus a master's or doctoral degree in nursing. *See id.* at 2.

44.     As a result of the 2009 amendments, a total of 357 of 384 new nursing program applications were approved by the Florida BON between 2009 and January 2018, an approval rate of 93 percent.

45.     Among the new nursing programs were exploitive and expensive for-profit institutions, including HCI (then named Health Career Institute).

46.     In 2014, the Florida legislature further amended the Nurse Practice Act to require nursing education programs to be accredited by one of three specialized nursing accrediting agencies recognized by the United States Secretary of Education: Accreditation Commission for Education in Nursing ("ACEN"), Commission on Collegiate Nursing Education ("CCNE"), or National League for Nursing Commission for Nursing Education Accreditation ("NLN CNEA"). § 464.003, Fla. Stat.

47.     Nursing programs that were approved and that enrolled students before July 1, 2014, were required to have become an "accredited program" by July 1, 2019. § 464.019(11)(a), Fla. Stat.

48.     Nursing programs that enrolled students after July 1, 2014, are required to become an "accredited program" within five years after the date of first enrolling students. §§ 464.019(11)(b)-(c), Fla. Stat.

49.     Florida Statutes § 464.019(11)(e) specifies: "A nursing education program that fails to meet the accreditation requirements shall be terminated and is ineligible for reapproval under its original name or a new program name for a minimum of 3 years after the date of termination. An institutional name change or the creation of a new educational institution with the same ownership does not reduce the waiting period for reapplication."

50.     Florida law also requires the BON to "deny a program application for a new prelicensure nursing education program submitted by an educational institution if the institution has an existing program that is already on probationary status." § 464.019(5)(a)(2), Fla. Stat.

51.     Additionally, any nursing program placed on probation must disclose its probationary status in writing to the program's students and applicants, along with an explanation of the implications of the probationary status on the students or applicants. § 464.019(5)(3)(c), Fla. Stat.

52.     Until it achieves programmatic accreditation, a Florida nursing program must annually submit to the BON a report disclosing information for the previous academic year, including information about applicants, enrollees, number of graduates, student retention rates, and accreditation. § 464.019(3), Fla. Stat.

53.     The annual report must also contain an affidavit certifying continued compliance with state law, including:

   a.   the requirement that at least 50 percent of the program's nursing curriculum consists of at least 50 percent clinic training, § 464.019(1)(b)(1), Fla. Stat.; Fla. Admin. Code R. 64B9-2.021(4)(b)(2);

   b.   the requirement that no more than 50 percent of each clinical training category (acute care, long-term care, and community-based care) may be simulated, § 461.019(2)(b), Fla. Stat.; Fla. Admin. Code R. 64B9-2.022(5)(b) (defining clinical simulation as "activities or events replicating clinical practice using scenarios, high-fidelity manikins, medium-fidelity manikins, standardized patients, role playing, skills stations, and computer-based critical thinking situations");

c.  and the requirement that the program director and at least 50 percent of the
program's faculty members are registered nurses who have a master's or higher
degree in nursing or a bachelor's degree in nursing and a master's or higher degree
in a field related to nursing, § 464.019(1)(a)(1), Fla. Stat.

54.  The Florida Commission for Independent Education ("CIE"), an administrative
body within the state's Department of Education, is responsible for licensing independent schools,
colleges, and universities in the State of Florida. § 1005.31(1)(a), Fla. Stat.

55.  HCI is licensed by the CIE.

56.  Florida law and implementing rules governing fair consumer practices require that
every institution under the jurisdiction of the CIE, or that directly or indirectly solicits students for
enrollment, must:

a.  At least one week prior to enrollment or collection of any tuition from the
prospective student, disclose in writing its status regarding licensure and a
statement regarding transferability of credits to and from other institutions;

b.  "Provide to prospective and enrolled students accurate information regarding the
relationship of its programs to state licensure requirements for practicing related
occupations and professions in Florida";

c.  "Publish and follow procedures for handling student complaints, disciplinary
actions, and appeals";

d.  "Ensure that all advertisements are accurate and not misleading"; and,

e.  For nursing programs, provide written disclosures to students, prior to enrollment,
that must be signed and dated by the prospective student and maintained in the
student's file, disclosing the NCLEX passage rates for first-time test takers and any

probationary status of the program for the most recent calendar year.

§ 1005.04, Fla. Stat.; Fla. Admin. Code R. 6E-1.0032(11).

57.    The BON provides a template, Form 609a, for the disclosures required for professional nursing programs.

***Federal Requirements***

58.    Institutions must comply with a number of federal requirements in order for their students to receive federal student aid, including need-based grants and student loans, under Title IV of the Higher Education Act ("Title IV") and its implementing regulations.

59.    Such "Institutions of Higher Education" must be "legally authorized within such State to provide a program of education beyond secondary education." 20 U.S.C. § 1001(a)(2). As defined by the U.S. Department of Education, they must be "legally authorized to provide an educational program beyond secondary education in the State in which the institution is physically located." 34 C.F.R. § 600.4(a)(3).

60.    There are two basic requirements for an institution to be considered "legally authorized" by a state for the purposes of Title IV funding eligibility: the state must explicitly authorize the institution for this purpose and the state must have a process to review and act on complaints concerning the institution. 34 C.F.R. § 600.9(a).

61.    Institutions receiving Title IV funding generally must also be accredited by a nationally recognized accrediting agency; programmatic accreditation is not required. 20 U.S.C. § 1001(a)(5); 34 C.F.R. § 600.4(a)(5). This includes proprietary (i.e. for-profit) institutions, like HCI, which must hold accreditation through at least a regional accrediting agency. 20 U.S.C. § 1002(b)(1)(D).

62.     Once an institution, proprietary or otherwise, has demonstrated that it satisfies all Title IV eligibility requirements, it is required to enter into a program participation agreement ("PPA") with the Department of Education that defines the terms and conditions that must be met and upheld to maintain Title IV eligibility. 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14.

63.     Federal law also states that schools are responsible for the truthfulness of the information that students and their families might rely on in deciding whether or not to attend. The Secretary of Education is permitted to revoke Title IV eligibility from any institution deemed to have engaged in substantial misrepresentation. 34 C.F.R. §§ 668.71-668.74.

64.     For-profit institutions, like HCI, are subject to additional statutory and regulatory requirements.

65.     For-profit institutions are required to "prepare students for gainful employment in a recognized occupation." 20 U.S.C. §§ 1001(b)(1), 1002(b)(1)(A)(i), (c)(1)(A). The principal measure of whether programs lead to gainful employment is the ratio of debt to income that a program's typical student has upon graduation.

66.     For-profit institutions must also adhere to the Department of Education's 90/10 rule, which caps the percentage of revenue that a school can receive from federal financial aid sources at 90 percent. 20 U.S.C. § 1094(a)(24); 34 C.F.R § 668.14(b)(16).

***Evolution of HCI's RN Program***

67.     HCI, as Health Career Institute, LLC, was founded as a nonprofit provider of emergency medical services training in 2002.

68.     Health Career Institute was reincorporated as a for-profit corporation in 2012, and was purchased by Florian Education Investors LLC in 2013.

69.     In 2013, the BON first approved HCI to operate an RN program at its West Palm Beach campus. The BON issued this program NCLEX code 70755.

70.     As seen below, in the years that followed, graduates of HCI's initial RN Program struggled to pass the NCLEX-RN.



Results of HCI's First-Time NCLEX Test Takers

71.     The program's graduates consistently, and dramatically, under performed first-time NCLEX-RN takers in Florida and the United States as a whole, as depicted in the following chart.[10]



Comparison of Average NCLEX-RN Passage Rates for First-Time Test Takers

72.     While the national average for first-time test takers in 2014 was 81.78 percent, only 26.32 percent of HCI's graduates passed the exam that year.

---

[10] NCLEX passage rates obtained from the Florida Board of Nursing's records found at: https://floridasnursing.gov/education-and-training-programs/ (last accessed Nov. 17, 2022) and the website for the National Council of State Boards of Nursing (NCSBN) at: https://www.ncsbn.org/nclex.page (last accessed Nov. 17, 2022).

73.     In 2015, the national average for first-time test takers was 84.53 percent. Only 57.14 percent of HCI's graduates passed that year.

74.     Based on these scores, in 2016, the first year it was subject to the NCLEX requirement—needing to attain a passage rate within 10 points of the national average—the BON placed HCI's RN Program on probationary status.

75.     In 2017, the BON found that the RN Program's graduate passage rate "for first-time test takers within six months of graduation" in 2016 was within 10 points of the national average, and removed the program from probationary status.

76.     Because its graduates failed to achieve the NCLEX-RN passage rates required by Florida law in 2016 and 2017, the BON issued a Notice of Intent to place HCI's RN Program on probationary status for the calendar year of 2018.

77.     In March 2018, HCI challenged the BON's Notice of Intent to place the RN Program on probation by filing an action with Florida's Department of Administrative Hearings. HCI argued that the BON improperly calculated HCI's passage rate using all test takers during the calendar year. HCI challenged this method of calculation, but nowhere established that it would otherwise have achieved the necessary passage rate under its preferred calculation methodology.

78.     In May 2018, HCI applied to the BON for approval to operate a "new" RN Program at its West Palm Beach campus.

79.     HCI's May 2018 application did not explain, or even expressly acknowledge, the existence of its existing RN Program operating under NCLEX code 70755. However, the "Nursing Student Handbook" that was submitted as part of the application was the 2017-2018 handbook for students enrolled under NCLEX code 70755.

