**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**West Palm Beach Division**

|  |  |
|---|---|
| BRITTANY ROBERSON, REBECCA FREEMAN, BIANCA VIÑAS, TIFFANY KING, and TRESHA THOMPSON, individually and on behalf of others similarly situated,<br><br>    *Plaintiffs*,<br><br>v.<br><br>HEALTH CAREER INSTITUTE LLC (dba HCI COLLEGE LLC and HCI ACQUISITION LLC), FLORIAN EDUCATION INVESTORS LLC, and STEVEN W. HART,<br><br>    *Defendants*. | Civil Action No. 9:22-cv-81883-RAR |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................. **Error! Bookmark not defined.**

**INTRODUCTION**............................................................................................1

**FACTUAL BACKGROUND** ...........................................................................1

**ARGUMENT**...................................................................................................2

   **I.**   **Plaintiffs Have Established Personal Jurisdiction over Florian and Hart.** ................. 2

   **II.**   **Plaintiffs' Complaint Is Not a Shotgun Pleading.** ........................................ 7

   **III.**   **Each of Plaintiffs' Counts States a Claim for Relief.** ................................... 7

     **A.**   **Plaintiffs' Complaint States Contract Claims.** ..................................... 11

     **B.**   **Plaintiffs' Complaint States FDUTPA Claims.** .................................... 15

     **C.**   **Plaintiffs' Complaint States a Claim for Unjust Enrichment.** ................. 20

     **D.**   **Plaintiffs' Complaint States a Claim Under ECOA.** ............................. 22

     **E.**   **Plaintiffs' Complaint States a Claim Under Title VI.** ........................... 28

**CONCLUSION**...............................................................................................28

**REQUEST FOR HEARING**..........................................................................31

## INTRODUCTION

Plaintiffs' First Amended Complaint, ECF No. 40 ("FAC"), describes a pattern of predatory conduct by a for-profit nursing school, Health Career Institute LLC, dba HCI College LLC and HCI Acquisition LLC ("HCI"); its parent company, Florian Education Investors LLC ("Florian"); and the chief executive of both organizations, Steven W. Hart ("Hart"). HCI operates a professional nursing program that it advertises as being "designed to provide educational and clinical experiences preparing students for employment positions as a Registered Nurse (RN) in hospitals or comparable facilities." It also claims that the program is accelerated, offered at convenient schedules, and includes tutoring assistance. But instead of preparing students for careers as RNs and helping them to achieve economic advancement, Defendants provide an insufficient product financed by federal and private loans they know students will be unable to repay, place arbitrary barriers in the way of student advancement, and ultimately trap students in debt. Worse, Defendants target their predatory product to Black students, believing that such students will be more likely to require an extension of credit and will thus provide a steady stream of federal money.

Defendants move to dismiss the FAC under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). ECF No. 55 ("MTD"). None of their arguments is availing. Plaintiffs have established that this Court has personal jurisdiction over Defendants, who regularly avail themselves of the forum state, and each claim is well pleaded. Defendants' motion should be denied.

## FACTUAL BACKGROUND

Plaintiffs Brittany Roberson, Rebecca Freeman, Bianca Viñas, Tiffany King, and Tresha Thompson ("Plaintiffs") were students in HCI's Associate of Science in Nursing Program (the "RN Program") between 2020 and 2022. FAC ¶¶ 37–41. Plaintiffs Roberson, Freeman, Viñas, and King attended HCI's West Palm Beach campus ("HCI-WPB"), while Plaintiff Thompson attended HCI's Ft. Lauderdale campus ("HCI-FTL"). *Id*. Defendant Florian controls and manages Defendant HCI, and Defendant Hart directs both companies; together, Defendants are engaged in a scheme to enrich themselves while damaging students. *Id*. ¶¶ 5, 42–44, 81.

Each Plaintiff entered into a contract with Defendants HCI and Florian. *Id*. ¶¶ 121, 133, 255, 303, 349, 375, 417. These contracts consist of the terms of each Plaintiff's enrollment agreement, the terms of the college catalog that each Plaintiff received, and other college publications. *Id*. ¶¶ 121, 133. Among other things, these contracts state that the RN Program "is designed to provide . . . clinical experiences leading to employment in entry-level positions as

1

registered nurses in hospitals or comparable facilities," *id.* ¶ 128; that "[a] grade of (80%) or higher is required for all Nursing Core" courses and "all written and practical examinations," *id.* ¶¶ 211, 132; and that students would have to pass the Assessment Technologies Institute ("ATI") Comprehensive Predictor exam with a stated minimum score, with one retake permitted, in order to graduate, *id.* ¶ 130. Defendants HCI and Florian breached these contracts by failing to provide meaningful clinical experience, enforcing new, arbitrary grading requirements, and erecting new, arbitrary barriers to graduation. *E.g.*, *id.* ¶¶ 190–91, 194, 204, 237–39, 267, 321, 358, 383, 424.

Defendants also engaged in deceptive and unfair trade practices. They misrepresented the quality of the RN Program and the qualifications of their instructors, *id.* ¶¶ 187–89, 195, 423; and the availability of meaningful clinical experiences, *id.* ¶¶ 190–91, 194, 267, 321, 358, 383, 424. When it became clear that the HCI-WPB RN Program was at risk of termination by the Florida Board of Nursing ("BON") in 2018 for failure to achieve programmatic accreditation, Defendants designed and implemented a two-pronged scheme to continue enrolling students and taking their money, without actually improving the program or brining it in line with BON requirements: they created a sham "new" RN Program at HCI-WPB, *e.g.*, *id.* ¶¶ 93–95, 105–06, 261, 301, 308, 351, 388; and they placed uniform, yet arbitrary and unannounced, obstacles in front of students that effectively blocked them from graduating from the RN Program and sitting for the NCLEX-RN, the licensure exam for registered nurses, *e.g.*, *id.* ¶¶ 203–205. Defendants steered students into risky retail installment contracts despite lacking the license required by Florida law. *Id.* ¶¶ 137–140. And Defendants blocked students' advancement through the RN Program, and refused to release their academic transcripts, until they paid payments on their retail installment contracts. *Id.* ¶¶ 167–69.

Defendants sell a predatory product, and they intentionally focus their marketing on a Black audience. *Id.* ¶ 527. The vast majority of the models featured in their advertisements are Black. *Id.* ¶¶ 113–14. And their enrollment demographics show that their racial targeting is successful, as Black students are disproportionately represented among RN Program enrollees when compared to the demographics of the surrounding geographical area. *Id.* ¶ 26(e).

## <u>ARGUMENT</u>

### I.      **Plaintiffs Have Established Personal Jurisdiction over Florian and Hart.**

In their FAC, Plaintiffs named HCI's parent corporation, Florian Education Investors LLC ("Florian"), and its chairman and owner, Steven Hart, as Defendants. Although both are domiciled

in Connecticut, Plaintiffs lay out enough factual allegations to support a finding that these parties are subject to personal jurisdiction in this matter.

### A. Legal Standard

When assessing whether personal jurisdiction exists over a non-resident defendant, the Eleventh Circuit first looks to the requirements of the operative state's long-arm statute and then to the Due Process Clause of the Fourteenth Amendment, which requires that the defendant have minimum contacts with the forum state. *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1222 (11th Cir. 2023). Further, "[w]hen a federal court uses a state long-arm statute, because the extent of the statute is governed by state law, the federal court is required to construe it as would the state's supreme court." *Lockard v. Equifax, Inc*., 163 F.3d 1259, 1265 (11th Cir.1998). *See also Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989).

Under the Florida long-arm statute, there are two ways to establish jurisdiction over a nonresident defendant—specific and general. Fla. Stat. § 48.193. General jurisdiction requires a showing that "the defendant's connections with the forum state are so substantial that it is unnecessary to establish a relationship between this state and the alleged wrongful actions." *Aegis Def. Servs., LLC v. Gilbert*, 222 So. 3d 656, 659 (Fla. Dist. Ct. App. 2017). The requirements of general jurisdiction are satisfied "where a nonresident defendant's activities are 'extensive and pervasive, in that a significant portion of the defendant's business operations or revenue [are] derived from established commercial relationships in the state.'" *Id* (quoting *Trs. of Columbia Univ. v. Ocean World, S.A.*, 12 So.3d 788, 793 (Fla. Dist. Ct. App. 2009)) (alteration in original). When a corporate parent exercises sufficient control over a subsidiary, that control establishes an agency relationship and supports the exercise of general jurisdiction over the parent based on the presence in the state of the subsidiary. *TRW Vehicle Safety Systems, Inc. v. Santiso*, 980 So. 2d 1149, 1153 (Fla. Dist Ct. App. 2008). Specific jurisdiction requires a showing that "the alleged activities or actions of the defendant are directly connected to the forum state." *Aegis Def. Servs., LLC*, 222 So. 3d at 659. As relevant here, specific jurisdiction can be established if a defendant or its agent "[o]perat[es], conduct[s], engag[es] in, or carryi[es] on a business or business venture in [Florida] or ha[s] an office or agency in [Florida]," Fla. Stat. § 48.193(1)(a)(1), and such activities are connected to the cause of action, *Yarger v. Convergence Aviation Ltd*, 310 So. 3d 1276, 1280 (Fla. Dist. Ct. App. 2021). "[W]hether a nonresident is conducting business in Florida for purposes

3

of the long-arm statute turns on the nature, not the extent, of the nonresident's activities in Florida." *Oriental Imports & Exps. v. Maduro & Curiel's*, 701 F.2d 889, 892 (11th Cir. 1983).