80.     The details of the "new" program, as contained in HCI's application to BON, were

substantively identical to those reported by HCI to the BON in its prior-year compliance report for the existing program. Those details include the name of the school and program, the identity of the nursing director, and the campus address and phone number. HCI also indicated that the "new" program was accredited under the same code (MO72133) issued by the Accrediting Commission of Career Schools & Colleges to the existing program.

81.      By letter dated October 1, 2018, the BON approved HCI's application for a new RN Program and issued it NCLEX code 704146.

82.      Shortly thereafter, in February 2019, HCI voluntarily withdrew its action against the BON pending in the Florida Department of Administrative Hearings. The Administrative Law Judge released jurisdiction of HCI's claims to the BON on or around February 26, 2019.

83.      In March of 2019, the BON issued a Notice of Intent to place HCI's "old" RN Program (NCLEX code 70755) on probationary status (again) due to its failure to achieve satisfactory NCLEX-RN passage rates in 2017 and 2018.

84.      This probationary status was imposed for the 2019 and 2020 calendar years.

85.      In the spring of 2019, HCI received approval from the BON and the Florida Department of Education to change its name from "Health Career Institute" to "HCI College." This name change applied to all of HCI's NCLEX codes.

86.      HCI is generally accredited by the Accrediting Commission of Career Schools and Colleges ("ACCSC"), a national accreditor with no nursing specialization. Although HCI reported that it was seeking ACEN accreditation in its annual reports to the BON beginning in 2017, it never received accreditation from ACEN or any other programmatic accreditor.

87.      Because it failed to obtain programmatic accreditation by July 1, 2019, as required by Florida law, the BON terminated HCI's "old" RN Program on August 17, 2019.

88.     Students who had enrolled in the RN Program before September 2019 continued in the "old" RN Program through 2020 in what is referred to as a "teach-out," whereby an institution agrees to wind down an education program while fulfilling its contractual and educational obligations to the students still enrolled.[11]

89.     However, Defendants continued to offer a substantively identical RN program at the West Palm Beach campus—the "new" RN Program operating under NCLEX code 704146.

90.     From the time HCI began enrolling students in its "new" RN Nursing Program through at least March 2021, HCI's college catalogs stated that the RN Program was licensed by the Florida Department of Health and BON under the old NCLEX code, 70755.

***Programs and Practices of HCI's RN Program***

Advertising and Target Marketing

91.     At all times material to this Complaint, Defendants advertised the RN Program as a professional nursing program that prepares students for employment as RNs, as opposed to a practical nursing program that prepares students for employment as LPNs.

92.     HCI's website advertising the RN Program as a "72-credit hour nursing course that may be completed in as little as 2 years . . . [and] is designed to provide educational and clinical experiences preparing students for employment positions as a Registered Nurse."

93.     HCI advertises the RN Program as accessible to working people and promises immediate entry and no wait list to begin.

94.     Much of the marketing for HCI's RN Program is intentionally targeted toward working people of color, and especially Black women.

---

[11] BON records show that from the date of termination through the third quarter of 2021, approximately 216 HCI graduates took the NCLEX-RN for the first time under the "old" NCLEX code, 70755.Only 50.1 percent of those test-takers passed the exam.







95.     For example, many Facebook advertisements—like the ones above—feature almost exclusively Black and Hispanic women as models and highlight the program's "flexible schedule."[12]

---

[12] Ads not currently posted on HCI's Facebook page, facebook.com/HCICollege/, can be found in the Facebook advertising archive at https://www.facebook.com/ads/library/, by searching for "HCI College."

96.     Effectively, there are no entry criteria for HCI's RN Program. Defendants allow prospective students to take the entrance exam as many times as necessary until they achieve a satisfactory result, and Defendants do not require any prerequisites beyond those in the general education portion of the RN Program curriculum.

97.     HCI advertises its RN Program as having a length of five semesters—less than two years—including general education, non-nursing specific courses.

98.     HCI advertises its RN Program as having a cost of roughly $10,000 per semester.

99.     Thus, a reasonable person would conclude that the RN program would cost no more than $50,000.

Enrollment Paperwork

100.    On information and belief, HCI began enrolling students in the "new" RN Program by September 1, 2019, with 198 students enrolled by June 2020.

101.    As part of the enrollment process, each Plaintiff and Class Member entered into a contractual relationship with Defendants in the form of a standardized enrollment agreement, signed by the prospective student indicating his or her intent to begin the RN Program.

102.    While HCI's enrollment agreement has undergone minor changes over time, the vast majority of its provisions remain consistent.

103.    Each Enrollment Agreement signed by Plaintiffs and Class Members contains the following provision, noting that the "Enrollment Agreement reflects the entire agreement between HCI College and the Student."

V.    **ACKNOWLEDGEMENT**

This Enrollment Agreement contains the entire agreement between HCI College and the Student. The Student understands that there is financial aid available to those who qualify, is responsible for payments due prior to class starting per policy and any installment contract scheduled payments until paid in full. The Student also acknowledges that they have received a receipt of payment as well as been given a copy of this completed Enrollment Agreement as executed for the Student's records. The Student further acknowledges that a copy of the College's catalog has been provided and reviewed prior to signing this Enrollment Agreement located at www.HCI.edu.

104.   The "Program Description" on page 1 of each enrollment agreement signed by Plaintiffs and Class Members contains the following provision:

> Upon satisfactorily completion of the requirements for graduation and NCLEX preparation assessments (including VATI), the student is awarded an ASN Degree and must pass the National Council Licensure Exam (NCLEX-RN) to become a registered nurse.

105.   The "VATI" referred to above is the Virtual-ATI, an online 12-week NCLEX prep course.

106.   In each enrollment agreement signed by Plaintiffs and Class Members, HCI reserved the right to terminate a student's enrollment agreement and to make changes to the rules and policies outlined in the HCI College Catalogue as seen in the following provision:

> **II. GROUNDS FOR CANCELLATION, TERMINATION, or WITHDRAWAL**
> I agree to comply with all HCI College's the rules and policies and understand that the College shall have the right to terminate this Enrollment Agreement and my enrollment at any time for violation of rules and policies as outlined in the HCI College's Catalog, Addendum, and/or College's Handbooks. I understand that the College reserves the right to modify the rules and policies outlined in the Catalog with or without notification.

107.   Notably, HCI did not reserve the right to modify the terms of students' enrollment agreements.

108.   Each enrollment agreement signed by Plaintiffs and Class Members stated that, "the program is designed to provide educational and clinical experiences leading to employment in beginning positions as registered nurses in hospitals or comparable facilities."

109.   Each enrollment agreement signed by Plaintiffs and Class Members contained a section titled "Graduation Requirements," with two graduation requirements, the first of which stated:

> I understand that in order to graduate from the program and to receive a certificate of completion, diploma or degree I must successfully complete the required number of scheduled credit/clock hours as specified in the Catalog and on the Enrollment agreement.

23

110.    All of Plaintiffs' and Class Members' their enrollment agreements contained "graduation requirements," of which only one was an examination requirement: students would have to pass the ATI (Assessment Technologies Institute) Comprehensive Predictor exam with a stated minimum score, with one retake permitted.

111.    Each college catalog applicable to Plaintiffs and Class Members stated the following:

> A grade of (80%) or higher is required for all Nursing Core and (70%) or higher for General Education Courses. A 95% predictability score on the ATI Comprehensive predictor is required to pass course: NUR2943L. It is a 180-item test (three hours long) that offers assessment of the student's comprehension and mastery of nursing content and integration of NCLEX Client Need categories similar to the percentage of items on the NCLEX-RN. **Any student who receives anomaly warnings from ATI based on the ATI Predictor must retake an ATI Predictor on campus and achieve a minimum of 95%. Any student who receives anomaly warnings from ATI during enrollment in Virtual ATI (VATI) may be required to repeat additional remediation and exams online or on campus. as recommended by the Coach or Director of Nursing prior to release of the students name to the Florida Board of Nursing.** If student is deemed to be 100% complete by their ATI Coach, but the Coach is unable to award Greenlight based on anomaly warnings, the student will be required to repeat, retest, or remediate as determined by the Director of Nursing and or the ATI Coach."

112.    Under Florida law, a student handbook or college catalog creates contractual obligations on the part of the school.

113.    Page 45 of the 2020 college catalog states: "Students will normally follow the requirements in effect at the time of their admission. However, students and the Institution are bound by the agreement signed at the time of the student's enrollment unless the student signs a new agreement."

114.    Plaintiffs and Class Members signed one enrollment agreement.

<u>Financial Aid</u>

115.    Individuals enrolled in HCI's RN Program may be able to pay for a portion of the

program using federal student loans and grants.

116.    Defendants encouraged students to supplement federal aid with institutional loans, which are made through retail installment contracts and require students to make monthly payments made while attending school.

117.    HCI's retail installment contracts are preassigned to be serviced by Tuition Options, a third-party processor.

118.    Under Florida law, it is a misdemeanor of the first degree to engage in or transact the business of a retail seller engaging in retail installment transactions without a business license. § 520.32(1), Fla. Stat.

119.    Neither HCI nor Tuition Options is licensed to offer retail installment contracts in the state of Florida.

120.    On information and belief, since at least 2017, Defendants have been in a contractual business relationship with Tuition Options for the servicing of retail installment contracts entered into by HCI students.

121.    Tuition Options has lent money to Defendants, as "Florian Education Investors LLC DBA Health Career Institute LLC," and in 2017 recorded a security interest in, inter alia, "[a]ny contract, promissory note, instrument, document, and/or other agreement evidencing, or securing or guaranteeing repayment of, any loan made by [Defendants] to any student or former student of [HCI] which is funded and/or serviced by [Tuition Options]." State of Florida UCC Financing Statement, attached hereto as **Exhibit A**.