A plaintiff has the burden of establishing a *prima facie* case of personal jurisdiction over a nonresident defendant. *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268–69 (11th Cir. 2002). Where the defendant submits affidavits contesting personal jurisdiction, "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction unless those affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Id.* at 1269 (citing *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1215 (11th Cir.1999)). And if the allegations from a plaintiff's complaint and supporting evidence conflict with the defendant's submitted affidavit, the court must construe all reasonable inferences in favor of the plaintiff. *Id.* (citing *Madara v. Hall*, 916 F.2d 1510 at 1514 (11th Cir. 1990)).

### B. **Plaintiffs' Allegations Support Personal Jurisdiction over Defendant Florian.**

The FAC alleges that Florian maintained sufficient control over HCI, its subsidiary, to establish an agency relationship and support the exercise of general jurisdiction over Florian, based on HCI's presence in Florida. A subsidiary's contacts with the forum state may be imputed to the foreign parent and subject the parent to personal jurisdiction. *See Meier*, 288 F.3d at 1272. This agency theory of personal jurisdiction also extends to other relationships, such as the relationship between members of a limited liability company and the company itself. *Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231, 1240–41 (S.D. Fla. 2015). Florian was co-founded by Steven Hart and Larry Brown and was "established to build a multi-campus and online school group focused on the allied health sector." FAC ¶ 24. And Florian did just that by acquiring HCI College (then known as Health Career College) on December 31, 2013. FAC ¶ 80. HCI's statement of legal control, which it included in its college catalogs, describes HCI as a "for-profit Limited Liability Corporation and a subsidy [sic] of Florian Education Investors LLC." FAC ¶ 43. Plaintiffs allege that Florian is a managing member of HCI, *id*, and that "Florian is an active owner [of the school] and has been intimately involved in the operation of HCI since 2013," FAC ¶ 81. Plaintiffs further alleged that both Florian and HCI share a corporate director in the person of Steven Hart, and that Hart "can direct" the president of HCI. FAC ¶ 44. HCI's CEO is given autonomy from Florian but is subject to "Authorization Guidelines" that are presumably promulgated by Florian and/or Hart. Hart Decl., ECF No. 55-1, ¶ 13. Finally, Plaintiffs submitted proof of Florian's deep financial connection to its subsidiary in the form of a Florida UCC financing statement wherein it

obtained a loan in exchange for assignment of student debt obligations originated by HCI, FAC ¶ 31, and did so as "Florian Education Investors LLC dba Heath Careen Institute LLC," UCC Filing, ECF No. 40-1. These relationships are sufficient to support the exercise of general jurisdiction over Florian. *See TRW Vehicle Safety Systems, Inc.*, 980 So. 2d at 1153.

In the alternative, the nature of Florian's business activities in Florida subjects it to the specific jurisdiction of this Court, *see Oriental Imports & Exps.*, 701 F.2d at 892, and the FAC alleges a significant connection between the causes of action and Florian's activities in Florida, *see Yarger*, 310 So. 3d at 1280. As noted in Plaintiffs' FAC, Florian has and exercises control over HCI, its wholly owned Florida subsidiary. FAC ¶¶ 43, 81. HCI's business operations in Florida are at the center of each count in the FAC. *E.g.*, ¶¶ 461, 466, 470, 492 (counts 1, 2, 3, 6, 7 concern "the provision of educational services by HCI's RN program"); ¶¶ 475, 482 (counts 4 and 5 concern contracts for products or services); ¶ 501 (count 8 concerns the sale of products or services), ¶¶ 513, 527 (counts 9 and 10 concern the extension of credit for educational services). Florian's control over HCI thus supports the exercise of specific jurisdiction over Florian under section 48.193(1)(a)(1). *Cf. MacMillan-Bloedel v. Canada*, 391 So. 2d 749 (Fla. Dist. Ct. App. 1980) (a nonresident corporation was not "doing business" for jurisdictional purposes even though its wholly-owned subsidiary was engaged in business in Florida, because the nonresident corporation was not shown to have "control" over the subsidiary).

Finally, exercising personal jurisdiction over Florian would comport with the due process requirements of the Fourteenth Amendment. The Eleventh Circuit has adopted a three-part test to determine whether this test is satisfied: (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (internal quotation marks and citations omitted). Here, Plaintiffs' claims arise out of Florian's control of HCI, a Florida company, and Florian purposefully availed itself of the privilege of conducting activities within Florida when it purchased and operated HCI, and when it obtained a loan in exchange for assignment of student debt obligations originated by HCI. And "Florida has a significant interest in adjudicating a dispute involving services

provided by [an] out-of-state [corporation] to its residents, concerning [schools] located within its borders." *See Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 259 (11th Cir. 1996).

### C. **Plaintiffs' Allegations Support Personal Jurisdiction over Defendant Hart.**

Defendants submitted an affidavit from Hart, on behalf of Florian, in support of their motion to dismiss for lack of personal jurisdiction. In it, Hart confirms that: (1) he is currently the Chairman of HCI and that this role permits him to direct the CEO of HCI; (2) he is also the CEO of Florian; (3) HCI is wholly owned by Florian; (4) and HCI's CEO is given autonomy from Florian but is subject to "Authorization Guidelines" that are presumably promulgated by Florian and/or Hart. ECF No. 55-1. Notably absent from Hart's affidavit is clarification on what his role at HCI *was*. The relevant time period of this action reaches back to 2019 and on his own LinkedIn page, Hart describes himself as being "Co-CEO" of HCI from 2013 to 2019.[1] Additionally, in its Annual Reports to the Florida Board of Nursing, HCI lists its owner as Steven Hart. FAC ¶ 42. Hart also founded Hart Capital LLC, which is allegedly an investment company but, for unclear reasons, operates under the North American Industry Classification System ("NAICS"), code 611310, which is the NAICS code reserved for Colleges, Universities, and Professional Schools. FAC ¶ 45. Implicit in these overlapping corporate roles and layers of authority is the fact that Mr. Hart directed HCI's wrongful actions that are at the heart of the matter at hand.

As stated *supra*, Part I.A, a showing of specific personal jurisdiction requires that "the alleged activities or actions of the defendant are directly connected to the forum state." *Aegis Def. Servs., LLC*, 222 So. 3d. at 659. Specific jurisdiction can be established if a defendant or its agent "[o]perat[es], conduct[s], engag[es] in, or carryi[es] on a business or business venture in [Florida] or ha[s] an office or agency in [Florida]," Fla. Stat. § 48.193(1)(a)(1), and such activities are connected to the cause of action, *Yarger*, 310 So. 3d at 1280. The connections between the causes of action and business actions of HCI spelled out *supra* in Part I.B doubly apply to Hart, given his instrumental role as the head of both Florian and HCI. Here, Plaintiffs allege key elements of Hart's relationship with his agent, HCI. At present, he maintains the ability, as the Chairman, to direct HCI's CEO, FAC ¶ 44; was formerly the "Co-CEO" himself; and presumably oversees HCI's broader policies and business priorities through Authorization Guidelines, ECF No. 55-1, ¶ 13.

---

[1] https://perma.cc/J5HD-B7FF?type=image, as preserved on April 13, 2023.

These factors satisfy the requirements of Florida's long-arm statute, and also fulfill the requirements of Due Process. *See Louis Vuitton Malletier, S.A.*, 736 F.3d at 1355. The acts forming the basis for the claims at issue did occur in Florida. They were done by HCI under the direction of its parent company, Florian, and by Hart as Chairman (and former Co-CEO) of HCI and CEO of Florian. These causes of action arose there because Hart purposefully availed himself of this forum state as the home of his business, HCI. Furthermore, Florida has a reasonable interest in exercising jurisdiction over businessmen like Mr. Hart, who avail themselves of the state for the engagement of business ventures and, in so doing, affect Florida residents. *See Robinson*, 74 F.3d at 259.

For these reasons, the exercise of personal jurisdiction over all three Defendants is appropriate. Given the degree and extent of corporate control that Plaintiffs allege Florian and Hart wield and exercise over HCI, Plaintiffs assert that it would be improper to remove either of these co-Defendants for lack of personal jurisdiction. At a minimum, Plaintiffs should have the opportunity to engage in discovery with respect to the issue of jurisdiction.

## II. Plaintiffs' Complaint Is Not a Shotgun Pleading.

### A. The FAC Provides Defendant Fair Notice of Plaintiffs' Allegations.

Above all, in considering whether the FAC is a "shotgun pleading," the most fundamental question is whether "it affords [the d]efendant fair notice of [the p]laintiff's allegations against it." *Hunter v. Carnival Corp.,* 609 F. Supp. 3d 1305, 1313 (S.D. Fla. 2022). While Defendants make a litany of complaints about the FAC, and claim to be left confused by it, the Partial Motion to Dismiss that Defendants filed on January 31, 2023 (ECF No. 27) in response to the initial Complaint tells a different story. The first six paragraphs of that filing accurately summarize nine of the ten counts contained in the FAC, even citing paragraphs in the initial Complaint (which is substantially similar to the FAC) that support each count. Similarly, the below excerpt from Defendants' February 3, 2023, media response to this lawsuit also makes clear Defendants understand the claims against them:

> The facts are that HCI College has never . . . sought to block its nursing students from graduating or passing the NCLEX exam. HCI College has also never misrepresented its accreditation status . . . HCI is accredited, and its graduates are fully prepared and eligible to sit for the NCLEX-RN.[2]

---

[2] *HCI College Important Information Regarding Nursing Schools in Florida and HCI College*, located at https://www.hci.edu/area-news/25144-important-information-regarding-nursing-schools-in-florida-and-hci-college.com (last accessed Apr. 11, 2023).