122.    On information and belief, nearly every student who enrolls in the RN Program enters into a retail installment contract with HCI, serviced by Tuition Options.

123. On information and belief, HCI steers students into retail installment contracts even when other, more favorable financing options exist.

124. On information and belief, nearly all of the students who enrolled in the RN Program between September 2019 and the present entered into a retail installment contract with HCI, serviced by Tuition Options.

125. The retail installment contracts require immediate payment while students are in school, do not offer income-sensitive repayment options, and have a risky acceleration clause that makes the entire balance due upon a single missed payment.

126. Evidencing the prevalence and predatory nature of the institutional loans is the following excerpt from HCI's official student newsletter, "HCI Times," which notes that students behind on their Tuition Options payments will not even be permitted to enter campus.[13]



Students,

I want to ensure that each student is equipped to graduate and prepared to enter into the work force.

To help ensure we are providing the best possible outcomes for all students, as of January 1st, 2020 students will not be allowed to enter HCI College if they are past due on their tuition options payment plan. This means that all students will need to be current on their payment plans starting January 1st, 2020.

Please feel free to contact me with any questions, comments, or concerns.

Regards,

Ryan Miller
Vice President of Finance                    Have Questions About Finacial Aid?

127. Additionally, HCI's policy is to not release students' education transcripts, official or otherwise, to students or the BON, for students with outstanding tuition balances.

---

[13] HCI Times Student Newsletter, September 2019, located at https://www.hci.edu/wp-content/uploads/2019/08/HCI_TIMES_SEPTEMBER.pdf (last accessed Nov. 21, 2022).

128.    The Consumer Financial Protection Bureau has found that restricting students'

access to classes when they are late on their loan payments and withholding academic transcripts

from students that owe the school a debt are "abusive" practices under the Consumer Financial

Protection Act.[14]

***Concealment, Omission, and Misrepresentation of Program Attributes***

129.    On information and belief, every new student who enrolled in HCI's "new" West

Palm Beach RN Program after September 2019, until at least the end of January 2021, received a

Form 609(a) disclosure.

130.    Plaintiffs enrolled between February of 2020 and January of 2021. They each were

entitled to be provided with disclosures as required by the CIE and BON.

131.    On January 22, 2019, Pearson Vue published a report indicating that 39 of 71, or

54.93 percent, of HCI West Palm Beach RN nursing program graduates taking the NCLEX-RN

for the first time in 2018, passed.

132.    On January 21, 2020, Pearson Vue published a report indicating that 57 of 138, or

41.30 percent, of HCI West Palm Beach RN nursing program graduates taking the NCLEX-RN

for the first time in 2019, passed.

133.    On January 20, 2021, Pearson Vue published a report indicating that 97 of 168, or

57.74 percent, of HCI West Palm Beach RN nursing program graduates taking the NCLEX-RN

for the first time in 2020, passed.

134.    On January 20, 2022, Pearson Vue published a report indicating that 56 of 111, or

---

[14] Press Release, CFPB, Consumer Financial Protection Bureau to Examine Colleges' In-House Lending Practices (Jan. 20, 2022), https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-to-examine-colleges-in-house-lending-practices/.

50.45 percent, of HCI West Palm Beach RN nursing program graduates taking the NCLEX-RN for the first time in 2021, passed.

135.    On information and belief, every student who was recruited on or after September 1, 2019, until at least the end of 2020 received a Form 609a disclosure that claimed zero graduates of the RN Program had taken the NCLEX-RN exam.

136.    Upon information and belief, the CIE Form 609a disclosures HCI provided to new students enrolling after September 1, 2019, did not disclose the number of HCI West Palm Beach RN nursing program graduates who took or passed the NCLEX-RN in the previous academic year.

137.    For example, the CIE Form 609a disclosures provided to students enrolling in HCI's "new" RN Nursing Program as of May 27, 2020, stated the following:

In 2018, the national passage rate for first time test takers for the NCLEX-RN is 85.11%.

In the same year,  ___0____ students from this institution took the NCLEX-RN for the first time and the institutional passage rate for first time test takers is no test takers.

Status with the Florida Board of Nursing:  _____X_____Not on probation

_____On probation

138.    Even when HCI's CIE Form 609a disclosures purported to reflect testing information from the previous academic year, HCI failed to include in the disclosed number of first-time test takers who tested under the "old" HCI RN Nursing Program NCLEX code (70755).

139.    This was misleading because the "new" program was substantively identical to the terminated program. The only difference in the programs was the NCLEX code.

140.    Defendants did not disclose that the previous, substantively identical RN program had a 55 percent NCLEX passage rate in 2018—30 points lower than the national average.

141.    Defendants did not disclose that the previous, substantively identical RN program was on probation in 2018 and would have still been on probation in 2020 had it not been terminated.

142.    Defendants did not disclose that the substantively identical program had been terminated for lack of programmatic accreditation in August 2019 and was barred from seeking reapproval and enrolling any students for a period of at least three years, until August 2022.

143.    Additionally, Defendants implicitly and explicitly represented to Plaintiffs and members of the Proposed Class that HCI's RN Program fully complied with Florida's faculty and curricular requirements.

144.     In fact, HCI's RN Program suffered from extremely high turnover. Instructors frequently quit and the program went through at least eleven Directors of Nursing ("DONs") from 2015 to 2021.

145.    Many instructors were part-time or adjunct personnel who were not supported by the school and were retaliated against for raising concerns about student welfare and academic performance and standards.

146.    Upon information and belief, far fewer than 50 percent of the program's faculty members were registered nurses who have a master's or higher degree in nursing or a bachelor's degree in nursing and a master's or higher degree in a field related to nursing.

147.    Additionally, Defendants do not, in reality, provide meaningful clinical instruction. Students in the RN Program did not spend at least 50 percent of their class time in clinical training, and significantly more than 50 percent of the clinical training they did have was—at best—clinical simulation, in violation of Florida Statute § 464.019(1).

148.    HCI's clinical relationships are extremely limited because of the school's poor reputation and standards.

149.    HCI's clinical relationship with a Cleveland Clinic medical center in Weston, Florida, was terminated by Cleveland Clinic in the summer of 2021.

150. Cleveland Clinic terminated the relationship because of HCI's lack of programmatic accreditation.

151. Once this clinical site was no longer available, students were directed to study hall settings to complete their required clinical hours.

152. Clinical instructors routinely cancelled these sessions so that they did not have to drive to campus and sent students instructions to complete their clinical timesheets from home.

153. As a result, students received very little hands-on instruction; one of the only opportunities they had to practice real nursing skills was afforded when an instructor offered her own arm to students to practice drawing blood.

154. Regarding its lack of programmatic accreditation, HCI officials routinely lied to its student body about this material detail.

155. In an email to the nursing student body, dated August 20, 2021, the campus president, Mr. D. Shelpman, addressed "some rumors going around regarding HCI's Nursing Program...HCI College's nursing program is approved by the Florida Board of Nursing...Upon graduation, the student is awarded an Associate Degree in Nursing (ADN) and is eligible to take the National Council Licensure Exam (NCLEX-RN) to become a registered nurse (RN) and subsequently seek employment in the field. Further HCI College is licensed by the Commission of Independent Education (CIE) - Florida Department of Education (FLDOE), and it is institutionally accredited by the Accrediting Commission of Career Schools and Colleges (ACCSC)."

156. Nowhere in this email was there a disclosure about the RN Program's probationary history or a truthful explanation of its accreditation status.

157.     Further, the RN Program has still not achieved programmatic accreditation, and its period of eligibility to seek ACEN accreditation expired on September 23, 2022.

158.     Despite this fact, HCI's website stated that it was eligible to seek ACEN accreditation until at least October 19, 2022, when it was contacted by the accreditor and directed to remove the false information.

### *Defendants' Imposition of Unfair and Arbitrary Requirements on Nursing Students*

159.     Beginning sometime before May of 2021, Defendants adopted a new grading policy as a way of weeding out students and forcing them to repeat semesters they had already taken. This increased the amount of money and time it took for the Proposed Class to complete their program, and also allowed Defendants to manipulate their NCLEX passage rates.

160.     Under the new policy, students were required to achieve both an 80 percent overall score and at least 50 percent in every subcategory of end-of-semester "predictor" exams in order to advance through the program.

161.     The new policy was not prompted by the requirements of HCI's actual or potential accreditor, the BON, the CIE, or any other regulatory body.

162.     The exams Defendants used generally have at least 14 different concept areas. Some of these concept areas are represented by only one or two questions on a single exam. Therefore, a student who achieved 95 percent on the overall exam could still fail and be required to retake the entire semester because of a single incorrect answer.

163.     These predictor exams are usually a third-party test known as the ATI Comprehensive Predictor, as referenced in the Enrollment Agreement. The intended purpose of this test is to serve as a predictor of the student's success on the NCLEX and a guide on what to

focus on before the NCLEX, not as high-stakes determination of a student's ability, or as a bar to graduation.

164.    Indeed, ATI's website advises that "ATI tests are not designed for high stakes purposes such as a graduation requirement, and we do not recommend that they be used in this manner."[15]

165.    Students had to pass these predictor exams at the end of Nursing I, Nursing II, and Nursing III. In the final Capstone course, students had to pass at least one predictor to continue advancing through the semester before passing a final "exit exam."

166.    The pain this unfair rule brought to students was palpable in an email from a student to administrators, dated August 9, 2021: "Please reconsider this 50% rule, I was one of the students who got a level 3 but did not pass due to the 50% rule. It was one question in one category that threw my whole test. I do not believe that is fair for any of us who have worked so hard to get to this point to be failed or have to repeat because of the 50% rule."