Defendants cannot plausibly claim that they do not have notice of Plaintiffs' allegations against them.

### B.   Plaintiffs Did Not Commit the "Sins" That Characterize Shotgun Pleadings.

As this Court recently explained, The Eleventh Circuit has identified four "sins" that characterize shotgun pleadings: (1) "containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint"; (2) "being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) "not separating into a different count each cause of action or claim for relief"; and (4) [a]sserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1208 (S.D. Fla. 2022) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015)). Plaintiffs' FAC commits none of these sins.

### 1.   The FAC Does Not Adopt Allegations of Preceding Counts into Each Count.

While Plaintiffs' FAC does contain multiple counts, ten to be exact, not one of those counts adopts the allegations of all previous counts; therefore, Plaintiffs have not committed Sin #1.

### 2.   The FAC is Not Replete with Conclusory, Vague, and Immaterial Facts Not Obviously Connected to Any Particular Cause of Action.

Defendants' Motion is full of "buzz words" used to describe shotgun pleadings, such as "conclusory," "vague, and "immaterial." MTD. at 7, 8, 11–13, 15, 16, 18, 19, 22, 25, 26, 27, 33–35. Upon closer inspection, however, Defendants' "conclusory, vague, and immaterial" argument is targeted at only two issues in the FAC; each addressed in turn below.

#### a.   *The Court's Jurisdiction Over Defendants Florian and Hart*

Defendants argue that the FAC does not establish that the Court has personal jurisdiction over Florian and Hart. MTD at 5–17. This issue is addressed in detail *supra* Part I, and Plaintiffs reiterate here that the FAC states sufficient factual allegations to support the extension of personal jurisdiction to both non-resident Defendants.

#### b.   *Ambiguity As to Grading/Advancement Policy and Testing Policy*

Defendants claim to not understand Plaintiffs' allegations concerning changes to its grading/advancement and testing policies. MTD at 18–19. Defendants' feigned confusion is replete

with irony given that the FAC merely repeats the terminology used in Defendants' enrollment agreements and catalogs. Indeed, the materials published by Defendants, by design, contain nearly enough double speak and contradiction for Defendants to deny any "policy" a student might challenge. However, as explained in the FAC, the enrollment agreement signed by class members before beginning the RN Program, FAC ¶ 121—which is only a few pages long, which Defendants did not reserve the right to amend, *id.* ¶ 127, and which Defendants themselves say binds the students and the Institution, *id.* ¶ 134—sets forth the following "Graduation Requirements:"[3]

> I understand that in order to graduate from the program and to receive a certificate of completion, diploma or degree I must successfully complete the required number of scheduled credit/clock hours as specified in the Catalog and on the Enrollment Agreement, pass all written and practical examinations with a minimum score of 80%, pass the ATI Predictor with a minimum score of 95% with only two attempts permitted (second attempt is at the sole cost of the student), complete all required clinical hours, achieve "Green Light" status with Virtual ATI (VATI), and satisfy all financial obligations to the College.

*Id.* ¶ 257. This graduation requirement imposes two separate exam obligations on students. One is an obligation to achieve a minimum score on the "ATI Predictor," and second is the obligation to achieve a minimum of 80% on "all other written and practical exams." The college catalog states that "[a] grade of 80% or higher is required for all Nursing Core" courses. FAC ¶ 132.

Defendants complain that "it is impossible to determine which of any of the particular exams alleged is a 'specialty exam,' 'predictor' exam, or 'exit exam,' or all three." MTD at 19. For the sake of clarity, Plaintiffs provide the following explanation of these terms, referencing Defendants' own published material as outlined in the FAC. When used in the FAC, the term "predictor exam" refers to an exam that "serve[s] as a predictor of the student's success on the NCLEX and a guide on what to focus on before the NCLEX." FAC ¶ 222. The ATI exam is one such "predictor exam." As explained in the FAC, "the ATI Comprehensive Predictor exam [was] the only exam-related graduation requirement for the RN Programs listed in their corresponding HCI enrollment agreements and college catalogs." FAC ¶ 232. When used in the complaint, the term "exit exam" refers to the exam administered at the end of the Capstone course, passage of which is required before a student may graduate and take the NCLEX. *Id.* ¶ 220.  The phrase

---

[3] To the extent that some enrollment agreements did not include reference to the 80% requirement, this was set forth in the HCI College catalog and the "50% Rule" was never disclosed. FAC ¶¶ 203, 204, 211.

"specialty exam" refers to the end of semester exams, usually created by ATI or Kaplan, which students had to pass at the end of Nursing I, Nursing II, and Nursing III. FAC ¶¶ 204-209. Plaintiffs understand these "specialty exams" to be the "other written and practical exams" referenced in the enrollment agreement. The FAC explains that these are the tests on which Defendants imposed the "50% Rule." FAC ¶¶ 211, 363, 368, 427–429. For these reasons, Plaintiffs have not committed Sin #2.

### 3.   The FAC Separates Each Cause of Action into a Different Count.

In paragraphs 460-528 of the FAC, Plaintiffs allege ten distinct counts against Defendants. Each count clearly sets forth which Plaintiffs bring the claim, the law Plaintiffs allege Defendants violated, and a summary of the material elements and facts corresponding with each count. Defendants complain that, "[a]s to each count, Plaintiffs fail to specify which allegations support same, which leaves the Court and Defendants to parse through some 500 paragraphs to search for allegations that could conceivably serve as basis for the claims." MTD at 17. The defendant in *Melillo v. Shendell & Assocsiates, P.A.*, No. 11-cv-62048, 2012 WL 253205, (S.D. Fla. Jan. 26, 2012), used a similar argument when seeking dismissal based on plaintiff's alleged shotgun pleading, asking "to have [the p]laintiff replead each violation as a separate count, with each count specifying which paragraph from the fact section applies." *Id.* at *2. In *Melillo,* the court found that "the claims are already clear" even though the plaintiff had not specified which count each fact in the complaint supported. *Id.* The same is true here.

"The essence of a shotgun pleading is 'that it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" *Vujin v. Galbut*, 836 F. App'x 809, 814–15 (11th Cir. 2020) (quoting *Anderson v. District Bd. Of Trustees of Cent. Florida Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)). This does not describe Plaintiffs' FAC in the least. To the contrary, as made clear in the index below, the FAC sets forth facts in an organized and logical order, using clear headings and clarifying sub-headings, making it easy for the reader to locate the facts relevant to each count.

> Background (¶¶ 46–250):
>    o Rules Governing Nursing Programs and the Nursing Profession in Florida (¶¶ 46–69),
>    o Federal Requirements (¶¶ 70–78),
>    o Evolution of HCI's RN Program (¶¶ 79–109),
>    o Programs and Practices of HCI's RN Program (¶¶ 110–250):
>       ▪ Advertising & Target Marketing (¶¶ 110–118),
>       ▪ Enrollment Paperwork (¶¶ 119–135),

- Financial Aid (¶¶ 136–170),
- Misrepresentations & Omissions (¶¶ 171–202),
- Imposition of Unfair & Arbitrary Requirements on Students (¶¶ 203–250);

Facts as to Named Plaintiffs (¶¶251–441):
- o Brittany Roberson (¶¶ 251–292),
- o Rebecca Freeman (¶¶ 293–346),
- o Bianca Viñas (¶¶ 347–372),
- o Tiffany King (¶¶ 373–405)
- o Tresha Thompson (¶¶ 406–441).

This clear organization is sufficient; Plaintiffs are not required to specify which paragraph from the fact section applies to each count. *Melillo*, 2012 WL 253205 *2. The FAC is not a shotgun pleading as Plaintiffs have not committed Sin #3.

4.    The FAC Provides Defendants Adequate Notice of the Claims Against Them and the Grounds Upon Which They Rest.

Defendants take issue with the fact that the FAC does not specify Defendants' names in each count; however, there are only two corporate Defendants, which are closely related. Additionally, the suit is brought against Defendant Hart in his official capacity as head of each of these companies. Nevertheless, Plaintiffs clarify that counts 4 (Breach of Contract as to Grading and Advancement), 5 (Breach of Contract as to Clinical Placement), and 8 (Unjust Enrichment) are asserted against Defendants HCI and Florian, and counts 9 (ECOA) and 10 (Title VI) are asserted only against Defendant HCI. The remaining counts 1 (FDUPTA as to Grading and Advancement), 2 (FDUPTA as to Misrepresentation of Educational Services Provided), 3 (FDUPTA as to Unauthorized Retail Installment Contracts), 6 (FDUPTA as to the "New" Program), and 7 (FDUPTA as to Withholding Advancement and Transcripts) are brought against all three Defendants.