167.    This new testing policy was inconsistent with Defendants' enrollment agreements and college catalogs, which expressly state that all written and practical examinations, and each core nursing course, must be passed with a minimum score of 80 percent.

168.    Some students who failed to pass a course under the new high-stakes testing requirements were encouraged to repeat the semester. Others were expelled. Those who were expelled were told that they were being removed from the student body on the basis of "academic integrity."

169.    Upon information and belief, Defendants' decision to expel certain students was

---

[15] ATI, "General Ordering Information," https://www.atitesting.com/home/ordering-information (last accessed Oct. 21, 2022).

based on the conclusion that, in certain cases, it was more cost-effective to cut a struggling student—after pillaging their Title IV funding and saddling them with institutional loans—and focus on enrolling replacements than it was to work to prepare that student to eventually pass the NCLEX.

170.    Students who were able to advance to their final Capstone course despite the new testing requirements were met with additional, unexpected hurdles.

171.    Before 2021, the final semester of HCI's RN Program was Nursing III/Capstone, a two-part semester designed to run concurrently. Nursing III consisted of coursework done in-person, including a "leadership" course, and ended with a predictor exam. The Capstone portion, which consisted of an online NCLEX prep course, was intended to be done at home.

172.    At the end of 2020, Defendants first began pressuring students to split this final semester of Nursing III/Capstone into two separate semesters. Effective December 22, 2020, this change was made mandatory, and the full program went from five to six semesters.

173.    The Capstone course consists almost exclusively of the Virtual-ATI ("VATI"), a 12-week, online course published and administered by ATI.

174.    The VATI course, designed and administered by ATI, is geared toward a comprehensive predictor exam also designed and administered by ATI.

175.    The VATI is available for purchase on ATI's website for $525. Defendants charge at least $4,300 for the Capstone course.

176.    Defendants' college catalogs and enrollment agreements include exit exam and graduation requirements. Between 2019 and 2022, none of these documents disclosed requirements such as the 50 percent rule, and all referenced the ATI comprehensive predictor.

177.     In the summer semester of 2021, despite the specifications in its enrollment agreements and college catalogs, Defendants abandoned the ATI Comprehensive Predictor as the final graduation requirement. Instead, regardless of a student's score on the ATI predicator exam, Defendants would not allow a student to pass the Capstone course and graduate unless they took an exam designed by a different third party and achieved a benchmark set by Defendants.

178.     One such third-party test is the Health Education Systems, Inc. ("HESI") exam. An institution, not HESI, sets the benchmark for passing the HESI. Rather than producing a percentage likelihood of a test taker passing the NCLEX-RN exam, the HESI establishes ranges of scores from 0 to 1000 and describes the likelihood of passing the NCLEX-RN for that range in qualitative terms (e.g., "outstanding probability," "excellent probability," "average probability").

179.     Upon information and belief, Defendants inappropriately pre-selected the questions that would appear on the HESI predictor exam administered to Capstone students in the winter semester of 2021.

180.     Defendants also refused to tell students in Capstone which third-party exam they would administer. School officials simply told students to prepare for several different platforms (including Saunders, HESI, ATI, and Kaplan), despite the major differences between these testing platforms.

181.     In the fall of 2021, upon information and belief, only five students out of a class of over 100 passed the HESI exam and were permitted to graduate.

182.     Students, like Plaintiffs Roberson, Freeman, and King, who achieved a passing score on the ATI Comprehensive Predictor exam, the only exam-related graduation requirement for the RN Program listed in HCI's enrollment agreements and college catalogs, were not allowed to graduate because they did not achieve the score HCI set as a passing score for the HESI exam.

183.    Students were not given an opportunity to retake the exam, in violation of their enrollment agreements and HCIs' college catalog.

184.    A student is only eligible to sit for the NCLEX-RN exam after HCI sends their name and certifies their graduation and eligibility to the BON.

185.    HCI's high-stakes testing rules were clearly designed to squeeze more money out of students who elected to retake the semester they supposedly failed and keep them from graduating and taking the NCLEX-RN.

186.    HCI unveiled these high-stakes testing requirements in surreptitious ways and never disclosed such unreasonably high bars to passing during the initial enrollment period.

187.    Defendants made arbitrary and capricious changes to the curriculum with these tests and grading requirements that students were not aware of and did not agree to when they enrolled.

188.    These changes were significant, disruptive, and served no educational or pedagogical purpose.

189.    These changes were not prompted by the requirements of any regulatory bodies.

190.    The major changes to curriculum and passing requirements were not communicated to students in a coherent or timely manner.

191.    Students' attempts to communicate with HCI administrators were often futile, as complaints are frequently left unanswered by directors.

192.    In violation of Florida law, there is no appeals process published and followed by HCI for students who cannot pass HCI's unreasonable testing requirements. Appeals are uniformly rejected with boilerplate language and without meaningful explanation from HCI.

193.    When faced with legitimate complaints from cheated students, Defendants have responded with paltry consolations, usually in the form of an offer to forward the student's name

to the BON as a qualified candidate to sit for the NCLEX-PN, the licensure examination for licensed practical nurses.

194.     An LPN credential is not comparable to that of an RN. An RN credential is a more sought-after professional designation that is harder and more expensive to achieve and results in higher pay and more responsibilities, including direct patient care.

195.     Students enrolled at HCI with the understanding that they were paying for and pursuing a career as an RN, not an LPN.

196.     Many students, such as Plaintiff Brittany Roberson, were working as LPNs even before their enrollment at HCI.

197.     Out of the scores of people who enrolled at HCI's RN Program in 2020/2021, only a tiny fraction passed Defendants' enhanced testing requirements and were permitted to move on to take their NCLEX-RN.

198.     According to the National Council of State Boards of Nursing, only eight students who graduated from the RN Program in December 2021 took the NCLEX-RN in Q1 of 2022.

199.     HCI is not so much a school as it is an expensive, capricious, and unyielding gatekeeper to the NCLEX-RN. HCI develops and implements unfair testing requirements designed to cut students in order to extract more money from them through retaken semesters and to maintain artificially high NCLEX scores that it can report to the BON.

**FACTUAL ALLEGATIONS CONCERNING NAMED PLAINTIFFS**

*Brittany Roberson*

200.     Brittany Roberson is a Black 36-year-old single mother who lives in Cincinnati, Ohio.

201.     Before attending HCI, Ms. Roberson attended college and worked as an LPN for 12 years.

202.     Mrs. Roberson currently works in Cincinnati, Ohio, at a drug rehabilitation facility providing direct patient care. She also holds a remote position for Haven Health, a Florida-based drug rehabilitation program.

203.     Ms. Roberson's admissions counselor was Lisa Sgherza.

204.     On May 27, 2020, Ms. Roberson signed an enrollment agreement with HCI for enrollment in the RN Program with NCLEX code 704146. Roberson Enrollment Agreement, May 27, 2020, attached hereto as **Exhibit B**.

205.     Ms. Roberson never signed another enrollment agreement.

206.     Mr. Roberson's enrollment agreement contained the following "Graduation Requirements:"

> I understand that in order to graduate from the program and to receive a certificate of completion, diploma or degree I must successfully complete the required number of scheduled credit/clock hours as specified in the Catalog and on the Enrollment Agreement, pass **all** written and practical examinations with a minimum score of 80%, pass the ATI Predictor with a minimum score of 95% with only two attempts permitted (second attempt is at the sole cost of the student), complete all required clinical hours, achieve "Green Light" status with Virtual ATI (VATI), and satisfy all financial obligations to the College.

207.     Ms. Roberson's enrollment agreement also stated that, "Upon satisfactorily completion [sic] of the requirements for graduation and NCLEX preparation assessments (including VATI), the student is awarded an ASN Degree and must pass the National Council Licensure Exam (NCLEX-RN) to become a registered nurse."

208.     Ms. Roberson's enrollment agreement stated that Ms. Roberson's "Anticipated End Date" was 12/18/21.

209.    When she enrolled, Ms. Roberson was provided "CIE Form 609a," which stated that HCI's RN Program had "0 students from this institution" take the NCLEX-RN for the first time in 2018. This form also explicitly stated that the school's status with the Florida BON was "Not on probation."

210.    At her time of enrollment, no disclosure was made to Ms. Roberson about the NCLEX-RN exam passage rate for graduates of the RN Program that operated under NCLEX code 70755, the fact that the "old" program was placed on probation for poor passage rates, or the fact that the "old" program had been terminated for failure to obtain programmatic accreditation.

211.    Defendants offered Ms. Roberson a retail installment contract agreement, which she signed on May 28, 2020. The retail installment contract specified Tuition Options as an assignee and servicer of the agreement.

212.    Tuition Options was the only option presented to Ms. Roberson for financing her education expenses not covered by her federal student aid.

213.    Ms. Roberson started classes in HCI's RN Program on July 6, 2020.

214.    Ms. Roberson placed out of Nursing I using credits earned pursing her LPN, and successfully completed several general education courses. In the summer of 2021 she successfully passed Nursing II, despite the 50 percent rule.

215.    Defendants provided Ms. Roberson with a different clinical setting experience than what they promised. Clinicals were on weekends for 12 hours of classroom time, which was essentially a mandatory study hall. Defendants never provided her with an official clinical placement at a care facility.

216.    Ms. Roberson's nursing program curriculum did not consist of at least 50 percent of clinical training.

217.    More than 50 percent of Ms. Roberson's clinical education featured simulated, not actual, clinical experience.

218.    In her final semester, Ms. Roberson took Nursing III and Capstone concurrently.

219.    The content of the Capstone class that cost Ms. Roberson more than $4,000 consisted of little more than access to the VATI, an online prep course that Ms. Roberson could have independently purchased for approximately $500.