## III.    Each of Plaintiffs' Counts States a Claim for Relief.

### A.    Plaintiffs' Complaint States Contract Claims.

1.    Plaintiffs' Contract Claims Are Proper as to Defendants HCI and Florian.

Defendants assert that Plaintiffs' contract claims must be dismissed as to Florian because the company "was not party to any alleged contracts at issue." MTD at 21 (citing *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). But this is the extent of their argument—Defendants do not attempt to establish that Florian was not party to the contracts at issue, and the FAC plausibly alleges that it was. "On a motion to dismiss, the factual allegations in the complaint are taken as true, even if they are subject to dispute," *Devengoechea v. Bolivarian Republic of*

*Venezuela*, 889 F.3d 1213, 1220 (11th Cir. 2018), and "a court must view the complaint in the light most favorable to the plaintiff," *Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1319 (S.D. Fla. 2021). Although "the court's review is generally 'limited to the four corners of the complaint,' . . . the court may also consider 'documents incorporated into the complaint by reference.'" *Baitner v. Ironshore Specialty Ins. Co.*, No. 21-cv-60687, 2021 WL 7368734, at *2 (S.D. Fla. May 12, 2021) (quoting *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009), and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Here, Plaintiffs allege that Florian is a managing member of HCI, FAC ¶ 43, and that the companies share a corporate head, *id.* ¶ 44. Plaintiffs allege that "Florian is an active owner and has been intimately involved in the operation of HCI since 2013." *Id.* ¶ 81. Significantly, Plaintiffs allege that HCI's catalogs—incorporated by reference into the complaint—state that HCI is "a subsidy [sic] of Florian," *id.* ¶ 43, and inform students that Florian has legal control over HCI, *id.* Together, these allegations plausibly support the conclusion that Florian is a party to the implied-in fact contract arising from HCI's publications. *See Ferretti v. Nova Se. Univ., Inc.*, 604 F. Supp. 3d 1330, 1334 (S.D. Fla. 2022) (terms of implied-in-fact contract "may be derived from university publications such as the student handbook and catalog"); *see also Goldstein*, 559 F. Supp. 3d at 1319.

     2. Count 4 States a Contract Claim.

   Count 4 states a claim based on Defendants Florian and HCI's breaches of contract provisions relating to requirements for advancement through and graduation from the RN program. Defendants claim that Plaintiffs have not identified contractual grading requirements for end-of-semester or specialty exams, MTD at 21,[4] but this is facially false. The FAC explains that, to the extent the "Graduation Requirements" section of the enrollment agreements referenced advancement through the RN Program, it stated that a student must "pass **all** written and practical examinations with a minimum score of 80%," and also achieve a minimum score of 95% on the exit exam, the ATI Predictor. FAC ¶ 257. To the extent enrollment agreements did not reference the 80% requirement at all, one can look to the catalogs and see that they consistently stated that "[a] grade of (80%) or higher is required for all Nursing Core" courses. FAC ¶ 132. It is also clear

---

   [4] Notably, Defendants do not contest that Proposed Class Members' enrollment agreements stated that students would have up to two attempts to achieve the minimum score on the ATI exam, FAC ¶ 131, or that Proposed Class Members were not given an opportunity to retake that exam, *id.* ¶¶ 233, 398.

from the FAC what specific changes were made to the grading requirements (in practice, not in writing): instead of needing a score of 80 percent to pass exams other than the exit exam, "[u]nder the new policy, students were required to achieve both an 80 percent overall score and at least 50 percent in every subcategory." FAC ¶ 204.

Defendants' reliance on *Lamb v. Outback Steakhouse of Florida, Inc.*, No. 8:13-cv-794, 2014 WL 12689882 (M.D. Fla. Sept. 4, 2014), is misplaced. In *Lamb*, the plaintiff conceded that her employment contract "d[id] not explicitly discuss renewal," but argued that the term's omission made the contract ambiguous. *Id.* at *7. Here, by contrast, the contract created by the enrollment agreements and the catalog explicitly discusses grading requirements. FAC ¶¶ 132, 257, 305. Interpreting the facts in the light most favorable to Plaintiffs, the contract establishes, "by reasonable implication," that 80 percent was the required passing score for all exams in core nursing courses. *See Lamb*, 2014 WL 12689882, at *8.

Defendants suggest that the 80 percent requirement was "a floor and not a ceiling." MTD at 21. This is an argument that the contracts are ambiguous, not silent, as to grading requirements. Interpreting an ambiguous contract "is typically inappropriate at the motion to dismiss stage." *Ferretti*, 604 F. Supp. 3d at 1333.

Finally, Defendants assert that there can be no breach of the grading requirements because "the enrollment agreements state that HCI 'reserves the right to modify the rules and policies outlined in the Catalog with or without notification.'" MTD at 22. First, as Plaintiffs alleged and Defendants confirmed, Defendants reserved the right to modify "the Catalog"—they did not reserve the right to modify the enrollment agreements. FAC ¶¶ 126–27. In fact, the college catalog itself indicates that where the terms of the enrollment agreement and catalog differed (Plaintiffs do not concede that this was the case), the terms of the Enrollment Agreement at the time it was signed by the student would control. FAC ¶ 134. Second, Defendants did *not* modify the college catalog: as stated above, Plaintiffs allege that HCI's college catalog **consistently stated** that "[a] grade of (80%) or higher is required for all Nursing Core" courses. FAC ¶ 132. Third, and most important, Defendants' right to modify the contract is not unrestricted. *Jallali v. Nova Southeastern University, Inc.*, upon which Defendants rely, stands for the proposition that a university may change degree requirements only "if such changes are *not* arbitrary or capricious." 992 So. 2d 338, 343 (Fla. Dist. Ct. App. 2008). Plaintiffs plainly allege that the changes to the grading requirements **were** arbitrary and capricious because, inter alia, they were "significant, disruptive, and served no

13

educational or pedagogical purpose" and "were not promoted by the requirements of any regulatory bodies." FAC ¶¶ 237–39. Count 4 thus states a plausible claim for relief.

3. Count 5 States a Contract Claim.

Count 5 states a claim based on Defendants Florian and HCI's breaches of contract provisions relating to the provision of clinical training. Florida law defines "clinical training" as "direct nursing care experiences with patients or clients which offer the student the opportunity to integrate, apply, and refine specific skills and abilities based on theoretical concepts and scientific principles." § 464.003(10), Fla. Sta. Class Members' enrollment agreements state that the RN Program "is designed to provide . . . clinical experiences leading to employment in entry-level positions as registered nurses in hospitals or comparable facilities." FAC ¶ 128. And Florida law requires that a program's nursing curriculum consists of at least 50 percent clinic training and that "[n]o more than 50 percent of the program's clinical training consists of clinical simulation." FAC ¶ 54(a) (quoting §§ 464.019(1)(b)(1), (2)(c), Fla. Stat.). Thus, Defendants Florian and HCI were contractually obligated to provide meaningful, hands-on clinical experience to nursing students in a manner that complied with Florida law governing nursing programs.

Contrary to Defendants' assertions, the FAC plainly supports Plaintiffs' allegations that what little clinical experience they received was far from what was promised. For example, Plaintiffs allege that "[s]tudents in the RN Program did not spend at least 50 percent of their class time in clinical training, and significantly more than 50 percent of the clinical training they did have was—at best—clinical simulation," FAC ¶ 190; that HCI's clinical relationships are extremely limited because of the school's poor reputation and standards, id. ¶ 191; and that Class Members spent their clinical hours in study hall, not at clinical sites or in clinical simulations, id. ¶ 194. Plaintiff Roberson alleges that "Defendants never provided her with an official clinical placement at a care facility." Id. ¶ 267. Plaintiff Freeman alleges that although her "limited clinical experience was more extensive than what most of her classmates received[,] . . . her curriculum still did not consist of at least 50 percent of clinical training," and "more than 50 percent of [her] clinical education featured simulated, not actual, clinical experience." Id. ¶ 321. Plaintiff Viñas alleges that her "only hands-on clinical experience consisted of an unofficial visit to a psychiatric facility, Ambrosia Treatment Center, for just one day out of the entire semester." Id. ¶ 358. Plaintiff King alleges that her only clinical experience consisted of "limited practice on medical dummies." Id. ¶ 383. Finally, Plaintiff Thompson alleges that "she was almost exclusively provided simulation

14

clinicals on-campus at HCI, with inadequate supplies and faulty software," and that she spent no more than two days in on-site clinical placements. *Id.* ¶ 424. Viewed in the light most favorable to the Plaintiffs, Count 5 thus clearly states a claim for breach of contract.

**B.  Plaintiffs' Complaint States FDUTPA Claims.**

1.  Plaintiffs' FDUTPA Claims Are Proper as to Defendants HCI, Florian, and Hart.

Defendants argue that Plaintiffs have failed to allege that Defendant Hart is individually liable under FDUTPA. MTD at 25. To establish individual liability for FDUTPA violations, a plaintiff must allege that the individual "(1) participated directly in the deceptive acts or practices; or (2) possessed the authority to control them; and (3) had some knowledge of the practices." *Fed. Trade Comm'n v. Student Aid Ctr., Inc.*, 281 F. Supp. 3d 1324, 1336 (S.D. Fla. 2016) (citations omitted). Plaintiffs allege that Hart possessed the authority to control the Corporate Defendants' deceptive acts: "[i]n his role as Chairman of HCI, Hart directs HCI's President and CEO." FAC ¶ 44. Implicit in this is the allegation that Hart directed each of the actions described in the complaint. *See Goldstein*, 559 F. Supp. 3d at 1319 ("[A] court must view the complaint in the light most favorable to the plaintiff.").

2.  Count 1 States a Claim Under FDUTPA.

Defendants argue that "Count 1 is no more than an allegation that Defendants intentionally breached the enrollment agreement with a nefarious motive and therefore fails as a claim for FDUTPA," MTD at 25, citing *Epoch International Partners, LLP v. Bigfoot Inc.*, 587 F.Supp.3d 1214, 1219 (S.D. Fla. 2022), and *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1338 (11th Cir. 2012). Both cases are plainly distinguishable. Under *Epoch International,* allegations that simply mirror a breach of contract claim are insufficient to state a claim under FDUTPA, but "allegations of wrongdoing that exceeded the terms of the contract" can bring a contract-related claim within the ambit of the statute. 587 F.Supp.3d at 1219 (discussing *Kenneth F. Hackett & Assoc., Inc. v. GE Capital Information Tech. Solutions, Inc.*, 744 F. Supp. 2d 1305, 1313 (S.D. Fla. 2010)). Here, Plaintiffs do not simply allege that HCI changed the grading requirements—they allege that they change occurred "without notice" (and thus denied students the opportunity to prepare or change their approach), FAC ¶ 461; that Defendants "force[d] students to retake, and pay again for, courses," *id.*; and that the change was motivated by "HCI's need to evade the consequences of its failure to attain programmatic accreditation and a sufficient pass rate of its graduates," FAC ¶ 463.