220.    Ms. Roberson successfully completed the required number of scheduled credit/clock hours as specified in the course catalog and enrollment agreement.

221.    Ms. Roberson earned a grade of 80 percent or higher in all Nursing Core courses and 70 percent or higher in all General Education Courses.

222.    Ms. Roberson passed all written and practicable examinations with a minimum score of 80 percent.

223.    Ms. Roberson achieved the score required by her enrollment agreement on the ATI Predictor.

224.    Ms. Roberson achieved "green light" status with VATI.

225.    Despite having met the above graduation requirements, Ms. Roberson was not permitted to graduate.

226.    On December 16, 2021, Defendants presented Ms. Roberson with an exit exam they claimed she had to pass to graduate.

227.    This exam was unexpectedly the HESI exam.

228.    Ms. Roberson was not told in advance that her exit exam would be the HESI exam.

229.    Ms. Roberson was not familiar with the HESI format.

230.   Defendants did not tell Ms. Roberson, or her cohort, what score she needed to attain in order to pass the HESI.

231.   Ms. Roberson received a score of 14.41, defined by HESI as "minimally acceptable."

232.   Defendants determined that this score was insufficient and told Ms. Roberson she would need to repeat the entire semester at additional cost.

233.   Defendants did not offer Ms. Roberson a second opportunity to take the HESI exam.

234.   Ms. Roberson filed an appeal with Defendants.

235.   On December 20, 2021, Defendants informed her that her appeal was being denied.

236.   Ms. Roberson was not permitted to graduate despite meeting the graduation requirements set forth in her enrollment agreement and college catalog.

237.   Ms. Roberson could not afford to retake classes and therefore she withdrew from HCI.

238.   Attending HCI's RN Program left Ms. Roberson with about $20,000 in loans through Tuition Options as well as at least $20,000 more in federal student loans but no registered nursing license.

239.   HCI is currently refusing to provide Ms. Roberson with a copy of her transcript because of her outstanding Tuition Options balance.

240.   Because of the financial ruin that HCI brought to her life, Ms. Roberson moved back to Ohio to live with her brother to try and improve her financial situation. In addition to her two current jobs as an LPN, she also works part-time at a Lowe's hardware store.

*Rebecca Freeman*

241.    Rebecca Freeman is a 37-year-old woman who lives in Port St. Lucie, Florida.

242.    Before attending HCI, Ms. Freeman worked in a variety of professions and earned an associate degree in medical assisting from Indian River State College ("IRSC").

243.    Ms. Freeman is currently enrolled in IRSC's nursing program and works part-time at an assisted living facility.

244.    Ms. Freeman's HCI recruiter was Krystal Zimbaldi.

245.    Ms. Freeman considered several nursing programs, but ultimately chose HCI because her recruiter said that by transferring her existing college credits, she would be able to complete the HCI RN Program and become an RN in just one year and could do so without attending school in-person every day. By comparison, IRSC's nursing program would take a full two years.

246.    HCI's advertising presented HCI's RN Program as accommodating to working people, which appealed to Ms. Freeman. They leaned heavily on claims such as "one day a week on campus and clinicals in your area" and "flexible schedules" along with "individualized support" (i.e. tutoring services) and "plenty of scholarships."

247.    Defendants' recruiter pursued Ms. Freeman relentlessly, constantly calling her because she was viewed as an ideal student, given her previous academic success. Ms. Zimbaldi told Ms. Freeman that she needed to quickly commit and "reserve your seat" because classes were filling up fast for the January start date.

248.    During recruitment, Defendants told Ms. Freeman that students were allowed to choose their preferred clinical rotation days and location.

41

249.    Before Ms. Freeman enrolled, Ms. Zimbaldi claimed that the RN Program was "in the process" of receiving ACEN accreditation.

250.    When Ms. Freeman asked about graduation and NCLEX pass rates, Ms. Zimbaldi that told her that HCI's NCLEX pass rate was "well over 80%."

251.    On September 16, 2020, Ms. Freeman signed an enrollment agreement with HCI for enrollment in the RN Program with NCLEX code 704146. Freeman Enrollment Agreement, September 16, 2020, attached hereto as **Exhibit C.**

252.    Ms. Freeman never signed another enrollment agreement.

253.    Page 6 of Ms. Freeman's enrollment agreement contained the following "Graduation Requirements:"

> I understand that in order to graduate from the program and to receive a certificate of completion, diploma or degree I must successfully complete the required number of scheduled credit/clock hours as specified in the Catalog and on the Enrollment agreement. In the final semester, students are required to achieve a minimum raw score of 72.7 on the Predicted Probability of Passing NCLEX-RN ATI Proctored Exam – the Comprehensive Predictor Test (CPT). Students who score below a 72.7 on the CPT will be permitted one re-take upon completing the two-week remediation program. Failure to achieve a raw score of 72.7 for the second time will result in repeating the Nursing Capstone (NUR2943L[)]. If a student fails to meet the required score at the end of the second attempt of NUR2943L, the student will be dismissed.

254.    Ms. Freeman's enrollment agreement also stated that, "Upon satisfactorily completion [sic] of the requirements for graduation and NCLEX preparation assessments (including VATI), the student is awarded an ASN Degree and must pass the National Council Licensure Exam (NCLEX-RN) to become a registered nurse."

255.    Ms. Freeman's enrollment agreement stated that Ms. Freeman's "Anticipated End Date" was 12/18/21.

256.    At her time of her enrollment, no disclosure was made to Ms. Freeman about the NCLEX-RN exam passage rate for graduates of the RN Program that operated under NCLEX code 70755, the fact that the "old" program was placed on probation for poor passage rates, or the fact that the "old" program had been terminated for failure to obtain programmatic accreditation.

257.    The same day she signed her enrollment agreement, Ms. Freeman was rushed into the financial aid office where she was told by a financial aid officer, Ms. B. Simpson, that she was eligible for $18,000 in federal loans.

258.    Defendants also offered Ms. Freeman a retail installment contract agreement for the remaining $30,000 in tuition costs and fees, which she signed on September 16, 2020. The retail installment contract specified Tuition Options as an assignee and servicer of the agreement.

259.    Tuition Options was the only option presented to Ms. Freeman for financing her education expenses not covered by federal student aid.

260.    Since she believed she would only be in school for a year, Ms. Freeman decided to pay $1,045 a month toward this $30,000 institutional loan.

261.    Ms. Freeman was never given a detailed cost breakdown. She only ever saw lump sum costs associated with each class, as laid out in her enrollment agreement.

262.    She was pressured to sign all documents during her campus tour because she was told that "seating is very limited."

263.    Ms. Freeman began classes at HCI in January 2021.

264.    During Nursing I, Ms. Freeman was placed at a retirement facility for clinicals. She was placed at the same facility for Nursing III, when she was supposed to be in an ER and ICU clinical placement.

265.     Ms. Freeman's clinical experience in Nursing II was cut short when Cleveland Clinic terminated its association with HCI in August 2021.

266.     She received an email from Cleveland Clinic on August 9, 2021, explaining that "since you are not employed by Cleveland Clinic Martin Health, we are unable to accept you for a preceptorship assignment. We can only honor those who are . . . currently employed by Cleveland Clinic Martin Health." HCI's Director of Nursing was cc-ed on this email.

267.     Ms. Freeman's only other on-site clinical experience consisted of a few short weeks at South County Mental Health, which was also cut short. Her maternity clinicals, for example, were entirely a study hall setting.

268.     Ms. Freeman's limited clinical experience was more extensive than what most of her classmates received; however, her curriculum still did not consist of at least 50 percent of clinical training.

269.     Additionally, more than 50 percent of Ms. Freeman's clinical education featured simulated, not actual, clinical experience.

270.     When Ms. Freeman was in Nursing II, Defendants implemented the 50 percent rule. This extra condition had its intended effect; almost all of the students in Ms. Freeman's cohort failed and were forced to repeat the semester.

271.     Despite the 50 percent rule, Ms. Freeman successfully passed Nursing II.

272.     In her final semester, Ms. Freeman took Nursing III and Capstone concurrently.

273.     The content of the Capstone class that cost Ms. Freeman more than $4,000 consisted of little more than access to the VATI, an online prep course that Ms. Freeman could have independently purchased for approximately $500.

274.     Ms. Freeman successfully completed the required number of scheduled credit/clock hours as specified in the course catalog and enrollment agreement.

275.     Ms. Freeman earned a grade of 80 percent or higher in all Nursing Core courses and 70 percent or higher in all General Education Courses.

276.     Ms. Freeman achieved the score required by her enrollment agreement on the ATI Predictor.

277.     Ms. Freeman achieved "green light" status with VATI.

278.     Despite having met the above graduation requirements, Ms. Freeman was not permitted to graduate.

279.     On December 14, 2021, Defendants presented Ms. Freeman with an exit exam they claimed she had to pass to graduate.

280.     This exam was unexpectedly the HESI exam.

281.     Ms. Freeman was not told in advance that her exit exam would be the HESI exam.

282.     Ms. Freeman was not familiar with the HESI format.

283.     Defendants did not tell Ms. Freeman, or her cohort, what score she needed to obtain in order to pass the HESI.

284.     Ms. Freeman received a score of 15.90, defined by HESI as "minimally acceptable."

285.     The same day Ms. Freeman took the exam, Defendants determined that her score was insufficient and told Ms. Freeman she failed Capstone.

286.     Ms. Freeman was not given an opportunity to retake the HESI without repeating the final semester at the usual cost.