As the concepts of deception or unfair methods of competition are "extremely broad," Count 1 thus states a claim of for relief that goes beyond a claim for breach of contract. *See Kenneth F. Hackett & Assocs., Inc.*, 744 F. Supp. 2d at 1313 (quoting *Siever v. BWGaskets, Inc.*, 669 F.Supp.2d 1286, 1293 n.2 (M.D. Fla. 2009)).

In *Virgilio*, the court explained that "the sole basis alleged for [homebuyers'] FDUTPA claim is [vendors'] breach of 'an affirmative duty of disclosure' when [vendors] 'knowingly omitted any disclosure of the existence of [an adjacent WWII bombing site].'" Because the court had already held that "the alleged duty of disclosure did not exist under Florida law," the unelaborated FDUPTA claim necessarily failed. Here, it has been established that arbitrary and capricious changes to graduation requirements are actionable contract claims under Florida law. *Jalalli*, 992 So. 2d at 343. But more importantly, Plaintiffs did not frame their claim as "breach of a contractual duty"—they described the deceptive act. Had the homebuyers in *Virgilio* described the deceptive omission without reliance on another duty, their claim would have survived. *See, e.g.*, *Harris v. Nordyne, LLC*, No. 14-cv-21884, 2014 WL 12516076, at *6 (S.D. Fla. Nov. 14, 2014) (allegation of deceptive omission states claim under FDUTPA). Thus, if Defendants are correct (which they are not) that there is no breach of contract claim for changes to grading requirements and if Defendants are correct (which they are not) that Count 1 is a "mirror" of Count 4, Count 1 can stand alone—just as an omission can be deceptive even if it does not violate a duty of disclosure, a change of course can be deceptive even if it does not breach a contract.

        3.    Count 2 States a Claim Under FDUTPA.

Count 2 alleges FDUTPA violations related to the misrepresentation of the educational services provided at HCI. Numerous factual allegations in the FAC support this count. Plaintiffs allege that they were misled as to the quality and qualification of instructors.[5] *See, e.g.*, FAC ¶ 187 (high turnover); ¶ 188 (part-time or adjunct personnel who were not supported by the school); ¶ 189 (far fewer than 50 percent of the faculty members at either campus were registered nurses who have a master's or higher degree in nursing or a bachelor's degree in nursing and a master's or higher degree in a field related to nursing, as required by law); ¶ 195 (clinical instructors cancelled even simulated clinical sessions "so that they did not have to drive to campus and sent students

---

     [5] That Ms. Thompson's teachers were "qualified on paper" in no way contradicts allegations of inferior instruction—the allegation is that they were unqualified **in fact**. *Contra* Motion at 22.

instructions to complete their clinical timesheets from home"); ¶ 423 (Plaintiff Thompson's instructors "Were not experienced in teaching" and her cohort had to teach themselves medical surgery). As detailed *supra*, in Part III.A.3, Plaintiffs allege that Defendants advertised that they provide the clinical experience required by F.S. § 464.019(1)—on-site clinical experience that would prepare students for job—but wholly failed to do so. With respect to high pressure sales tactics, Plaintiffs apologize for the error: the intended citation was FAC 6E-2.004(5)(b)(3), which prohibits "false or misleading statements about the institution, its personnel, its programs, its services, its licensure status, its accreditation, or any other pertinent information"—the basis of this Count. Finally, the allegation that Defendants offered an insufficient product that trapped students in debt and inflated the value of the product to inflate tuition is not "vague," MTD at 26; it is the thrust of the entire complaint. Together, these allegations are sufficient to state a claim for relief under FDUTPA. *See Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1233 (S.D. Fla. 2021) ("Plaintiffs allege that Defendants engaged in unfair and deceptive trade practices by representing that the Class Vehicles have safety features that they do not have and representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not.")

    4.    Count 3 States a Claim Under FDUTPA.

Defendants argue that the law prohibiting the sale of retail installment contracts without a license is not the kind that proscribes unfair trade practices and thus cannot support a *per se* FDUPTA violation. MTD at 26–27. "Violations of laws or statutes that give rise to a FDUTPA claim must be of the kind that proscribe unfair trade practices or unfair methods of competition; not . . . a violation of any law or statute that may have some benefit to consumers." *In re Edgewater By The Bay, LLLP*, 419 B.R. 511, 516 (Bankr. S.D. Fla. 2009). But the retail installment contract licensing law ***is*** a consumer protection standard: it sets forth rules and regulations designed to protect consumers from unscrupulous actors. And failure to maintain a required license has been held to be a *per se* FDUPTA violation. *Anden v. Litinsky*, 472 So. 2d 825, 827 (Fla. Dist. Ct. App. 1985) (engaging in the business of contracting without a license).

Further, Plaintiffs do not only allege a *per se* violation of FDUTPA: they specifically argue that offering retail installment contracts without a license and collecting on unlawful retail installment contracts was deceptive under FDUPTA, because the misrepresentations and/or omission regarding the legality of the contracts caused students to enter into, and pay money towards, contracts that were not actually legally enforceable. FAC ¶¶ 471–72. While Defendants

17

argue that "nothing in the statute provides that the failure to obtain a license renders the contracts 'illegal' or otherwise enforceable," MTD at 28, they are plainly wrong. The statute makes clear that "[a] person may not engage in or transact the business of a retail seller engaging in retail installment transactions as defined in this part or operate a branch of such business without a license." § 520.32(1), Fla. Stat. A violation of Section 520.32 is a misdemeanor. § 520.39, Fla. Stat. "Where a statute imposes a penalty for an act, a contract founded upon said act is considered void in Florida." *Thomas v. Ratiner*, 462 So.2d 1157, 1159 (Fla. Dist. Ct. App. 1984) (citations omitted).

Finally, Plaintiffs have adequately alleged damages. The amount that Class Members paid pursuant to the illegal contracts, amount they currently "owe," and any fees, FAC ¶ 474, are plainly connected to the statutory violation—Plaintiffs would not have paid on, or owe anything towards, the contracts had they known that they were illegal. That these damages are not directly connected to the value of the RN Program is not important: while FDUTPA damages are generally related to the diminution in value of the product sold, in appropriate circumstances, other actual damages are appropriate. *See Buckley v. Moore*, No. 20-cv-61023, 2021 WL 3173185, at *8 (S.D. Fla. July 26, 2021) (finding FDUTPA claim properly stated where the "Plaintiffs allege that as a direct result of Defendants' publication and to combat its negative effects, the Plaintiffs expended money on reputation management services"). Because Plaintiffs allege that, as a result of Defendants' actions, they expended money that they should not have had to pay, and otherwise would not have paid, they have stated a claim for damages under FDUTPA. *See id.*

  5.   Count 6 States a FDUTPA Claim.

Count 6, asserted by the proposed WPB Subclass, alleges FDUPTA violations related to Defendants' misrepresentations and omissions regarding the "new" RN Program at HCI-WPB. Defendants assert that the FAC "fails to allege sufficient facts to establish that Defendants misrepresented that the ADN programs Plaintiffs attended had programmatic accreditation or improperly failed to disclose that the programs attended did not." MTD at 29. This is false: Plaintiff Roberson alleges that she was not told that the "old" program was terminated because of failure to obtain programmatic accreditation, FAC ¶ 261; Plaintiff Freeman alleges that she was told that HCI was "in the process" of receiving ACEN accreditation, *id.* ¶ 301, and that she was not told that the "old" program was terminated because of failure to obtain programmatic accreditation, *id.* at ¶ 308; Plaintiff Viñas and Plaintiff King also allege that they were not told that the "old" program

18

was terminated because of failure to obtain programmatic accreditation, *id.* at ¶¶ 351, 377; and Plaintiff Thompson alleges that her admissions representative implied that HCI had programmatic accreditation, *id.* at ¶ 412. Furthermore, misrepresentations and omissions about accreditation are not the only deceptive practices alleged in Count 6: the core allegations relate to Defendants' presentation of the new NCLEX code as a new ADN program and the obfuscation of the "old" program's poor performance. *E.g.*, *id.* ¶¶ 178–180 (Defendants provided WPB Subclass Members with disclosures misstating the number of program graduates who took the NCLEX in the preceding year); ¶ 183 (Defendants failed to disclose that the "old" program had a 55 percent passage rate in 2018); ¶ 184 (Defendants failed to disclose that the "old" program was on probation in 2019).

Plaintiffs also sufficiently allege causation and damages. With respect to causation, "federal courts and Florida courts alike have stated that 'FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct.'" *Lewis*, 530 F. Supp. 3d at 1234 (collecting cases). Rather, a plaintiff must simply allege that the conduct was likely to deceive a consumer acting reasonably in the same circumstances. *Id*. Plaintiffs have done so. FAC ¶ 493. Moreover, the FAC *does* allege reliance. *Id.* ¶¶ 13, 412. As to damages, Plaintiffs allege that RN Program was "functionally valueless," *id.* ¶ 494, because of its true NCLEX scores and accreditation status. "Generally, actual damages constitute 'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'" *In re Mednax Servs., Inc.*, 603 F. Supp. 3d at 1212 (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)). Thus, the WPB Subclass's damages equal the amount charged for admission. *Id*.