287.     Ms. Freeman submitted an appeal on December 17, 2021.

45

288.    Defendants denied her appeal on December 20, 2021, with a four-sentence letter.

289.    Defendants refused to submit Ms. Freeman's name to the BON as eligible to sit for the NCLEX-RN. She was simply told that she was "eligible to reenroll in the Capstone Course for the Spring 2022 semester."

290.    Ms. Freeman was not permitted to graduate despite meeting the graduation requirements set forth in her enrollment agreement and college catalog.

291.    After an unreasonable delay and sustained pressure from Ms. Freeman, Defendants finally agreed to release her transcript and permit her to sit for the NCLEX-PN, thereby allowing her to become an LPN.[16]

292.    After wasting nearly one year of her life, and tens of thousands of dollars, at HCI, Ms. Freeman is now enrolled in another nursing program. Adding insult to injury, she had to start from scratch because her credits from HCI were not transferable.

293.    Attending HCI's RN Program cost Ms. Freeman at least $12,000 in out-of-pocket expenses, paid through a retail installment contract with Tuition Options. It has also left her with $18,000 in outstanding federal student loan debt.

*Bianca Viñas*

294.    Bianca Viñas is a 30-year-old woman from West Palm Beach, Florida.

295.    Ms. Viñas is currently attending nursing school full-time.

296.    In January 2021, Ms. Viñas signed an enrollment agreement with HCI for enrollment in the RN Program with NCLEX code 704146.

---

[16] This consolation is in no way equivalent to the RN credential Ms. Freeman attended school and paid tens of thousands of dollars to receive. As Defendants readily admit on their website, "For the most part, LPN programs will not require college courses to be taken prior to admittance, but instead a high school diploma or a GED." https://www.hci.edu/hci-news/459-licensed-practical-nurse.

297.    Ms. Viñas never signed another enrollment agreement.

298.    At the time of her enrollment, no disclosures were made to Ms. Viñas about the NCLEX-RN passage rates for graduates of the RN Program that operated under NCLEX code 70755, the fact that the "old" program was placed on probation for poor passage rates, or the fact that the "old" program had been terminated for failure to obtain programmatic accreditation.

299.    When meeting with Defendants' recruiter, Ms. Viñas immediately stressed her concern over her financial situation and whether she could reasonably afford the HCI's RN Program. After much coaxing, her recruiter agreed that if Ms. Viñas signed her enrollment paperwork, she could meet with the dean to discuss financial assistance—but only after she signed.

300.    Defendants assured Ms. Viñas that financial assistance, including scholarship money, would be made available and that she would not be overly burdened by out-of-pocket expenses, something that she had repeatedly told her recruiter would be problematic for her. After enrolling, she learned that Defendants had lied and no scholarship money would be made available to her.

301.    Defendants offered Ms. Viñas a retail installment contract agreement, which she signed in early 2021. The retail installment contract specified Tuition Options as an assignee and servicer of the loan.

302.    Tuition Options was the only option presented to Ms. Viñas for financing her education expenses not covered by federal student aid.

303.    Ms. Viñas's monthly Tuition Options payments were over $800, far above the amount she was told to expect or that she could reasonably afford. She ended up paying around $8,000 out-of-pocket during her first semester.

47

304.    Ms. Viñas's only hands-on clinical experience consisted of a placement with a psychiatric facility, Ambrosia Treatment Center, for just one day a week for five weeks of the semester.

305.    The rest of her "clinical" experiences consisted of mandatory study hall, with occasional simulated work with mannequins and training videos.

306.    Ms. Viñas's nursing program curriculum did not consist of at least 50 percent of clinical training.

307.    More than 50 percent of Ms. Viñas's clinical education featured simulated, not actual, clinical experience.

308.    Ms. Viñas progressed in the HCI RN Program until the end of Nursing II, during which she took two ATI predictors in December of 2021.

309.    Ms. Viñas exceeded the benchmark for passage of the semester and exams overall; however, she achieved less than 50 percent in just one subject area of the second and final ATI predictor test and was therefore told she did not pass.

310.    Defendants insisted that, under the 50 percent rule, Ms. Viñas could not continue on to Nursing III, and that she was required to repeat Nursing II.

311.    Ms. Viñas was discouraged to learn that very few institutions would credit any of her coursework if she were to transfer to a different program.

312.    Administrators told her that it was entirely her fault that she failed and tried to prove it by subjecting her to an on-the-spot oral examination that went on until they falsely claimed that she had answered a question incorrectly, using that as proof that she needed to retake the entire semester.

313.    Not able to afford yet another semester of tuition, and with no reason to believe that her outcome would be different, Ms. Viñas left HCI at the end of 2021 and did not return.

314.    Ms. Viñas has paid over $8,000 to Defendants through Tuition Options already, but still owes more than $10,000 to Defendants and another $20,000 in federal student loans.

315.    Currently, Ms. Viñas is attempting to start her nursing career from scratch. She is attending a different nursing school as a full-time student.

*Tiffany King*

316.    Tiffany King is a 35-year-old Black single mother.

317.    Before attending HCI, Ms. King was a full-time case worker for the West Palm Beach Housing Authority, working six days a week and she had earned all her nursing prerequisites at another school.

318.    In February 2020, Ms. King signed an enrollment agreement with HCI for enrollment in the RN Program with NCLEX code 704146.

319.    Ms. King never signed another enrollment agreement.

320.    At the time of her enrollment no disclosures were made to Ms. King about the exam passage rates for graduates of the RN Program that operated under NCLEX code 70755, the fact that the "old" program was on placed probation for poor passage rates, or the fact that the "old" program had been terminated for failure to obtain programmatic accreditation.

321.    During her enrollment, HCI presented Ms. King with a retail installment contract agreement, which she signed. The retail installment contract specified Tuition Options as an assignee and servicer of the agreement.

322.    The retail installment contract was the only option presented to Ms. King to cover the portion of her education expenses not covered by federal student aid.

323.     Ms. King began classes at HCI the first week of May 2020.

324.     Ms. King and her cohort were visited during classroom instruction by one of the directors of nursing, Mr. K. DeVevo, who falsely stated that HCI had a 100 percent NCLEX passing rate.

325.     Ms. King's clinical experience for Nursing II consisted entirely of limited practice on medical dummies.

326.     Ms. King's classroom experience included poor instruction and textbooks with conflicting information. Hands-on experience was very limited, with only a single training session for intramuscular injections and one other for intravenous injections. Training supplies, such as mannequins, catheters, and colostomy bags, were either unavailable or unusable.

327.     Ms. King's nursing program curriculum did not consist of at least 50% of clinical training.

328.     Of the minimal clinical education Ms. King did have, more than 50% featured simulated, not actual, clinical experience.

329.     Ms. King was able to pass all predictor exams in both Nursing I and Nursing II.

330.     Defendants pressured Ms. King to split up her final semester (Nursing III/Capstone) into two semesters. She agreed after being told that she was far more likely to pass if she did.

331.     Ms. King successfully got through Nursing III, passing the predictor exam at the end of the semester.

332.     After completing Nursing III, Ms. King began Capstone, during which students had to pass one of two initial predictor exams before taking the VATI Comprehensive Assessment. After passing the VATI, students were subjected to one final exit exam.

333.    HCI did not tell Capstone students what exam they were taking or should prepare for.

334.    During her first attempt at Capstone, Ms. King failed her first predictor (a Kaplan exam) but passed her second predictor (an ATI exam). This gave her the "green light" to take the VATI Comprehensive Assessment, which she also passed.

335.    Ms. King took her exit exam, a Kaplan adaptive exam. She was never given her score for this test. She was simply told by Professor A. Dennis that she had failed and would have to retake the semester.

336.    Ms. King appealed this decision but Defendants never responded to her appeal, even though it was addressed to several instructors and the Dean of HCI's West Palm Beach campus.

337.    When she presented herself at campus and demanded a response from someone in the school's administration, Ms. King was told by Ms. C. Leandre that her appeal had been denied but that she should try again. Recognizing how close she had come to graduating, Ms. King decided to use the last bit of financial aid available to her to make one more attempt at passing Capstone. She re-enrolled at great personal and financial expense.

338.    During her second attempt at Capstone, Ms. King had her best semester. She passed her first predictor (an ATI exam), her second predictor (a Kaplan), and her VATI Comprehensive Assessment.

339.    The only exam she was told she failed was, again, her exit exam, which was unexpectedly a HESI exam, a format with which Ms. King and her classmates were unfamiliar.

340.    Ms. King was not offered an opportunity to retake the final exam despite the fact that her enrollment agreement provided for such an opportunity.

341.     Once again, she was never given a specific breakdown of her exit exam score or what a passing grade would have been. She was simply told by email that she had not passed.

342.     Ms. King did not appeal again, understanding the appeals process to be futile. She declined to reenroll because the cost was prohibitive and would have required taking on significant institutional loans through Tuition Options. She was, therefore, effectively forced to drop out.

343.     Ms. King was not permitted to graduate despite meeting the graduation requirements set forth in her enrollment agreement and college catalog.

344.     Specifically, Ms. King successfully completed the required number of scheduled credit/clock hours as specified in the college catalog and enrollment agreement, she met the required benchmark for the ATI predicator, and she passed all written and practical examinations with a minimum score of 80 percent.

345.     When she complained to the Director of Nursing, she was merely told that the school would pass her name on to the BON to allow her to sit for the NCLEX-PN, but not for the NCLEX-RN.

346.     Ms. King passed the NCLEX-PN and began working as an LPN at a Boynton Beach rehab center, earning less than she would be had Defendants fulfilled their promises and allowed her to sit for the NCLEX-RN.