6. Count 7 States a FDUTPA Claim.

Count 7, asserted by the Withholding Subclass, alleges FDUTPA violations related to Defendants' policy of withholding advancement and/or transcripts until students paid the balance on their retail installment contracts. Defendants argue that this claim fails as a matter of law because the alleged conduct is not a violation of established public policy and is not "inherently unfair." MTD at 27. But Plaintiffs allege that the conduct has been deemed abusive by the Consumer Financial Protection Bureau ("CFPB"), an allegation substantiated by the CFPB

publication cited at footnote 22.[6] That publication states that "blanket policies to withhold transcripts in connection with an extension of credit are abusive under the Consumer Financial Protection Act." CFPB, Supervisory Highlights: Student Loan Servicing Special Edition, at 9 (Sep. 2022), *available at* https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf. Plaintiffs have thus alleged that the practice is unfair as a violation of public policy.[7]

Defendants' argument that Plaintiffs have failed to allege actual damages caused by withholding transcripts, MTD at 29, also fails. Count 7 alleges that Defendants withheld students' advancement or transcripts "until they paid the balance on their retail installment contracts," FAC ¶ 497, and alleges that the resulting damages equal "any amounts they paid on their retail installment contracts in order to access their education or to obtain their academic transcripts," *id.* ¶ 499. Because Plaintiffs allege that, as a result of Defendants' actions, they expended money that they should not have had to pay, and otherwise would not have paid, they have stated a claim for damages under FDUTPA. *See Buckley*, 2021 WL 3173185, at *8.

### C. **Plaintiffs' Complaint States a Claim for Unjust Enrichment.**

Under Florida law, to state a claim for unjust enrichment a plaintiff must allege: (1) a benefit conferred on the defendant by the plaintiff; (2) the defendant's acceptance and retention of the benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain this benefit without compensating the plaintiff for the value of the benefit. *Omnipol, A.S. v. Multinational Defense Services, LLC*, 32 F.4th 1298 (11th Cir. 2022); *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332 (S.D. Fla. 2021). Further, the claim of unjust enrichment is one of equity. Unjust enrichment is available "'to prevent the wrongful retention of a benefit, or the retention of

---

[6] At ¶ 496, the FAC quoted language that was included the CFPB's announcement of the special edition of *Supervisory Highlights* rather than in the report itself. *See* CFPB, Newsroom: CFPB Supervisory Examinations Find Violations of Federal Law by Student Loan Servicers and University-Owned Lenders (Sep. 29, 2022), https://www.consumerfinance.gov/about-us/newsroom/cfpb-supervisory-examinations-find-violations-of-federal-law-by-student-loan-servicers-and-university-owned-lenders./ Plaintiffs' counsel apologizes for the error.

[7] Defendants state that "the Bureau does not have any authority to deem anything unlawful." Motion at 27. In addition to being supported by no authority, this assertion is patently false: the Dodd-Frank Act, 12 U.S.C. § 5301 *et seq*, states that "[t]he Bureau may prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." § 55 31(b).

money or property of another, in violation of good conscience and fundamental principles of justice or equity.'" *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 584 (11th Cir. 2013) (quoting *Henry M. Butler, Inc. v. Trizec Props., Inc*., 524 So.2d 710, 711 (Fla. Dist. Ct. App. 1988)).

The uncontested facts laid out in Plaintiffs' FAC allege that Defendants were unjustly enriched through their unconscionable pricing of one of the final courses Plaintiffs were required to take and pass, the Capstone VATI program. Defendants charged over $4,000 for this course, which is owned and administered by an outside third-party vendor, ATI Testing. The retail price of this course is just $525, when purchased directly from ATI Testing. The difference in these price points, which students are not able to negotiate or contest, is objectively unjust. There is no dispute that the first two elements required for an unjust enrichment claim are satisfied. As to the third element, allowing Defendants to pocket this monetary chasm as profit is an inequitable result, which should warrant preservation of this cause of action. "The most significant requirement for a recovery [for unjust enrichment] is that the enrichment to the defendant be unjust." *14th & Heinberg, LLC v. Terhaar & Cronley Gen. Contractors, Inc*., 43 So. 3d 877, 881 (Fla. Dist. Ct. App. 2010).

Defendants argue that Plaintiffs' unjust enrichment claim should be dismissed because Plaintiffs "received what they bargained for." MTD at 30. "[A] plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists *concerning the same subject matter*." *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. Dist. Ct. App. 2008) (emphasis added). "It is only upon a showing that an express contract exists that [an] unjust enrichment . . . count fails. Until an express contract is proven, a motion to dismiss a claim for . . . unjust enrichment on these grounds is premature." *Mobil Oil Corp. v. Dade Cnty. Esoil Mgmt. Co.*, 982 F. Supp. 873, 880 (S.D. Fla. 1997) (internal citation omitted); *see also Saxon Fin. Grp., Inc. v. Rath*, No. 11-cv-80646, 2012 WL 3278662, at *7 (S.D. Fla. Aug. 9, 2012) ("[I]t is not the allegation of the existence of a contract, but the showing that an express contract exists that will cause the unjust enrichment count to fail."). Defendants have not shown that an express contract exists governing the sale of the VATI program. And Plaintiffs allege that "[n]either Defendants' Enrollment Agreements nor Defendants' college catalogs contained express provisions relating to the charges for the VATI program." FAC ¶ 505. Thus, although an implied-in-fact contract existed between Defendants HCI and Florian, on the one hand, and Plaintiffs, on the other, *see Ferretti*, 604 F. Supp. 3d 1330, 1334, it has not been established that there was an express contract between

the parties concerning the purchase of the VATI program. Because there was no express contract, Plaintiffs' claim for unjust enrichment should not be dismissed. *See Diamond "S" Dev. Corp.*, 989 So. 2d at 697; *Mobil Oil Corp.*, 982 F. Supp. at 880.

Additionally, Florida case law supports the allowance of alternative claims. *See Salerno v. Fla. S. Coll.*, 488 F. Supp. 3d 1211, 1218 (M.D. Fla. 2020) (defendant's attempt to dismiss both an unjust enrichment claim and a claim for breach of contract claim was improper because plaintiff was entitled to "allege alternative claims in her complaint"); *Nuwer v. FCA US LLC*, 552 F. Supp. 3d 1344, 1361–62 (S.D. Fla. 2021) (noting that Florida law permitted plaintiffs to plead unjust enrichment as alternative theory of recovery in consumer case alleging violations of the Florida Deceptive and Unfair Practices Act).

Defendants next argue that Plaintiffs' unjust enrichment claim fails because they "in essence allege they paid too much for a product they claim is worthless." MTD 30. But this is facially untrue. Count 8 alleges that Defendants charged over $4,000 for access to a program that costs only $525, pocketing the difference, and does so by obscuring the nature of what is being sold. FAC ¶¶ 501, 503. This sort of deceptive overcharge is a textbook form of unjust enrichment. *See, e.g.*, *Donoff v. Delta Air Lines, Inc.*, No. 18-cv-81258, 2019 WL 9091763, at *9 (S.D. Fla. July 9, 2019) (allegation that defendant overcharged plaintiffs for trip insurance and kept that overcharge "suffices to show unjust enrichment at the pleading stage"); *Zamber v. Am. Airlines, Inc.*, 282 F. Supp. 3d 1289, 1301 (S.D. Fla. 2017) (same).

Finally, Defendants rely on *ASD Specialty Healthcare, Inc. v. Jupiter Hematology & Oncology Assocs., P.A.*, No. 10-cv-80534, 2010 WL 11596318 (S.D. Fla. Oct. 1, 2010), to posit that Hart should not be subject to Plaintiff's claim of unjust enrichment. As discussed *supra,* Part II.B.4, Plaintiffs are not asserting unjust enrichment claims against Defendant Hart.

"Because unjust enrichment is an equitable remedy, the entirety of the circumstances must be considered." *In re Univ. of Miami COVID-19 Tuition & Fee Refund Litig.*, No. 20-cv-22207, 2022 WL 18034457, at *7 (S.D. Fla. Dec. 30, 2022). At this early stage, it would be improper to dismiss a cause of action without first permitting the discovery process unfold and reveal what the entirety of the circumstances are.

**D. Plaintiffs' Complaint States a Claim Under ECOA.**

Under the Equal Credit Opportunity Act ("ECOA"), it is "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction, (1) on the basis

of race." 15 U.S.C. § 1691(a). Plaintiffs have plausibly stated an ECOA claim against Defendant HCI.As explained in the FAC, "ECOA defines 'creditor' as 'any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of the original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e); FAC ¶ 508.

  1. Defendant HCI Is a "Creditor" under ECOA.

  As explained in the FAC, "ECOA defines 'creditor' as 'any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of the original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e); FAC ¶ 508. The FAC alleges specific facts that, if proven true, support a finding that Defendant HCI is a creditor because it regularly extends debt through its Tuition Options retail installment contract program and because it advertises the availability of Federal student loans to HCI students, submits paperwork and forms to the government to qualify students for Federal student loans, and directly receive the proceeds of those loans. FAC ¶¶ 136, 137, 513–514, 527. Notably, Defendants do not argue otherwise. A school's involvement in the financial aid process makes it a creditor under ECOA. *See Brook v. Sistema Universitario Ana G. Mendez, Inc.*, No. 8:17-cv-171, 2017 WL 1743500, at *3 (M.D. Fla. May 4, 2017) (finding that "[t]he [c]omplaint alleges facts sufficient to demonstrate that [defendant] is a 'creditor' as defined by ECOA" because by encouraging students to apply for federal student loans "it did refer prospective loan applicants to creditors."). The FAC also explains that "nearly all of the students who enrolled in the RN Program between September 2019 and the present entered into a retail installment contract with Defendants, serviced by Tuition Options" and that Defendants "steer[ed] students into retail installment contracts even when other, more favorable financing options exist." FAC ¶¶ 160, 162, 163, 263, 311, 355, 379, 413–414. These retail installment contracts are an extension of "credit" as that term is used in ECOA. 15 U.S.C. ¶ 1691a(d) (defining "credit" to mean "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor").