347.     Ms. King paid Defendants tens of thousands of dollars, through both Tuition Options loans and federal student loans, to become an RN and never achieved that goal.

## CLASS ACTION ALLEGATIONS

### A.  Class Definition

348.     Named Plaintiffs seek an order certifying a Class consisting of "all students who enrolled at HCI West Palm Beach in the ADN program operating under NCLEX code 704146"; a

subclass (the "Unjust Enrichment Subclass") consisting of "all students who enrolled in the Capstone course at HCI West Palm Beach in the ADN program operating under NCLEX code 704146"; and a subclass (the "Targeting Subclass") consisting of "all Black students who enrolled at HCI West Palm Beach in the ADN program operating under NCLEX code 704146".

349.     Plaintiffs reserve the right to modify or amend the definition of the Proposed Class before the Court determines whether certification is appropriate.

**B.  Numerosity**

350.     The Proposed Class is so numerous that joinder of all members would be impracticable. The individual Class Members are ascertainable, as the names and addresses of all Class Members can be identified in the records maintained by Defendants. The precise number of Class Members can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint: in its 2020 annual report, HCI stated that 198 students were enrolled in the program operating under NCLEX code 704146.

**C.  Commonality and Predominance**

351.     The Class Members share common questions of law and fact. Such questions include, but are not limited to, the following:

a.  Whether representations made by Defendants describing the program operating under NCLEX code 704146 as a new program constituted an unfair or deceptive trade practice under FDUTPA;

b.  Whether Defendants committed unfair or deceptive trade practice under FDUTPA, and/or committed a breach of contract when they failed to provide Class Members instruction by qualified faculty and/or practical clinical experience as required under Florida law;

    c.   Whether changes to testing and grading policies made by Defendants constituted unfair or deceptive trade practice under FDUTPA and/or a breach of contract;

    d.   Whether Defendants committed a per se violation of FDUTPA when they offered retail installment contracts without the required license;

    e.   Whether Defendants were unjustly enriched by charging over $4,000 for the Capstone course that consisted of little more than the VATI test preparation program;

    f.   Whether Defendants engaged in racial targeting;

    g.   Whether Defendants are "Creditors" within the meaning of ECOA, 15 U.S.C. § 1691a(e); and

    h.   Whether, in the extension of credit for enrollment at WPB-ADN and/or for the provision of educational services by WPB-ADN, Defendants' acts, policies, and practices intentionally discriminate against Black people.

352.    These common issues will drive the outcome of every one of each Class Members' claims, will be decided under identical legal standards, and can be resolved using common evidence. Common issues therefore predominate.

**D.  <u>Typicality</u>**

353.    Plaintiffs are members of the Class they seek to represent.

354.    Plaintiffs Roberson, Freeman, and King are members of the Unjust Enrichment Subclass.

355.    Plaintiffs Roberson and King, Black women, are members of the Targeting Subclass.

356. Defendants provided each and every individual who enrolled in HCI's WPB-ADN program on or after September 1, 2019, with false and misleading disclosures concerning the standing of the program vis-à-vis the BON, its ability to gain accreditation, and the exam passage rates of the program's graduates.

357. During the entirety of the Class period, Defendants' college catalog and enrollment agreements indicated that passage of a comprehensive ATI exam evidenced sufficient testing performance to qualify for graduation from the RN Program.

358. At no time during the Class period did Defendants' nursing college catalog or enrollment agreements disclose that in order to progress through the RN Program, a student was required to achieve a 50 percent on each segment of a predictor exam.

359. At no time during the Class period did Defendants possess the required license to offer retail installment contracts in the State of Florida.

360. During the entire Class period, Defendants used marketing, advertising, and recruiting techniques to target their nursing program to Black individuals on the basis of their race.

**E. Superiority**

361. A class action is superior to individual actions. It is extremely unlikely that individual Class Members—low-income workers overwhelmed with debt—have any interest in instituting or controlling their own individual actions. Concentrating the litigation in this forum is not only reasonable but also efficient, because the relevant HCI campus, many Class Members, and most witnesses are located in this venue. Finally, this class action is not difficult to manage. Each of the claims here involves common issues of fact and law that can be resolved based on common proof; by contrast, separate actions by each Class Member would be repetitive, wasteful, and place an unnecessary burden on the courts.

### F. **Adequacy of Representation**

362.     Plaintiffs are adequate representatives of the Class they seek to represent and will fairly and adequately protect the interests of the Class. No substantial conflicts of interest exist between the Named Plaintiffs and the Class. All Class Members have the same interest in obtaining compensation and other relief for their injuries caused by Defendants' deceptive and predatory acts. The Named Plaintiffs will not benefit in any way from actions that will prove harmful to the interests of the members of the Class.

363.     Plaintiffs have retained competent counsel, experienced in litigation of this nature, to represent them. Undersigned counsel have represented hundreds of thousands of former students on predatory practices of for-profit colleges. They have significant experience representing plaintiffs in class actions and are thus uniquely qualified to prosecute this action. Moreover, they have invested significant time in identifying and investigating potential claims in this action and are committed to advancing the costs of this litigation.

### CAUSES OF ACTION

**Count 1: Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. Based on Deceptive Omissions and Unfair Trade Practices – "New" Program**

364.     At all material times, Defendants were engaged in "trade or commerce" within the meaning of §§ 501.204(1) and 501.203(8).

365.     In connection with the provision of educational services by HCI's RN Program, Defendants committed "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," § 501.204(1), when they, among other things:

a. applied for a new NCLEX code for the West Palm Beach campus after being placed on probation and after failing to receive programmatic accreditation;

b. marketed and presented the new NCLEX code as a new ADN program;

c. made misrepresentations about and/or failed to disclose the status of HCI's RN Program 's accreditation;

d. made misrepresentations about and/or failed to disclose HCI's RN Program's probationary status with the BON; and

e. made misrepresentations about and/or failed to disclose HCI's RN Program's graduates' NCLEX passage rates.

366.   Under FDUTPA, these violations constitute "deception" because they are misrepresentations and/or omissions that are likely to mislead the consumer acting reasonably in the circumstances to the consumer's detriment, or they constitute "unfair practices" because they offend established public policy or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

367.   Each of these violations caused Plaintiffs and Proposed Class Members damages. Because the education Defendants provided was functionally valueless, Plaintiffs' and Proposed Class Members' damages equal the price they paid for tuition.

**Count 2: Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. Based on Deceptive Omissions and Unfair Trade Practices – Grading and Advancement**

368.   At all material times, Defendants were engaged in "trade or commerce" within the meaning of §§ 501.204(1) and 501.203(8).

369.   In connection with the provision of educational services by HCI's RN Program, Defendants committed "[u]nfair methods of competition, unconscionable acts or practices, and

unfair or deceptive acts or practices in the conduct of any trade or commerce," § 501.204(1), when they, among other things, changed the standards for passage without notice and in violation of the enrollment agreement in order to force students to retake, and pay again for, courses.

370.    Under FDUTPA, these violations constitute "deception" because they are misrepresentations and/or omissions that are likely to mislead the consumer acting reasonably in the circumstances to the consumer's detriment, or they constitute "unfair practices" because they offend established public policy or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

371.    The changes were arbitrary and driven by HCI's need to evade the consequences of its failure to attain programmatic accreditation and a sufficient pass rate of its graduates, not by any legitimate educational judgment.

372.    These violations caused Plaintiffs and Proposed Class Members damages. Because the education Defendants provided was functionally valueless, Plaintiffs' and Proposed Class Members' damages equal the price they paid for tuition.

**Count 3: Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. Based on Deceptive Omissions and Unfair Trade Practices – Misrepresentation of Educational Services Provided**

373.    At all material times, Defendants were engaged in "trade or commerce" within the meaning of §§ 501.204(1) and 501.203(8).

374.    In connection with the provision of educational services by HCI's RN Program, Defendants committed "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," § 501.204(1), when they, among other things:

a.  made misrepresentations and/or failed to disclose material facts regarding the terms and conditions of the education they were providing, including the quality and qualifications of instructors;

b.  violated regulations pertaining to "ethical practices and procedures in the recruitment of students" by using, for example, high-pressure sales tactics to recruit students, Fla. Admin. Code R. 6E-2.004(5)(b)(2).

c.  advertised HCI's RN Program as offering clinical experience required by § 464.019(1), Fla. Stat., when no such experience was available;

d.  inflated the value of their product and used that valuation to inflate its tuition; and

e.  offered an insufficient product that trapped their students in debt.

375.    Under FDUTPA, these violations constitute "deception" because they are misrepresentations and/or omissions that are likely to mislead the consumer acting reasonably in the circumstances to the consumer's detriment, or they constitute "unfair practices" because they offend established public policy or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

376.    Each of these violations caused Plaintiffs and Proposed Class Members damages. Because the education Defendants provided was functionally valueless, Plaintiffs' and Proposed Class Members' damages equal the price they paid for tuition.

**Count 4: Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. Based on Deceptive Omissions and Unfair Trade Practices – Unauthorized Retail Installment Contracts**

377.    At all material times, Defendants were engaged in "trade or commerce" within the meaning of §§ 501.204(1) and 501.203(8).

59

378.    In connection with the provision of educational services by HCI's RN Program, Defendants committed "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," § 501.204(1), when they, among other things,

      a.    offered Plaintiffs retail installment contracts without first obtaining the required license; and

      b.    collected on illegal retail installment contracts.