  2. Defendant HCI Discriminated with Respect to an Aspect of a Credit Transaction through Reverse Redlining.

  Defendants argue for dismissal of Plaintiffs' ECOA claim by alleging that Plaintiffs "fail to specify any aspect of any credit transaction that they allege is discriminatory based on race . . . and

fail to identify any specific loan term that they allege was unfair or predatory, let alone unfair or predatory based on race." MTD at 28. Defendants are wrong on both counts because the FAC explains Defendant HCI *offered* and *arranged* credit in a manner that constitutes reverse redlining under ECOA. The FAC shows that: (i) HCI's lending practice and loan terms were 'unfair' and 'predatory,' *and* (ii) HCI either intentionally targeted on the basis of race, or there is a disparate impact on the basis of race."[8] *See Steed v. EverHome Mortg. Co.,* 308 F. App'x 364, 369 (11th Cir. 2009) (citing *Hargraves v. Capital City Mortg. Corp.,* 140 F. Supp. 2d 7, 20 (D.D.C. 2000)).

Specifically, HCI deliberately targets students for recruitment and enrollment into their RN Program on the basis of race, and/or conduct their marketing in a manner that has a disparate impact on the basis of race. FAC ¶¶ 26(e), 512. HCI knows and intends that practically every student enrolled in the RN Program will rely on credit, in the form of Federal student loans, retail installment contracts, or both, to pay for the RN Program. *Id.* ¶¶ 5, 26(b), 136–38. HCI induces students into these credit transactions on the premise that completion of the RN Program will afford students professional opportunities sufficient to allow them to repay these loans. *Id.* ¶¶ 110, 11, 264, 313, 356, 380, 416. HCI precludes students from completing the RN Program. *Id.* ¶¶ 4, 14, 277, 331, 394. As a result of these practices, HCI both intentionally discriminated against the targeting subclass and created a disparate impact based on race. *Id.* ¶¶ 26(e), 512.

Defendants concede that reverse redlining is unlawful under ECOA. MTD at 32–33. To date, two federal court cases (one cited in Defendants' Motion) have found that a for-profit school offering or arranging credit through practices, and/or on terms, adequately described as predatory and/or unfair can constitute reverse redlining under ECOA if credit is directed towards a protected class or results in a disparate impact on a protected class. *Carroll v. Walden Univ., LLC*, No. 1:22-cv-00051, 2022

---

[8] On page 33 of their Motion, Defendants inexplicably cite the standard for proving reverse redlining as set forth in a 2010 Northern District of California case; however, *Steed* is the leading reverse redlining case in the Eleventh Circuit. As the Nothern District of Georgia explained in *Horne v. Harbour Portfolio VI, LP*, 304 F. Supp. 3d 1332 (N.D. Ga. 2018):

> In *Steed*, the Eleventh Circuit applied the analysis of *Hargraves* in a reverse redlining case. To state a plausible reverse redlining claim, Plaintiffs must allege that the defendants' lending practices and loan terms were unfair and predatory, *and* that the defendants either intentionally targeted on the basis of race, or that there is a disparate impact on the basis of race . . . . Whether the practices alleged occurred, and whether the practices were unfair and predatory, is a jury question.

*Id.* at 1339–40 (internal citations omitted).

WL 17252556, at *10 (D. Md. Nov. 28, 2022) ("Walden is targeting Black and female students with a predatory program designed to hoodwink students and saddle them with onerous student debt. This is not laudable; instead, it constitutes illegal reverse redlining and racial discrimination."); *Brook,* 2017 WL 1743500, at *3 (dismissing ECOA claim without prejudice because plaintiff did not "explicitly describe the credit transaction she believe[d] was unlawful").

### a. Defendant HCI's Lending Practices and Loan Terms Are Unfair and Predatory.

The credit transactions at issue in this case include class members taking federal student loans arranged by Defendants and borrowing private loans through HCI's retail installment contract program known as "Tuition Options." FAC ¶¶ 5, 162–170, 514–518. Defendants claim that in this case, as in *Brook*, the ECOA claims should be dismissed because plaintiffs "fail to specify any aspect of any credit transaction that they allege is discriminatory based on race . . . and fail to identify any specific loan term that they allege was unfair or predatory, let alone unfair or predatory based on race." MTD at 28.  They are incorrect on both counts.

### i. Federal Student Loans

"ECOA violations are not necessarily restricted to consideration of the four corners of the paper bearing a student borrower's signature." *Carroll*, 2022 WL 17252556, at *10 (D. Md. Nov. 28, 2022). Because "the definition of credit transaction includes every aspect of an applicant's dealings with a creditor," *id.*, a credit transaction may be unlawful even where the terms of the loan extended are facially neutral. In *Carroll*, Black women who had enrolled in a graduate degree program at Walden University alleged that the school had "engaged in a consistent and longstanding pattern of fraudulent misrepresentations regarding the requirements of the . . . degree—including the required credits, the length of time required for completion, and, most consequentially, the cost of the degree—for the purposes of enticing students to enroll in the . . . degree program" and take out federal student loans to pay their tuition. *Id.* at 10–11. Finding that the plaintiffs had stated a claim of reverse redlining under ECOA, the court observed: "Plaintiffs allege that Defendants intentionally targeted Black and female prospective students for the [degree] program by marketing and advertising their predatory program to a protected class; and in reliance on their false representations, Plaintiffs entered into credit transactions and sustained considerable financial harm as a result." *Id.* at 11.

Plaintiffs make similar allegations, which similarly state a claim for relief under ECOA. As alleged in the FAC, Defendants induce students to take out federal student loans on the premise that completion of the RN Program will afford them professional opportunities sufficient to allow them to repay these loans. FAC ¶¶ 110, 11, 264, 313, 356, 380, 416. In fact, Defendants offer a valueless education, *id.* ¶¶ 464, 468, 494, and preclude students from completing the RN Program, *id.* ¶¶ 4, 14, 277, 331, 394. The admissions process and financial aid process are one and the same, such that the lies and omissions used to convince students to enroll in the RN Program were used at the same time to convince students to take out loans that Defendants knew they could likely never pay back. FAC ¶¶ 254–265; 303–315, 349–357, 411–417. And while Defendants portrayed the RN Program as costing a specific amount at the time of enrollment and financial aid sign-up, it ultimately cost much more because students were forced to repeat failed classes or be dropped from the program. FAC ¶¶ 5, 116-118, 203, 212, 284, 323, 364, 367, 431. Finally, because of Defendants' actions , students are unable to seek employment as RNs and unable to afford their federal loan payments. FAC ¶ 289, 292, 245–46, 370–72, 404–05, 439-41.[9]

The alleged unfavorable terms, and unlawful aspects of the credit transaction, thus include the predatory nature of the financed product, *see Carroll*, 2022 WL 17252556, at *10; the inflated sales price of the financed product, *see, e.g.*, *U.S. ex rel. Cooper v. Auto Fare, Inc.*, No. 14-cv-0008, 2014 WL 2889993, at *3 (W.D.N.C. June 25, 2014) (plaintiffs stated a reverse redlining claim based on predatory installment loan terms, including inflated sales prices); *Barkley v. Olympia Mortg. Co.*, No. 04 CV 875 RJD/KAM, 2007 WL 2437810, at *15 (E.D.N.Y. Aug. 22, 2007) (denying motion to dismiss where plaintiffs alleged that their mortgages contained unfavorable terms, "particularly because [they were] based on a grossly inflated appraisal"); and Defendants' misrepresentations regarding Plaintiffs' ability to repay their federal loans, *cf. Cooper*, 2014 WL 2889993, at *1, 3 (denying motion to dismiss where plaintiffs alleged, inter alia, "that [d]efendants extended credit without properly assessing the purchasers' creditworthiness or

---

[9] Payments on most federal student loans have been suspended since March 2020 in response to the Covid-19 pandemic. Payments will restart when the U.S. Department of Education is permitted to implement President Biden's loan relief program or the litigation over the program is resolved. If the debt relief program has not been implemented and the litigation has not been resolved by June 30, 2023, payments will resume 60 days after that. Federal Student Aid, *COVID-19 Emergency Relief and Federal Student Aid*, https://studentaid.gov/announcements-events/covid-19.

ability to repay"); *Jones v. Caliber Home Loans, Inc.*, No.18-cv-1023, 2019 WL 3366104, at \*6 (M.D. La. July 25, 2019) (discussing ability to repay in context of ECOA reverse redlining claims).

### ii. Retail Installment Contracts

Plaintiffs also allege that Defendant HCI committed reverse redlining through its private lending program referred to as "Tuition Options." FAC ¶¶ 5, 162–170, 514–518. The FAC describes the credit transactions at issue in detail, explaining how Defendants "encouraged students to supplement federal aid with institutional loans, which are made through retail installment contracts and require students to make monthly payments while attending school." *Id.* ¶ 137. The contracts contain the unfair terms described above, including the predatory nature and inflated price of the financed product and misrepresentations regarding Plaintiffs' ability to repay their loans. Additionally, the FAC explains that "Defendants steer students into retail installment contracts even when other, more favorable financing options exist" and identifies the unfair terms of HCI's retail installment contracts, which "require immediate payment while students are in school, do not offer income-sensitive repayment options, and have a risky acceleration clause that makes the entire balance due upon a single missed payment." *Id.* ¶ 162–64. The Enrollment Agreements require students to "satisfy all financial obligations to the College" prior to graduation. *Id.* ¶ 257. And, in perhaps the greatest display of predatory lending, Defendants would not permit students to enter campus, and threatened to dismiss them from the RN Program, if they were not caught up on their retail installment loan payments. *Id.* ¶¶ 165-166.