379.    These acts are per se violations of FDUTPA pursuant to Florida Statutes subsection 501.203(3)(c), and further constitute "deception" because they are misrepresentations and/or omissions that are likely to mislead the consumer acting reasonably in the circumstances to the consumer's detriment or "unfair practices" because they offend established public policy or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

380.    Each of these violations caused Plaintiffs and Proposed Class Members damages. Plaintiffs' and Proposed Class Members' damages equal the amounts they paid pursuant to the illegal contracts, any amounts they purportedly owe on such contracts, and any associated fees.

## Count 5: Breach of Contract – Grading and Advancement

381.    Each Plaintiff and Proposed Class Member entered into an Enrollment Agreement with Defendants. The Enrollment Agreement states, "Upon satisfactorily completion [sic] of the requirements for graduation and NCLEX preparation assessments (including VATI), the student is awarded an ASN Degree and must pass the National Council Licensure Exam (NCLEX-RN) to become a registered nurse."

382.    An Enrollment Agreement constitutes a contract between the student and Defendants.

383.    Defendants' nursing college catalogue states specific graduation requirements and promises that upon completion of these specific requirements, Defendants will forward the student's name to the Florida BON as eligible to sit for the NCLEX-RN exam.

384.    Defendants' college catalog is a contract. Fla. Admin. Code R. 6E-2.004(11)(b)(2).

385.    Defendants breached their contracts with Plaintiffs and Class Members by making arbitrary and capricious changes to testing and grading requirements.

386.    Defendants' breaches were material.

387.    As a result of these actions, Defendants caused Plaintiffs and Proposed Class Members damages in the form of tuition paid toward an illusory promise of graduation upon completion of specific requirements.

**Count 6: Breach of Contract –Clinical Placement**

388.    Each Plaintiff and Proposed Class Member entered into an Enrollment Agreement with Defendants.

389.    The Enrollment Agreement states that clinical rotations "[i]nclude[] a combination of medical facility, simulation lab and other field experience."

390.    An Enrollment Agreement constitutes a contract between the student and Defendants.

391.    Defendants' nursing college catalog states: "The [ADN] program is designed to provide educational and clinical experiences leading to employment in beginning positions as registered nurses in hospitals or comparable facilities."

392.    Defendants' college catalog is a contract. Fla. Admin. Code R. 6E-2.004(11)(b)(2).

393.    HCI maintains in its college catalog and on their website that HCI's RN Program is approved by the Florida BON. In order to maintain approval with the Florida BON, HCI s must

61

attest to its compliance with the statutory and regulatory requirements of professional nursing programs with respect to, *inter alia*, clinical placements.

394.   HCI breached its contracts with Plaintiffs and Proposed Class Members by failing to provide clinical placements.

395.   HCI's breaches were material.

396.   As a result of these actions, HCI caused Plaintiffs and Proposed Class Members damages.

## Count 7: Unjust Enrichment

### (By Plaintiffs Roberson, Freeman, King, and the Unjust Enrichment Subclass)

397.   Plaintiffs Roberson, Freeman, King, and Unjust Enrichment Subclass Members conferred a benefit on HCI when they paid over $4,000 to enroll in the required Capstone course.

398.   HCI knowingly and voluntarily accepted and retained this benefit.

399.   In exchange, HCI provided Plaintiffs and Unjust Enrichment Subclass Members with little more than access to the Virtual-ATI, an online NCLEX preparation review course developed and administered by a third party. As of October 2022, the VATI program is available for purchase on ATI's website for $525.

400.   Under the circumstances, it would be inequitable for HCI to retain the entire difference between the cost of the VATI and the amount it charged for the Capstone course.

## Count 8: Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq.

### (By Plaintiffs Roberson, King, and the Targeting Subclass)

401.   In 1974, Congress enacted the Equal Credit Opportunity Act ("ECOA"). ECOA makes it unlawful for a creditor to discriminate against an applicant during "any aspect" of a credit transaction "on the basis of race, color, . . . [or] sex or marital status." 15 U.S.C. § 1691(a).

402.    ECOA defines "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." Id. § 1691a(e).

403.    ECOA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." Id. § 1691a(d).

404.    An applicant is defined as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." Id. § 1691a(b).

405.    Aspects of credit transactions that are encompassed by ECOA's anti-discrimination mandate include the amount of credit extended, the repayment terms of that credit, and the denial of credit. For creditors who are also sellers, an aspect of the credit transaction includes the performance or delivery of the goods and services that are secured by credit, and the actions taken to secure the credit.

406.    ECOA also protects against "reverse redlining," which occurs when a creditor extends credit to a protected class for a predatory product or arranges credit for a predatory product, and intentionally targets or has a disparate impact or effect on people who are members of a protected class. Predatory products include products that are financed by debt and disadvantage the borrower and/or prevent the borrower from repaying the loan.

407.    HCI is a "creditor" within the meaning of 15 U.S.C. § 1691a(e) because of its participation in making and arranging the extension, renewal, or continuation of student loans.

408.     HCI cause students to apply for and take out credit in the form of federal and private student loans, including retail installment contracts.

409.     Plaintiffs are "applicants" because they applied for an extension, renewal, or continuation of student loans within the meaning of 15 U.S.C. § 1691a(b).

410.     HCI intentionally used marketing, advertising, and recruiting techniques to target their nursing program to individuals on the basis of their race, with the understanding that such individuals were highly likely to require an extension of credit in order to pay for HCI's nursing program.

411.     By extending credit to Plaintiffs Roberson, King, and the Targeting Subclass—including federal student loans and in-house retain installment contracts—for an illusory program, HCI committed unlawful reverse redlining in violation of 15 U.S.C. § 1691(a).

412.     As a result of these actions, HCI caused Plaintiffs and Proposed Class Members damages.

**Count 9: Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.**

**(By Plaintiffs Roberson, King, and the Targeting Subclass)**

413.     In 1964, Congress enacted Title VI of the Civil Rights Act of 1964 (Title VI). Title VI makes it unlawful for recipients of federal financial assistance under any federal program or activity to exclude, deny, or discriminate against a person "on the ground of race, color, or national origin." 42 U.S.C. § 2000d.

414.     Under Title VI, the definition of "program or activity" includes "a college, university, or other postsecondary institution, or a public system of higher education" or "an entire corporation, partnership, or other private organization, or an entire sole proprietorship—if assistance is extended to such corporation, partnership, private organization, or sole proprietorship

as a whole; or which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." 42 U.S.C. § 2000d-4a.

415.    Federal agencies, including the Department of Education, are "empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract." 42 U.S.C. § 2000d-1.

416.    Title VI provides redress to individuals who are excluded or discriminated against because of their membership in a protected class by an entity that receives financial assistance from the federal government; including when assistance is extended, rather than denied.

417.    Reverse redlining violates Title VI.

418.    Defendants, as recipients of federal financial aid, receive "Federal financial assistance" within the meaning of 42 U.S.C. § 2000d.

419.    Defendants have not complied with Title VI of the Civil Rights of 1964, 42 U.S.C. § 2000d.

420.    In connection with the making of federal student loans for enrollment at HCI's RN Program or for the provision of educational services by HCI, Defendants' acts, policies, and practices intentionally discriminated against Black people. By targeting Black people with their predatory product, Defendants engaged in reverse redlining violating 42 U.S.C. § 2000d.

421.    As a result of these actions, Defendants caused Plaintiffs and class members damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order and Judgment against the Defendants and in favor of Plaintiffs and the Proposed Class, Proposed Unjust Enrichment Class, and Proposed Targeting Subclass:

A. Certifying this case as a class action under Fed. R. Civ. P. 23;

B. Declaring that the foregoing acts, policies, and practices of Defendants violate the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq.;

C. Declaring that the foregoing acts, policies, and practices of Defendants breached Defendants' contracts with Proposed Class Members;

D. Declaring invalid each and every retail installment contract between Defendants and Proposed Class Members and Ordering Defendants to return all money paid under each contract;

E. Declaring that that the foregoing acts, policies, and practices of Defendants violate the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*;

F. Declaring that that the foregoing acts, policies, and practices of Defendants violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*;

G. Awarding actual damages, both economic and non-economic, to all members of the Proposed Class, Proposed Unjust Enrichment Subclass, and Proposed Targeting Subclass for an amount as determined by a jury that would completely compensate all members of the Proposed Class and Proposed Subclasses, to the extent possible, for their injuries caused by the conduct of Defendants;

H. In connection with Count 8 and other claims where permitted by law, awarding punitive damages to all members of the Proposed Class and Proposed Subclasses for an amount as determined by a jury that would punish Defendants for their conduct and deter similar misconduct;

I. Enjoining Defendants from enrolling students in "new" program;

J.   Enjoining Defendants or their agents or assignees from collecting on the retail installment contracts or reporting them to consumer credit reporting agencies;

K.   Compelling specific performance of the graduation requirements as contained in the enrollment agreement and college catalog as to each member of the Proposed Class;

L.   Awarding costs and attorneys' fees pursuant to 15 U.S.C. § 1691e(d), and Fla. Stat. § 501.2105; and

M.   Granting such other and further relief as is just and proper.

## JURY TRIAL DEMANDED

Plaintiffs request trial by jury as to all issues in this case.


Dated: 12/2/2022

Respectfully submitted,


*/s/ Nicole Mayer*
NICOLE MAYER
Florida Bar No. 012035
Nicole@MayerLawFlorida.com
171 Dommerich Drive.
Maitland, Florida 32751
(352) 494-3657

REBECCA EISENBREY
(*pro hac vice* application forthcoming)
reisenbrey@ppsl.org
ERIC SCHMIDT
(*pro hac vice* application forthcoming)
eschmidt@ppsl.org
Project on Predatory Student Lending
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
(617) 390-2669