### b. Defendants Intentionally Targeted on the Basis of Race and Caused a Disparate Impact on the Basis of Race.

The FAC explains in detail how the offering of credit was intentionally discriminatory because of the way in which Defendant HCI targeted prospective Black students. Specifically, the FAC explains that HCI encouraged the borrowing of federal student loans and private retail installment contracts; that these were taken on by nearly all students, *id.* ¶¶ 137, 162–163; and that the student body was disproportionately Black due to Defendants' targeted marketing, advertising, and recruiting, ¶¶ 113–114. Rather than conclusory allegations of disproportionality, the FAC sets forth publicly available data supporting the disparate impact claim by showing that Black students were disproportionately represented in Defendants' RN Program (42% of the program's enrollees are Black) when compared to Black individuals residing where Defendants' campuses are located, in Palm Beach County and Broward County (17% and 27% of the populations are Black, respectively).

*Id*. ¶¶ 26(e), 113. In *Carroll,* the district court allowed plaintiffs to proceed with ECOA claims against their for-profit school where plaintiffs similarly alleged that "[d]efendants[] intentionally targeted their protected status group through various forms of marketing and advertising to ensnare them in a credit transaction to enable them to enroll in the [degree] program on a false and fraudulent premise" and that this conduct "had a disproportionate injurious impact on their protected class." 2022 WL 17252556, at *9.

### E. Plaintiffs' Complaint States a Claim Under Title VI.

Title VI prohibits subjecting any person to discrimination based on race under a program or activity receiving Federal financial assistance. "To survive a motion to dismiss under Title VI, a plaintiff must plead sufficient facts supporting that (1) the defendant is a recipient of federal financial assistance; and (2) the defendant intentionally discriminated against plaintiff on the basis of race, color, or national origin." *Carroll v. Walden,* at *10 (citing *Alexander v. Sandoval,* 532 U.S. 275, 281 (2001); *Evans v. 7520 Surrats Rd. Ops., LLC.* No. 21-cv-1637, 2021 U.S. Dist. LEXIS 221041, at *9 (D. Md. Nov. 16, 2021)).

#### 1. Defendants Receive Federal Assistance.

Plaintiffs allege, and Defendants do not (and cannot) deny, that Defendant HCI is subject to Title VI because "their students receive federal student aid, including need-based grants and student loans, under Title IV of the Higher Education Act." FAC ¶ 70; *see Peters v. Molloy Coll. of Rockville Ctr.*, No. 07-cv-2553, 2008 WL 2704920, at *7 (E.D.N.Y. July 8, 2008) (rejecting dismissal of Title VI claims against defendant college that received federal financial assistance in the form of student loans and grants).

#### 2. Defendant HCI Committed Intentional Discrimination

Intentional discrimination on the basis of race under Title VI can be established by finding that the recipient of Federal funds committed reverse redlining. *See Brook,* 2017 WL 1743500, at *4 (not allowing reverse redlining claims under Title VI "would mean that Title VI, part of the Civil Rights Act 'created to be an instrument for the abolition of discrimination, allows injustice so long as it is visited exclusively on one ethnic group'").

In *Brook*, cited in Defendants' Motion, the court found that the plaintiff sufficiently plead a Title VI claim by alleging that the for-profit school defendant targeted her with its sham educational program because of her ethnicity. *Id.* Declining to dismiss her Title VI claims, the court explained, "[t]he discrimination claim arises from the harmful product being peddled; the targeted advertising

simply helps to prove that the discrimination was intentional." *Id*. Similarly, in this case, the FAC alleges that Defendants intentionally discriminated against the targeting subclass by using marketing, advertising, and recruiting techniques to target their subpar nursing program to Black individuals on the basis of their race. FAC ¶ 456.

### a. *Defendants Intentionally Targeted Black Individuals.*

"In analyzing whether a plaintiff alleges discriminatory intent under Title VI, the court takes an 'expansive approach . . . as 'plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence.'" *Carroll,* 2022 WL 17252556, at *5 (quoting *Wang v. Bethlehem Cent. Sch. Dist.*, No. 21-cv-1023, 2022 WL 3154142 at *35 (N.D.N.Y. Aug. 8, 2022)) (omission in original). In their Motion, Defendants ask the Court to take a narrow, rather than expansive, approach and find that this case somehow differs from *Brook* because, according to Defendants, "there is no allegation Defendants made any specific statement that Black people are its target market or focused on marketing to channels that disproportionately reached a Black audience." MTD at 30.

Defendants' argument fails because, as in *Brook*, the FAC "makes factual allegations from which the Court can reasonably infer intentionality." *Brook,* 2017 WL 1743500, at *3. The *Brook* court inferred intentionality because, "[t]he [c]omplaint alleges that [defendants'] student population is disproportionately Latino" and "that this disproportionality is due to intentional targeting." *Id.* Similarly, Plaintiffs allege disproportionality achieved via targeting, from which the Court can infer intentionality, by including in their FAC: (a) concrete examples of advertising targeted at Black women and (b) U.S. Census data and IPEDS data[10] in support of their allegation that Defendants' targeting is "evidenced by the fact that 42 percent of HCI's RN Program is Black, while census data shows that Palm Beach County is only 17 percent Black and Broward County is only 27 percent Black." FAC ¶¶ 26(e), 113.

Defendants imply that dismissal of the Title VI claim is warranted absent Plaintiffs alleging certain details about Defendants' advertising by citing *Steed*, in which the Eleventh Circuit upheld the district court's summary judgment on plaintiff's reverse redlining claims because he "did not establish a *prima facie* case of reverse redlining" because "he provided *no* evidence of where [defendant] advertised or that [it] made an unusual number of loans in majority [B]lack areas or targeted those debtors . . . in the way he alleged he was targeted." 308 Fed. App'x at 379 (emphasis

---

[10] IPEDS is the Integrated Postsecondary Education Data System.

in original). As an initial matter, a complaint "need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case . . . because *McDonnell Douglas*'s burden-shifting framework is an evidentiary standard, not a pleading requirement." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015) (internal citations omitted). Further, the complaint contains allegations relating both to the method of advertising and to its disparate impacts, FAC ¶¶ 26(e), 113, 114, allegations similar to those that the district court found sufficient to defeat a motion to dismiss in *Steed. Steed v. Everhome Mortg. Co.*, No. 1:06-cv-3064, 2007 WL 9703390, at *4 (N.D. Ga. Apr. 12, 2007).

### b. Plaintiffs' FAC Sufficiently Describes Harmful Products that Defendants Intentionally Peddled Toward a Protected Class.

Defendants claim that its RN Programs cannot be "shams" because "it is undisputed that the programs were BON approved with NCLEX codes and students could be eligible to sit for NCLEX-RN." MTD at 35. First and foremost, as Defendants' own history demonstrates, approval to operate from the BON is not synonymous with a quality program. Knowing this, the BON has procedures in place to terminate programs not in compliance with laws and regulations, which is exactly what happened to Defendants' "old" HCI-WPB RN Program. FAC ¶¶ 181,185.

Furthermore, Defendants' claim that Plaintiffs' attempt to characterize Defendants' nursing programs as a "sham" is "unsupported by any specific facts" entirely ignores Plaintiffs' allegations that the RN Programs were "functionally valueless" because, *inter alia*, the programs did not allow students to graduate and did not provide the type of clinical placements students were required to have by law to become RNs in Florida. *Id.* ¶¶ 460–464; 465–468; 491–494. Beyond conclusory allegations, the FAC details the methods Defendants used to keep students from graduating, *id.* ¶¶ 129–132, 203–212, 220–238, 277–285, 331–339, 362–368, 397–399; the abysmally low number of HCI students who went on to become RNs, *id.* ¶¶ 19, 20, 23, 83–90, 98–101, 247–250, and the fact that the programs did not satisfy Florida law for nursing curriculum because they consisted of less than 50% clinical training, of which more than 50% was clinical simulation, *id.* ¶¶ 26(c), 54(a), 65(a-b), 190, 268–269, 321, 322, 360, 362, 385, 386, 425, 426.

### CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss. In the event the Court is inclined to grant the motion in any respect, Plaintiffs respectfully request leave to amend.

## <u>REQUEST FOR HEARING</u>

In accordance with Local Rule 7.1(b)(2), Plaintiffs request a one-hour hearing focused on the factual, legal, and procedural issues raised by the motion to dismiss. The claims involve myriad complicated regulatory frameworks and several novel issues of law, and Plaintiffs would appreciate the opportunity to resolve any confusion that the pleadings may have caused.

Dated: April 13, 2023

Respectfully submitted,

*/s/ Nicole Mayer*
NICOLE MAYER
Florida Bar No. 012035
Nicole@MayerLawFlorida.com 171
Dommerich Drive.
Maitland, Florida 32751
(352) 494-3657

REBECCA EISENBREY
(*pro hac vice*)
reisenbrey@ppsl.org
ERIC SCHMIDT
(*pro hac vice*)
eschmidt@ppsl.org
Project on Predatory Student Lending
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
(617) 390-2669