UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CV-81883-RAR

**BRITTANY ROBERSON**, *et al.*,
*individually and on behalf of all*
*others similarly situated*,

       Plaintiffs,

v.

**HEALTH CAREER INSTITUTE LLC**, *et al.*,

       Defendants.

_____/

## ORDER ON DEFENDANTS' MOTION TO DISMISS

**THIS CAUSE** comes before the Court upon Defendants' Motion to Dismiss First Amended Complaint ("Motion"), [ECF No. 55]. Plaintiffs' First Amended Class Action Complaint ("FAC") alleges a pattern of predatory, discriminatory, and fraudulent misconduct by for-profit nursing school, Health Career Institute LLC, d/b/a HCI College LLC and HCI Acquisition LLC ("HCI"); its parent company, Florian Education Investors LLC ("Florian"); and the chief executive of both organizations, Steven W. Hart ("Hart"). *See generally* FAC. Defendants move to dismiss the FAC under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2) and maintain the FAC is a shotgun pleading. *See* Mot. at 5–35. The Motion is ripe for review.[1] The Court having carefully reviewed the pleadings and the record, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART** for the reasons stated herein.

---

[1] Plaintiffs filed a Response in Opposition to Defendants' Motion to Dismiss ("Response"), on April 13, 2023. [ECF No. 57]. The Consumer Financial Protection Bureau ("CFPB") filed a Statement of Interest in Support of Plaintiffs ("CFPB Statement"), on April 14, 2023. [ECF No. 58]. On April 28, 2023, Defendants filed a Reply in Support of the Motion to Dismiss ("Reply"). [ECF No. 62].

## BACKGROUND

HCI is a registered limited liability company organized under the laws of Delaware, registered to transact business in the state of Florida. FAC ¶ 42. In its Annual Reports to the Florida Board of Nursing, HCI has reported its owner to be "Steve Hart" or "HCI Acquisition LLC." *Id.* Defendant Florian is a Delaware limited liability company with its principal place of business in Darien, Connecticut. *Id.* ¶ 43. Florian is a managing member of HCI. *Id.* HCI college catalogues state that HCI College is a subsidiary of Florian. *Id.* Defendant Hart is a resident of Connecticut. *Id.* ¶ 44.

Plaintiffs Brittany Roberson, Rebecca Freeman, Bianca Viñas, Tiffany King, and Tresha Thompson ("Plaintiffs") were students at HCI's Associate of Science in Nursing Program ("RN Program") between 2020 and 2022. *Id.* ¶¶ 37–41. Brittany Roberson is a resident of Amelia, Ohio; Rebecca Freeman is a resident of Port St. Lucie, Florida; Bianca Viñas is a resident of West Palm Beach, Florida; Tiffany King is a resident of Lake Worth, Florida; and Tresha Thompson is a resident of Margate, Florida. *Id.*

Plaintiff's FAC contains ten counts alleging Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claims related to educational services in HCI's RN Programs (Counts 1, 2, 3, 6, and 7); Breach of Contract based on HCI's Enrollment Agreement and course catalog regarding the RN Program requirements (Counts 4 and 5); Unjust Enrichment based on allegedly unfair and deceptive pricing of the RN Program Capstone course (Count 8); Equal Credit Opportunity Act ("ECOA") violations as a result of HCI allegedly targeting RN Program enrollees based on race and extending credit for an illusory program (Count 9); and a Title VI of the Civil Rights Act of 1964 ("Title VI") claim for intentional discrimination against Black people in connection with federal student loans for enrollment in HCI's RN Program, and/or targeting Black people with a

predatory product, thereby engaging in reverse redlining in violation of 42 U.S.C. § 2000d.  Mot. at 4; FAC ¶¶ 460–528.

## LEGAL STANDARDS

### I.  Personal Jurisdiction

Federal courts in Florida may exercise personal jurisdiction over nonresident defendants to the same extent that a Florida court may, provided the exercise is consistent with federal due process requirements." *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008).  This analysis requires a two-part inquiry: (1) whether personal jurisdiction exists over the nonresident defendant under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013); *see also* Fed. R. Civ. P. 4(k)(1)(A); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).  "There are two types of personal jurisdiction: specific and general." *Madara v. Hall*, 916 F.2d 1510, 1516 n.7 (11th Cir. 1990).  "General personal jurisdiction is based on a defendant's substantial activity in [a state] without regard to where the cause of action arose," whereas "specific personal jurisdiction authorizes jurisdiction over causes of action arising from or related to the defendant's actions within [a state]." *Louis Vuitton*, 736 F.3d at 1352 (citations omitted).  To determine whether a cause of action "arises out of" or "is related to" a defendant's actions in a state, the court need not require "proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).  However, "the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.*

Where no evidentiary hearing is held on a motion to dismiss, "[a] plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs.*, 556 F.3d at 1274. "A prima facie case of personal jurisdiction is established if Plaintiffs present 'enough evidence to withstand a motion for directed verdict.'" *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1139 (S.D. Fla. 2019) (quoting *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000)). "The Court must accept allegations as true, to the extent that they are uncontroverted by the Defendants' affidavits and depositions, and must construe all reasonable inferences in favor of the Plaintiffs." *Id.* A defendant challenging personal jurisdiction must present evidence to counter the plaintiffs' allegations. *See Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009) (noting that the defendant must "raise, through affidavits, documents or testimony, a meritorious challenge to personal jurisdiction"). Once the defendant has presented sufficient evidence, "the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents." *Id.*

As a general rule, courts should address jurisdictional issues, such as challenges to personal jurisdiction, before reaching the merits of a plaintiff's claims. *See, e.g.*, *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 941 (11th Cir. 1997). This is logical because "[a] court without personal jurisdiction is powerless to take further action." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 n.6 (11th Cir. 1999).

**II.  Shotgun Pleading**

The Federal Rules of Civil Procedure provide, in pertinent part, that a pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In addition, the complaint must specify the grounds

for relief available to the moving party and state the facts supporting each ground for relief.  *See* FED. R. CIV. P. 8.

The Eleventh Circuit has identified four rough types or categories of shotgun pleadings. *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (citations omitted).  "The most common" shotgun pleading is one "containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint."  *Id.* at 1321.  "The next most common type . . . is a complaint that [is] . . . replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action."  *Id.* at 1321–22.  "The third type of shotgun pleading is one that . . . [does] not separat[e] into a different count each cause of action or claim for relief."  *Id.* at 1322–23.  Lastly, "there is the relatively rare [shotgun pleading] asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."  *Id.* at 1323.

"The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *Id.*  The Eleventh Circuit has repeatedly condemned the use of shotgun pleadings for "imped[ing] the administration of the district courts' civil dockets."  *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 806 n.4 (11th Cir. 2010).  The Eleventh Circuit has also made clear that shotgun pleadings are an unacceptable form of establishing a claim for relief.  *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295–96 (11th Cir. 2002).

### III. Failure to State a Claim

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiffs receive the benefit of all favorable inferences that can be drawn from the facts alleged.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Iqbal*, 556 U.S. at 678.

A court considering a 12(b)(6) motion is generally limited to the facts contained in the complaint and attached exhibits—but may also consider documents referred to in the complaint that are central to the claim and whose authenticity is undisputed.  *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).  While the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.  "Dismissal pursuant to Rule 12(b)(6) is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (citation and quotation omitted).  And "determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Holland v. Carnival Corp.*, 50 F.4th 1088, 1093 (11th Cir. 2022) (alterations accepted) (quoting *Iqbal*, 556 U.S. at 679).

## ANALYSIS

### I.  Personal Jurisdiction

Defendants seek dismissal of Hart and Florian on personal jurisdiction grounds.  The Court will analyze each Defendants' contacts and operations in turn.

### a.  *Personal Jurisdiction Over Defendant Hart*

Defendants argue as to Hart that "[w]hile the [FAC] vaguely alleges Hart was reportedly the owner and Chairman of HCI and CEO and co-founder of Florian, it is completely devoid of allegations that Hart undertook any specific act or engaged in any conduct enumerated under [Florida's long-arm statute] that could potentially give rise to any cause of action asserted as against him individually."  Mot. at 7.  Defendants also argue that Plaintiffs have not pled sufficient allegations to hold Hart liable individually or in his corporate capacity.  *Id.* at 8–9.  Defendants attach a relatively brief Declaration by Steven W. Hart ("Hart Declaration") stating in relevant part that 1) Hart is currently the Chairman of HCI and that this role permits him to direct the CEO of HCI; 2) Hart is also the CEO of Florian; 3) HCI is wholly owned by Florian; 4) and HCI's CEO is given autonomy from Florian but is subject to "Authorization Guidelines."  Hart Decl. [ECF No. 55–1]; Resp. at 6.  Lastly, Defendants argue that the FAC does not sufficiently plead enough facts to hold Hart liable individually under an alter ego theory.  Mot at 8–9; Reply at 4.

Plaintiffs respond that Hart directs HCI's CEO, FAC ¶ 44, was formerly Co-CEO himself, and plausibly has a hand in "HCI's broader policies and business priorities through [the] Authorization Guidelines" referenced vaguely in the Hart Declaration.  Resp. at 6. Plaintiffs highlight that the time period of their action reaches back to 2019 and the Hart Declaration does not clarify what Hart's role at HCI was in 2019.  Resp at 6.  Plaintiffs also cite to Hart's LinkedIn page, which describes Hart as "Co-CEO" of HCI from 2013–2019.  *Id.*  Additionally, the Annual

Reports to the Florida Board of Nursing list HCI's owner as Steven Hart.  FAC ¶ 42.  From these overlapping corporate roles and layers of authority, Plaintiffs allege, Mr. Hart directed HCI's wrongful actions that form the crux of this lawsuit.  *Id.*  Plaintiffs do not contest that this Court lacks general personal jurisdiction over Hart, but argue that specific jurisdiction should attach.  *See* Resp. at 6.

As set forth above, the personal jurisdiction analysis begins with a two-part inquiry: "(1) whether personal jurisdiction exists over the nonresident defendant . . . under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution."  *Louis Vuitton*, 736 F.3d at 1350; *see also* FED. R. CIV. P. 4(k)(1)(A).  The Eleventh Circuit has explained that a nonresident defendant may be subject to specific personal jurisdiction under Florida's long-arm statute "for conduct specifically enumerated in the statute."  *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) (citing *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203 (11th Cir. 2015)).

While Plaintiffs' explicit allegations against Hart are relatively brief, Defendants overstate their claims at the pleading stage of this litigation.  The Court finds that Plaintiffs have plausibly alleged a *prima facie* case for specific personal jurisdiction over Defendant Hart.  The Hart Declaration aligns with some aspects of the FAC and contradicts it in others.  But where allegations from a plaintiff's complaint and supporting evidence conflict with the defendant's submitted affidavit, the court must construe all reasonable inferences in favor of the plaintiff.  *See Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268–69 (11th Cir. 2002).  With this in mind, the Hart Declaration does not fully refute Plaintiffs' personal jurisdiction arguments, so the Court need not shift the burden back to Plaintiffs.  *See Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000) (explaining the burden shifts back to plaintiff to substantiate

jurisdictional allegations in the complaint by affidavit or other competent proof *if* defendant is able to make a *prima facie* showing of the inapplicability of long arm jurisdiction).

Section 48.193(1)(a)(1) of Florida's long-arm statute permits personal jurisdiction over a nonresident defendant or its agent "operating, conducting, engaging in, or carrying on a business or business venture in the state." The FAC alleges and the Hart Declaration confirms that Hart is the Chairman of HCI, FAC ¶ 43; Hart Decl. ¶ 4, and directs HCI's CEO, FAC ¶ 44; Hart Decl. ¶ 12. The Hart Declaration also vaguely states that HCI's CEO can only enact day-to-day decisions and institutional operations pursuant to "Authorization Guidelines" without explaining what those entail. *See* Hart Decl. ¶ 13. If Hart truly directs HCI's CEO, as both the FAC alleges and the Hart Declaration confirms, it is reasonable for the Court to assume that Hart could have day-to-day managerial control over HCI. Moreover, assuming Hart directed or had a significant role in directing the actions alleged in the hundreds of other paragraphs in the FAC, this would amount to significant business activity in the state of Florida. This activity satisfies the requirements of Florida's Long-Arm Statute by showing that Hart was operating, conducting, engaging in, and/or carrying on a business venture in Florida. Fla. Stat. § 48.193(1)(a)(1).

Defendants advance a half-hearted argument that Plaintiffs needed to have pled fraud or intentional misconduct by Hart "with particularity" in order to allege individual liability. Mot. at 4. Although Defendants do not cite the Rule, their argument appears to be in reference to FED. R. CIV. P. 9(b), which imposes a heightened pleading standard on claims "alleging fraud or mistake." While the Court has not found binding authority on the issue of whether a veil-piercing claim is governed by FED. R. CIV. P. 8's notice-pleading standard or the heightened pleading standard of Rule 9(b), courts in this district have held that Rule 8 provides the correct standard. *See Zhejiang Dushen Necktie Co. v. Blue Med, Inc.*, No. 16-24679, 2017 WL 4119604, at *3 (S.D. Fla. Sept.

18, 2017).  "Florida law does not require a party to prove fraud to pierce the corporate veil."  *Id.*
While fraudulent purpose is one means by which the corporate veil may be pierced, other means
recognized in Florida include utilizing a corporation as an alter ego for misleading purposes,
converting corporate property for personal benefit, or failing to establish a bona fide corporate
structure.  *See Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1120 (Fla. 1984); *cf. In re F
& C Servs., Inc.,* 44 B.R. 863, 868 (Bankr. S.D. Fla. 1984) (holding that "[a]n actual fraud need
not be perpetrated upon the creditors as a prerequisite to piercing a corporate veil").  These uses
of a corporation, while improper, do not necessarily constitute fraud, and therefore do not implicate
Rule 9(b)'s heightened pleading standard.

Here, the FAC does not specifically allege a theory of liability against Hart premised upon
piercing the corporate veil.  But the Court, taking the factual allegations as a whole and drawing
all inferences in favor of Plaintiffs, can implicitly recognize that some of Plaintiffs' claims are
asserting this theory of liability against Hart.  "Legal conclusions must be supported by 'enough
fact to raise a reasonable expectation that discovery will reveal evidence' of the claim."  *Haese v.
Celebrity Cruises, Inc.*, No. 12-20655, 2012 WL 3808596, at *2 (S.D. Fla. May 14, 2012) (quoting
*Twombly*, 550 U.S. at 556).  At this stage, "[t]he issue is not whether [plaintiffs] may ultimately
prevail on the 'piercing the corporate veil' theory, but whether the allegations are sufficient to
allow them to conduct discovery in an attempt to prove their allegations."  *Jackam v. Hosp. Corp.
of Am. Mideast*, 800 F.2d 1577, 1579–80 (11th Cir. 1986).  "Defendants may ultimately prevail on
the issue, but Plaintiffs must be allowed to plead and develop their case."  *Elof Hansson Paper &
Bd., Inc. v. Caldera*, No. 11-20495, 2011 WL 13115846, at *3 (S.D. Fla. Dec. 8, 2011).
Accordingly, Plaintiffs have adequately pled and met their burden of establishing a *prima facie*
case of specific personal jurisdiction over Defendant Hart.

###### b.  *Personal Jurisdiction Over Defendant Florian*

Plaintiffs argue that this Court can exercise both general and specific personal jurisdiction over Defendant Florian.  Resp. at 4–6.  Defendants fail to meaningfully address specific jurisdiction[2] and appear to only advance arguments against a finding of general jurisdiction over Florian.  Defendants stress that Florian and HCI are two separate corporate entities and the FAC only recounts actions taken by HCI.  Mot. at 13. Under Florida's long arm statute, the parent-subsidiary relationship alone is insufficient to confer personal jurisdiction over the foreign parent in the forum where the subsidiary acts.  Mot. at 14; *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1293 (11th Cir. 2000).  Defendants argue that Plaintiffs have merely alleged a parent-subsidiary relationship and that their allegations regarding Florian's operational control are too conclusory to confer general personal jurisdiction.  Mot. at 15.  Defendants maintain the Hart Declaration proves that HCI has the "semblance" of independence required to refute Plaintiff's claims of general personal jurisdiction over Florian.  *Id.* at 15–16.  Lastly, Defendants argue that the FAC is "devoid of allegations" that Florian took any specific action or engaged in any specific conduct with respect to the asserted causes of action.  Mot. at 11–12.

Plaintiffs respond that Florian maintained sufficient operational control over its subsidiary HCI to establish an agency relationship—and this relationship supports the exercise of general personal jurisdiction over Florian due to HCI's presence in Florida.  Resp. at 4 (citing *Meier*, 288

---

[2] Indeed, Defendants do not mention "specific personal jurisdiction" once in their Motion and only dedicate two sentences in their Reply to stating—in a conclusory fashion—that Plaintiffs' allegations are insufficient for "specific jurisdiction."  Reply at 3.  But Defendants do not cite any caselaw in support of that argument.  *See id.*  This lack of argumentation is tantamount to a waiver of arguments against specific personal jurisdiction over Florian on the part of Defendants.  "The Court will not serve as counsel's law clerk and make the arguments that should have been developed by each side."  *See Barmapov-Segev v. City of Mia.*, No. 19-23742, 2019 WL 6170332, at *5 (S.D. Fla. Nov. 20, 2019); *Cf. Christmas v. Harris Cnty., Ga.*, 51 F.4th 1348, 1354 (11th Cir. 2022) (stating that a "passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it" (citation omitted)).

F.3d at 1272).  Plaintiffs allege that Florian is a managing member of HCI; has been "intimately involved in the operation of HCI" since Florian acquired it in 2013, FAC ¶¶ 80–81; Florian and HCI share a corporate director in the person of Steven Hart, *id.* ¶ 44; Florian "presumably" controls HCI's CEO via the "Authorization Guidelines" referenced in the Hart Declaration, Resp. at 4; and Florian has a deep financial connection to its subsidiary in the form of a Florian UCC financing statement wherein it obtained a loan in exchange for assignment of student debt obligations by HCI, *see* FAC ¶ 31; [ECF No. 40–1].

In the alternative, Plaintiffs argue that Florian's business activities it conducted via HCI, all of which have "a significant connection" with the causes of action alleged in this lawsuit, subject Florian to specific personal jurisdiction.  Resp. at 5.  Exercising personal jurisdiction over Florian comports with due process requirements of the Fourteenth Amendment because Plaintiff's claims arise out of Florian's operational control over HCI; Florian purposely availed itself of the privilege of conducting business activities in Florida when it purchased and operated HCI, and obtained a loan in exchange for assignment of student debt obligations originated by HCI; and Florida has a significant interest in adjudicating a dispute involving educational services provided by an out-of-state corporation to students within its borders.  *Id.* at 5–6 (citing *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 259 (11th Cir. 1996)).

General personal jurisdiction "is typically available only where the defendant is incorporated or maintains its principal place of business."  *See Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1226 (S.D. Fla. 2021) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)).  Florian is neither incorporated nor does it maintain its principal place of business in Florida.  *See* FAC ¶ 43.  Plaintiffs attempt to establish general personal jurisdiction via agency theory.  *See* Resp. at 4–5.  But Plaintiffs have failed to adequately plead facts alleging that HCI is

"merely an agent through which [Florian] conducts business or that [Florian's] separate corporate status is formal only and without any semblance of individual identity." *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1343 (S.D. Fla.), *aff'd sub nom. Gen. Cigar Holdings v. Altadis, S.A.*, 54 F. App'x 492 (11th Cir. 2002) (citing *Meier*, 288 F.3d at 1272) (internal quotation marks omitted).  Moreover, the Hart Declaration confirms that "HCI and Florian do not share staff or employees"; "HCI is wholly owned by Florian but is a separate legal entity"; "Florian cannot make transactions with [HCI's] bank accounts"; and "Florian leaves decisions as to HCI's policy, day-to-day activities and institutional operations to [HCI's CEO's] direction pursuant to Authorization Guidelines."  Hart Decl. ¶¶ 6, 10, 13–14.  Thus, while the Court can plausibly infer the Authorization Guidelines include some level of involvement by Hart and/or Florian, the other uncontested aspects of the Hart Declaration prevent the Court from finding a pure agency relationship between both entities.

At this stage, however, the Court does find that Plaintiffs have plausibly alleged a *prima facie* case for specific personal jurisdiction over Florian.  The FAC alleges that Florian exercises control over HCI, and the Hart Declaration does not sufficiently refute this point to shift the burden back to Plaintiffs.  HCI's business operations in Florida are at the center of each count in the FAC, which include the provision of educational services by HCI's RN program, FAC ¶¶ 461, 466, 470, 492; contracts for products and services, *id.* ¶ 501; sale of products or services, *id.* ¶¶ 513, 527; and the extension of credit for educational services, *id.* ¶¶ 513, 527.  Plaintiffs also allege, and Florian has not refuted, that Florian obtained a loan in Florida in exchange for assignment of student debt obligations originated by HCI.  Resp. at 5.  These activities demonstrate that Florian, via its ownership and operation of HCI, purposely availed itself of the privilege of conducting activities in the Southern District of Florida. *Louis Vuitton*, 736 F.3d at 1355.  And Florida has an

interest in adjudicating this case involving a business entity providing educational services to its residents. *See Robinson*, 74 F.3d at 259.  Accordingly, Plaintiffs have successfully alleged a *prima facie* case of specific personal jurisdiction over Florian.

### II.  The FAC Requires Clarification to Comply with Pleading Requirements

In their Response, Plaintiffs clarify which counts they bring against which Defendants. Resp. at 11.  Plaintiffs explain that Counts 1 (FDUTPA as to Grading and Advancement), 2 (FDUTPA as to Misrepresentation of Educational Services Provided), 3 (FDUTPA as to Unauthorized Retail Installment Contracts), 6 (FDUTPA as to the "New" Program), and 7 (FDUTPA as to Withholding Advancement and Transcripts) are brought against all three Defendants. *Id.*  Counts 4 (Breach of Contract as to Grading and Advancement), 5 (Breach of Contract as to Clinical Placement), and 8 (Unjust Enrichment) are asserted against Defendants HCI and Florian. *Id.*  And Counts 9 (ECOA) and 10 (Title VI) are asserted only against Defendant HCI. *Id.*  This differs from Plaintiffs' FAC, where each of the ten counts are pled against "Defendants."  *See* FAC ¶¶ 460–528.  Plaintiff's Response therefore concedes that their FAC is "the relatively rare [shotgun pleading] asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Weiland*, 792 F.3d at 1323.

Defendants are correct that "plaintiffs cannot amend their complaint through a response to a motion to dismiss." *Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 665 (11th Cir. 2015); *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009).  Accordingly, Plaintiffs shall file a Second Amended Complaint that memorializes the clarifications included in their Response.[3]

---

[3]  For the remainder of this Order, the Court will only address Defendants' arguments as they relate to claims against the specific Defendants that Plaintiffs have specified on page 11 of their Response.

Defendants also argue that Plaintiffs' FAC is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." Mot. at 16–17 (citing *Weiland*, 792 F.3d at 1321). Defendants over-exaggerate this contention. The FAC does contain nearly 500 paragraphs of factual allegations, but this is a complex, class action complaint with multiple named plaintiffs alleging numerous causes of action against multiple defendants. In addition to the detailed factual background section, each of the ten counts in the FAC gives "a short plain statement showing that the pleader is entitled to relief" while also giving Defendants fair notice of what Plaintiffs' claims are and the grounds upon which they rest. FED. R. CIV. P. 8; *Twombly*, 550 U.S. at 555.[4] Therefore, in this regard, Plaintiffs' FAC is not an impermissible shotgun pleading. *Weiland*, 792 F.3d at 1325 (holding that dismissal of a complaint should be reserved for cases "where it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief").

### III.  Plaintiffs State Plausible Breach of Contract Claims

To state a breach of contract claim in Florida, a plaintiff must plead 1) that a contract exists, 2) a material breach of that contract occurred, and 3) resulting damages. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). "In Florida, a student's relationship with his or her private university is contractual in nature." *Dixon v. Univ. of Mia.*, No. 23-10299, 2023 WL 4853327, at *2 (11th Cir. July 31, 2023) (citing *Jallali v. Nova Se. Univ., Inc.*, 992 So. 2d 338, 342 (Fla. 4th DCA 2008)). "The terms of this may be derived from university publications such as the student handbook and catalog." *Id.* (quoting *Fla Int'l Bd. of Trs. v. Alexandre*, No. 3D22-0072, 2023 WL 3485498, at *3 (Fla. 3d DCA May 17, 2023) (internal quotation marks omitted)). But

---

[4] While Defendants quibble with some of Plaintiffs' allegedly muddled references to different exam types, *see* Mot. at 18–19; Reply at 8, these terminology deficiencies in the FAC do not create sufficient confusion to dismiss Plaintiffs' claims.

"a party can only advance a claim of breach of contract by identifying and presenting the actual terms of the contract allegedly breached." *In re Univ. of Mia. COVID-19 Tuition & Fee Refund Litig.*, No. 20-22207, 2022 WL 18034457, at *3 (S.D. Fla. Dec. 30, 2022) (quoting *Herssein Law Grp. v. Reed Elsevier*, 594 F. App'x 606, 608 (11th Cir. 2015)).

Defendants challenge Counts 4 and 5 of the FAC, which allege various breaches of contract, derived from the Enrollment Agreement and Defendants' college catalogue. FAC ¶¶ 475–78. Count 4 alleges that "Defendants breached their contracts with Plaintiffs and Class Members by making arbitrary and capricious changes to testing and grading requirements." *Id.* ¶ 479. This alleged breach caused damages in the form of "tuition paid to an illusory promise of graduation upon completion of specific requirements." *Id.* ¶ 481. Count 5 relates to clinical placement and alleges that "Defendants breached their contracts with Plaintiffs and Proposed Class Members by failing to provide clinical placements." *Id.* ¶ 488. Other portions of the FAC give added nuance to Count 5, alleging that Defendants did not "provide meaningful clinical instruction" in line with Florida Statute section 464.019(1), which mandates at least 50 percent clinic training and "[n]o more than 50 percent of the program's clinical training consists of clinical simulation." Fla. Stat. §§ 464.019(1)(b)(1); 464.019(1)(2)(c); FAC ¶¶ 54, 190.

Defendants conclusorily assert that Plaintiffs' contract claims must be dismissed as to Florian because the company "was not party to any alleged contracts at issue." Mot. at 20. But "[o]n a motion to dismiss, the factual allegations in the complaint are taken as true, even if they are subject to dispute," *Devengoechea v. Bolivarian Republic of Venez.*, 889 F.3d 1213, 1220 (11th Cir. 2018), and "a court must view the complaint in the light most favorable to the plaintiff," *Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1319 (S.D. Fla. 2021). Here, the FAC plausibly alleges that Florian was "an active owner and has been intimately involved in the

operation of HCI since 2013." FAC ¶ 81. Plaintiffs also allege that HCI's college catalogues identify HCI as a "subsidy" [sic] of Florian (apparently meaning a "subsidiary" of Florian) and inform students that Florian has legal control over HCI. *Id.* ¶ 43.[5] Taken together, these allegations support the conclusion that Florian may very well be a party to the implied-in-fact contract arising out of HCI's publications. *See Ferretti v. Nova Se. Univ., Inc.*, 604 F. Supp. 3d 1330, 1334 (S.D. Fla. 2022) (terms of implied-in-fact contract "may be derived from university publications such as the student handbook and catalog").

Defendants next assert that Plaintiffs' claims about "changes to the testing and grading requirements" constituting a breach of contract "are so vague that they do not establish any specific requirement in the enrollment agreements or catalogue was changed." Mot. at 22. Defendants argue that the FAC misinterprets the Enrollment Agreement exam requirements as a "floor and not a ceiling," and does not point "to any alleged contract provision that specified testing and grading requirements for end-of-semester or specialty exams." Mot. at 21. This appears to be false. The FAC explains that the "Graduation Requirements" section of the Enrollment Agreement states that students must "pass all written and practical examinations with a minimum score of 80%" and also achieve a minimum score of 95% on the exit exam, the ATI predictor. Resp. at 12; FAC ¶ 257. The FAC then alleges that HCI changed that policy to one where "students were required to achieve both an 80 percent overall score and at least 50 percent in every subcategory," in order to advance through the program. *Id.* ¶ 204. Defendants' suggestion that the 80 percent requirement was "a floor not a ceiling" is an argument that the contracts are ambiguous as to grading requirements. And interpreting potential ambiguity in a contract "is typically inappropriate at the motion to dismiss stage." *Ferretti*, 604 F. Supp. 3d at 1333; *see also Dixon*,

---

[5] Indeed, the Hart Declaration states that "HCI is wholly owned by Florian." Hart Decl. ¶ 10.

2023 WL 4853327 at *2 (noting that "when the terms of a contract are ambiguous, the parties' intensions become a question of fact for the jury"). Accordingly, Plaintiffs have adequately stated a breach of contract claim as to the grading requirements.

Defendants argue that Count 5 of the FAC must be dismissed because Plaintiffs' clinical placements did not breach the plain and unambiguous language of the Enrollment Agreement. *See* Mot. at 23–24. The Enrollment Agreement states that clinical rotations "[i]nclude[] a combination of medical facility, simulation lab and other field experience," and the college catalogue states that "[t]he RN program is designed to provide educational and clinical experiences leading to employment in beginning positions as registered nurses in hospitals or comparable facilities." FAC ¶¶ 483, 485. The FAC states that "Defendants breached their contracts with Plaintiffs and Proposed Class Members by failing to provide clinical placements," *id.* ¶ 488, and Defendants retort that because Plaintiffs received clinical placements, no breach occurred, Mot. at 23. This oversimplified argument, however, ignores key portions of the FAC.

The FAC sets forth a more nuanced claim, alleging that Defendants did not "provide meaningful clinical instruction" in line with Florida Statute section 464.019(1), which mandates at least 50 percent clinic training and "[n]o more than 50 percent of the program's clinical training consists of clinical simulation." Fla. Stat. §§ 464.019(1)(b)(1); 464.019(1)(2)(c); FAC ¶¶ 54, 190. The contours of Defendants' alleged contractual obligations are emphasized by the fact that HCI "must attest to its compliance with the statutory and regulatory requirements of professional nursing programs with respect to, *inter alia*, clinical placements." FAC ¶ 487. In other words, HCI needed to comply with Florida's clinical education standards in order to retain its accreditation, so it is reasonable to infer that the Enrollment Agreement and college catalogue encapsulated those standards. Moreover, the FAC is replete with detailed allegations about the

deficiencies of HCI's clinical offerings.  *See* Resp. at 14–15.  These facts taken together form a plausible basis for the clinical placement breach of contract claim.

Finally, Defendants argue that no breach of the grading requirements could exist because the Enrollment Agreement contained a clause stating HCI "reserves the right to modify the rules and policies outlined in the Catalog with or without notification."  Mot. at 22; Enrollment Agreement of Brittany Roberson [ECF No. 40–2] at 6; Enrollment Agreement of Rebecca Freeman [ECF No. 40–3] at 6; Enrollment Agreement of Tresha Thompson [ECF No. 40–4] at 7. Defendants cite to Florida caselaw holding that "implicit in the university's general contract with students is a right to change the university's academic degree requirements if such changes are *not* arbitrary or capricious."  *Jallali*, 992 So. 2d at 342–43.  Although courts largely defer to a university's judgment in modifying their contracts with students, that deference is not unrestricted. *See id.* at 343.  Plaintiffs sufficiently allege that HCI's changes to its grading requirements were arbitrary and capricious because they were disruptive, disconnected from any pedagogical purpose, and unsupported by the requirements of any regulatory bodies.  FAC ¶¶ 237–39.  The Court must take Plaintiffs' allegations as true and as such, Plaintiffs have plausibly alleged a breach of contract claim related to HCI's arbitrary and capricious grading requirement changes.

### IV.  Plaintiffs Fail to State an Unjust Enrichment Claim

"Under Florida law, a plaintiff stating a claim for unjust enrichment must allege (1) the plaintiff has conferred a benefit on the defendant, (2) the defendant voluntarily accepted and retained the benefit, and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof."  *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1308 (11th Cir. 2022).  "A claim for unjust enrichment is often referred to as a quasi-contract, or a contract implied in law."  *Doral Collision Ctr., Inc. v. Daimler Tr.*, 341

So. 3d 424, 429 (Fla. 3d DCA 2022).  "[I]t is well settled that a plaintiff 'cannot pursue an equitable theory, such as unjust enrichment or quantum meruit, to prove entitlement to relief if an express contract exists.'"  *Id.* (quoting *Fulton v. Brancato*, 189 So. 3d 967, 969 (Fla. 4th DCA 2016) (citation omitted)).

Plaintiff's unjust enrichment claim fails as a matter of law because an express contract provision existed governing the price of the Nursing Capstone Course.  Plaintiffs allege that they paid "over $4,000 to enroll in the required Capstone course" but "HCI did not provide the promised course" and instead provided the Virtual ATI (VATI) online NCLEX preparation course administered by a third party with a retail value of $525.  FAC ¶¶ 501–503.  Plaintiffs allege that "Neither Defendants' Enrollment Agreements nor Defendants' college catalogs contained express provisions related to the charges for the VATI program."  *Id.* ¶ 505.  While it may be true that those documents did not disclose the value of the VATI program, the Enrollment Agreement, attached to Plaintiffs' FAC, provided an express, numerical breakdown of tuition and fees including the price to be paid for the Nursing Capstone Course.  Reply at 15; Enrollment Agreement [ECF No. 40–2] at 2.

It may be true that Defendants' allegedly deficient Nursing Capstone Course could substantiate a breach of contract claim or consist of an unfair and deceptive business practice.  But the express provision in the Enrollment Agreement governing the price of the course vitiates Plaintiffs' unjust enrichment claim.  *See Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1341 (S.D. Fla. 2012) ("Under Florida law, unjust enrichment is an equitable remedy which necessarily fails upon a showing that an express contract exists.") (citing *Williams v. Bear Stearns & Co.*, 725 So. 2d 397, 400 (Fla. 5th DCA 1998)).  Accordingly, Plaintiffs' unjust enrichment claim in Count 8 is **DISMISSED**.

### V.  Plaintiffs' FDUTPA Claims

FDUTPA provides a cause of action for "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]." Fla. Stat. § 501.204(1) (alterations added).  "A consumer claim for damages under FDUTPA has three elements: (1) an objectively deceptive act or unfair practice; (2) causation; and (3) actual damages." *Lewis*, 530 F. Supp. 3d at 1231 (citing *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985-86 (11th Cir. 2016); *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006)).  A deceptive act or practice is one "that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Millennium Commc'ns & Fulfill., Inc. v. Office of the Att'y Gen.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000) (internal quotation marks and citation omitted).  FDUTPA violations can occur either: (1) *per se*, when "premised on the violation of another law proscribing unfair or deceptive practice[,]" or (2) a traditional violation involving some other "unfair or deceptive practice." *Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1288–89 (S.D. Fla. 2021) (quoting *Felice v. Invicta Watch Co. of Am.*, No. 16-62772, 2017 WL 3336715, at *2 (S.D. Fla. Aug. 4, 2017) (internal quotation marks and citation omitted)).

"Florida law permits a FDUTPA claim to travel with a related breach of contract claim if the FDUTPA claim challenges the acts underlying or giving rise to the breach, and does not rely solely on a violation of the Agreement as a basis for assertion of a FDUTPA claim." *Kenneth F. Hackett & Assocs., Inc. v. GE Cap. Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010) (quoting *Rebman v. Follett Higher Educ. Grp., Inc.*, 575 F. Supp. 2d 1272, 1279 (M.D. Fla. 2008)).  The heightened pleading "requirements of [Federal Rule of Civil Procedure] 9(b) do not apply to claims under FDUTPA." *Lewis*, 530 F. Supp. 3d at 1231.

### a. *Plaintiffs Fail to Adequately Plead FDUTPA Claims Against Defendants Hart and Florian[6] in Counts 1, 2, 3, 6, and 7*

Defendants argue that the FAC is "utterly devoid of any allegation that Hart took any individual actions in connection with FDUTPA claims and fails to allege he directly participated in any events giving rise to these causes of action." Mot. at 25. Defendants also argue that "Plaintiffs fail to demonstrate that any acts of HCI should be imputed to Florian" for purposes of their FDUTPA claims. *See* Reply at 9. Plaintiffs respond that "Hart possessed the authority to control the Corporate Defendants' deceptive acts" in his role as Chairman of HCI and CEO of Florian, and that Hart "directs HCI's President and CEO." Resp. at 15; FAC ¶ 44; Hart Decl. ¶ 12.

The Court agrees with Defendants that Plaintiffs' FDUTPA allegations against Defendants Hart and Florian are too vague. "[I]t has long been the law in Florida that in order to proceed against an individual using a FDUTPA violation theory an aggrieved party must allege that the individual was a direct participant in the improper dealings." *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1074 (Fla. 5th DCA 2008); *see also Aboujaoude v. Poinciana Dev. Co. II*, 509 F. Supp. 2d 1266, 1276–77 (S.D. Fla. 2007) (citing *Rollins, Inc. v. Heller*, 454 So. 2d 580, 582 (Fla. 3d DCA 1984)). While the Court is mindful not to impose a Rule 9(b) heightened pleading standard on Plaintiffs with respect to their FDUTPA counts, Plaintiffs cannot merely impute all the alleged FDUTPA wrongs in their FAC to all three Defendants equally and expect that Defendants will know how to defend against such claims. "[T]o satisfy Rule 8's pleading standards, Plaintiffs'

---

[6] Defendants' Motion maintains that Plaintiffs' FDUTPA claim should be dismissed as to Hart only. *See* Mot. at 25 (arguing the FAC "is utterly devoid of any allegation that Hart took any individual actions in connection with FDUTPA claims"). However, in their Reply, Defendants mention in passing that "Plaintiffs fail to demonstrate that any acts of HCI should be imputed to Florian" for purposes of FDUTPA liability. Reply at 9 (emphasis added). Despite this apparent waiver of any argument as to Florian, *see In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009), the Court will nonetheless address Plaintiffs' FDUTPA claims as to both Hart and Florian. As with Hart, Plaintiffs have not adequately pled how Florian was actively involved in the decision-making process that undergirds the alleged FDUTPA violations.

FDUTPA allegations must 'specify [Defendants'] individual actions and how they constitute a violation of FDUTPA.'" *SIG, Inc. v. AT & T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1195 (S.D. Fla. 2013) (quoting *Aboujaoude*, 509 F. Supp. 2d at 1277).[7]  Plaintiffs need to allege how each individual Defendant "actively participated in or controlled" the FDUTPA violations at issue to clear the plausibility pleading threshold.  *See SIG*, 971 F. Supp. 2d at 1195.  Accordingly, Counts 1, 2, 3, 6, and 7 are **DISMISSED** as to Defendants Florian and Hart *with leave to amend*.

### b. *Plaintiffs Plausibly Plead FDUTPA Claims Against Defendant HCI in Counts 1, 2, 3, and 6*

Count 1 alleges that HCI "changed the standards for passage" of courses "without notice" and forced students "to retake, and pay again for, courses."  FAC ¶ 462.  These changes were motivated by "HCI's need to evade the consequences of its failure to attain programmatic accreditation and a sufficient pass rate of its graduates" as opposed to legitimate pedagogical purposes.  *Id.* ¶ 463.  Plaintiffs allege that "[b]y limiting the number of students who took the NCLEX-RN [exam], and only graduating those students who had shown the highest likelihood of passing, Defendants were able to artificially inflate the RN Program's passage rates."  *Id.* ¶ 16.

Defendants argue that "Count 1 is no more than an allegation that Defendants intentionally breached the enrollment agreement with a nefarious motive and thus fails as a FDUTPA claim" because FDUTPA requires more than mere breach of contract.  *See* Mot. at 25.  Plaintiffs counter that the FAC frames Count 1 as a deceptive act, not merely a breach of contract.  Resp. at 15.  Moreover, Plaintiffs argue that arbitrary and capricious changes to graduation requirements have been found to be actionable by Florida courts.  *Jalalli*, 992 So. 2d at 343.

---

[7]  Defendants also argue that Plaintiffs fail to allege sufficient facts to allow this Court to pierce the corporate veil to hold Hart individually liable.  Reply at 9.  Defendant's argument rests on a false premise. So long as an individual defendant is alleged to be a direct participant in the unlawful activity, it is unnecessary to pierce the corporate veil to find FDUTPA liability.  *See Aboujaoude*, 509 F. Supp. 2d at 1277 (citing *Rollins*, 454 So. 2d at 582; *Anden v. Litinsky*, 472 So. 2d 825, 827 (Fla. 4th DCA 1985)).

The Court finds that Plaintiffs have adequately pled a FDUTPA violation based on arbitrary and capricious changes to grading and advancement.  "Florida law permits a FDUTPA claim to travel with a related breach of contract claim if the FDUTPA claim challenges the acts underlying or giving rise to the breach." *Hackett*, 744 F. Supp. 2d at 1312.  Plaintiffs, in alleging HCI's "nefarious" motive, Mot. at 25, combined with arbitrary and capricious changes in grading and advancement, are challenging the acts "underlying or giving rise to" an alleged breach of contract, *see Hackett*, 744 F. Supp. 2d at 1312.  According to Plaintiffs, the underlying acts giving rise to HCI's alleged breach were derived out of an improper motive—the desire to evade the consequences of failure to attain programmatic accreditation—as opposed to any bona fide educational justification.  Accordingly, this is a plausibly pled unfair and deceptive business practice that caused Plaintiffs damages in the form of tuition paid towards an illusory educational product.

Count 2 alleges that HCI misrepresented the "quality and qualifications of instructors"; unethically deployed "high-pressure sales tactics" in recruiting students; mislead potential students as to the quality of clinical experience offered; "inflated the value" of its product; and "trapped [its] students in debt." FAC ¶ 466.  Defendants argue that these allegations are too vague to support a cause of action.  Mot. at 26.  Plaintiffs respond that the FAC contains numerous factual allegations to bolster this count.  The FAC describes how HCI faculty exhibited high turnover, FAC ¶ 187; part-time or adjunct personnel were not supported by the school, *id.* ¶ 188; far fewer than 50 percent of the faculty members at either of HCI's campuses were registered nurses with a master's degree or higher in nursing or a bachelor's degree in nursing and a master's or higher degree in a field related to nursing, as required by law, *id.* ¶ 189; clinical instructors cancelled simulated clinical sessions to avoid having "to drive to campus and sent students instructions to

complete their clinical timesheets from home," *id.* ¶ 195; and Plaintiff Thompson's instructors "were not experienced in teaching" and her cohort had to teach themselves medical surgery, *id.* ¶ 423; Resp. at 16–17.

Moreover, Plaintiffs allege that HCI engaged in both misrepresentation and high-pressure sales tactics in violation of Fla. Admin. Code r. 6E-2.004(5)(b)(3), which prohibits "false or misleading statements about the institution, its personnel, its programs, its services, its licensure status, its accreditation, or any other pertinent information."[8]  Plaintiffs correctly argue that their allegations that "Defendants offered an insufficient product that trapped students in debt and inflated the value of the product to inflate tuition" is sufficiently concrete to constitute a cognizable FDUTPA violation at the pleading stage.  Resp. at 17; *see also Lewis*, 520 F. Supp. 3d at 1233 (finding that Plaintiffs properly alleged a FDUTPA violation where Defendants represented that a class of vehicles had safety features and a certain degree of quality that they in fact did not). Accordingly, Plaintiffs have plausibly pled a FDUTPA violation against HCI in Count 2.

Count 3 alleges a *per se* FDUTPA violation caused by HCI offering "Plaintiffs retail installment contracts without first obtaining the required license" in violation of Florida Statute section 501.203(3)(c) and collecting on those illegal retail installment contracts.  FAC ¶ 470. Plaintiffs allege that HCI "steers students into retail installment contracts" with burdensome and risky terms, "even when other, more favorable financing options exist."  *See id.* ¶¶ 162, 164. Defendants argue that this Florida Statute on licensing requirements related to retail installment contracts is not "of the kind that proscribe unfair trade practices or unfair methods of competition." Mot. at 26–27.  Defendants also argue that Count 3 does not properly allege damages.  Mot. at 28.

---

[8]  Plaintiffs shall include the correct Florida Administrative Code citation when they file their Second Amended Complaint.  *See* Resp. at 17.

Plaintiffs respond that the retail installment contract licensing law is a consumer protection law, and they have properly alleged damages.  Resp. at 16–17.

The Court is persuaded at this stage that Plaintiffs have plausibly alleged a FDUTPA violation related to HCI's unlicensed offering of retail installment contracts.  Florida Statute section 520.32(1) mandates that an entity "may not engage in or transact business of a retail seller engaging in retail installment transactions . . . without a license."   And Florida Statute section 520.12(1) states that "any person who willfully and intentionally . . . engages in the business of a retail installment seller without obtaining a license as required by this part is guilty of a misdemeanor of the first degree."  The FAC explains that HCI's unlicensed offering of "retail installment contracts as required by Florida law" enabled HCI "to lend enormous sums of money to vulnerable students, who HCI knew could not afford the charges, without oversight or fear of recourse."  *See* FAC ¶ 142.  By dodging the licensing requirements, HCI avoided oversight from Florida's Office of Financial Regulations, which requires information to ensure, among other things, the safety of consumers.   These allegations plausibly state a FDUTPA violation.  *Id.* ¶¶ 146–49.  *See Anden*, 472 So. 2d at 827 (finding a FDUTPA violation by a general contractor who held himself out to have a license but lacked one in violation of Florida law).

Plaintiffs allege that the above violation caused them damages. *Id.* ¶¶ 471–74.  Defendants argue that Count 3 should fail because it does not allege actual damages caused by the statutory violations.  Mot. at 28.  But Plaintiffs allege that they "would not have entered into or paid amounts toward unenforceable, illegal contracts" had they known HCI was unlicensed to offer the retail installment contracts.  *See* FAC ¶ 472.  Accordingly, Plaintiffs allege damages "equal [to] the amounts they paid pursuant to the illegal contracts, any amounts they purportedly owe on such contracts, and any associated fees."  *Id.*  ¶ 474.  Whether Plaintiffs can prove that they are entitled

to those damages is yet to be determined.  But the fact that they allegedly would not have entered

into the retail installment contracts but for HCI's deceptive conduct and could have pursued "more

favorable financing options" shows that they suffered a financial loss cognizable as actual

damages.  *See id.* ¶ 162.  Accordingly, at this stage, Plaintiffs have pled the necessary elements to

establish a FDUTPA violation in Count 3.

      Count 6 alleges a FDUTPA violation in relation to HCI's "New" Program.  *Id.* ¶¶ 491–94.

HCI's West Palm Beach campus (HCI-WPB)

> (a) applied for a new NCLEX code for the West Palm Beach campus
> after being placed on probation and after failing to receive
> programmatic accreditation; (b) marketed and presented the new
> NCLEX code as a new ADN program; (c) made misrepresentations
> about and/or failed to disclose the status of HCI's RN Program's
> accreditation; (d) made misrepresentations about and/or failed to
> disclose HCI's RN Program's probationary status with the BON;
> and (e) made misrepresentations about and/or failed to disclose
> HCI's RN Program's graduates' NCLEX passage rates.

*Id.* ¶ 492.  The FAC alleges that "Plaintiffs and hundreds of other prospective students enrolled on

the basis of these deceptive disclosures and omissions.  *Id.* ¶ 13.  Defendants argue that "Plaintiffs

fail to sufficiently allege how these alleged actions, misrepresentations and/or non-disclosures

about NCLEX codes, pass rates, probationary status and accreditation caused them any damages."

Mot. at 29.

      The Court can make a reasonable inference from the FAC that Plaintiffs would not have

enrolled in HCI-WPB's "New" Program had they known of these deficiencies.  Plaintiffs'

documented experiences in the "New" Program demonstrate that HCI's alleged conduct "is likely

to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

*Millennium Commc'ns*, 761 So. 2d at 1263.  For example, Plaintiff Brittany Roberson, member of

the HCI-WPB "New" Program, had an experience illustrative of this point.  Roberson received a

"CIE form 609a" disclosure form, which stated that the school's status with the Florida BON was "not on probation."  FAC ¶ 260.  HCI made no disclosure to her that the "old" program, (which was allegedly nearly identical to the "New" program) had been placed on probation for poor NCLEX exam passage rates and had been terminated for failure to obtain programmatic accreditation.  *Id.* ¶ 261.  Although performing adequately throughout the course, HCI required Roberson to take the HESI exam in order to graduate.  *Id.* ¶ 278.  Roberson was not told in advance that the HESI exam would be required to graduate, and as a result, she was not familiar with the exam format.  *Id.* ¶¶ 280–81.  Defendants did not tell Roberson or her cohort what score they needed to pass the HESI.  *Id.* ¶ 282.

Roberson received a score of 14.41, defined by HESI as "minimally acceptable."  *Id.* ¶ 283.  HCI determined that her score was insufficient, and that she would need to repeat the entire semester at additional cost.  *Id.* ¶ 284.  Defendants did not offer Ms. Roberson a second opportunity to take the HESI exam, despite her filing an appeal.  *Id.* ¶ 285–86.  Roberson was not permitted to graduate, despite meeting the graduation requirements set forth in her Enrollment Agreement, so she withdrew from HCI because she could not afford to retake the classes.  *Id.* ¶ 288–89.  Attending HCI left Roberson with about $40,000 in loans but no registered nursing license.  *Id.* ¶ 290.

HCI's alleged arbitrary and capricious changes to graduation requirements and failure to adequately prep students for required tests is consistent with HCI's lack of programmatic accreditation, probationary status, and low NCLEX exam passage rates.  Prospective students acting rationally with access to this information would likely refrain from enrolling in such a school.  Plaintiff Tresha Thompson explicitly alleges that had she known HCI "did not have programmatic accreditation, she would not have attended."  *Id.* ¶ 412.  The Court can assume the same for Roberson.  HCI's allegedly deceptive business practices caused Roberson nearly $40,000

in actual damages.  Accordingly, the Court finds that the elements of a FDUTPA claim in Count 6 have been plausibly pled by Plaintiffs.

> ### c. Plaintiffs Fail to Adequately Plead a Plausible FDUTPA Claim Against Defendant HCI in Count 7

Count 7 alleges that HCI "refused to let students progress through the RN Program until they paid the balance on their retail installment contracts; and refused to send former students copies of their transcripts until they paid the balance on their retail installment contracts."  FAC ¶ 497.  The FAC cites to an incorrect link from the Consumer Financial Protection Bureau ("CFPB").  Should Plaintiffs wish to replead this Count in their Second Amended Complaint, they shall cite to and quote from the correct CFPB publication, which states that "blanket policies to withhold transcripts in connection with an extension of credit are abusive under the Consumer Financial Protection Act," which the CFPB has the authority to interpret.[9]  *See* Resp. at 20. Defendants argue that the Court should dismiss Count 7 because Plaintiffs do not adequately allege actual damages.  Plaintiffs respond that the damages equal "any amounts [Plaintiffs] paid on their retail installment contracts in order to access their. . . academic transcripts."  FAC ¶ 499.  They also allege that the transcript withholding cost them "precious time during which they could have explored entering other nursing programs."  *Id.* ¶ 500.

Plaintiffs' damages allegations are more akin to consequential damages than actual damages, and therefore this count must be dismissed.  "Consequential damages are 'losses that do not flow directly and immediately from an injurious act but that result indirectly from the act.'" *In re Brinker Data Incident Litig.*, No. 3:18-CV-686-J-32MCR, 2020 WL 691848, at *13 (M.D.

---

[9]  Defendants state in their Reply that "the link provided in the Response leads to an error message."  Reply at 14.  The Court was able to locate the publication at the link Plaintiffs provided in their Response: https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf.

Fla. Jan. 27, 2020) (citing Consequential Damages, Black's Law Dictionary (11th ed. 2019)).  Lost personal time is generally considered to be a consequential damage and therefore not cognizable for purposes of FDUTPA's actual damages requirement.  *See In re Brinker Data*, 2020 WL 691848 at *13.  Moreover, Plaintiffs would have to pay back "any amounts paid on their retail installment contracts" regardless of whether they needed to access their transcripts or not.  Accordingly, Count 7 is **DISMISSED** *with leave to amend* to the extent Plaintiffs can establish actual damages.

### VI.  Plaintiffs State a Plausible ECOA Claim Against Defendant HCI

The Equal Credit Opportunity Act makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction, (1) on the basis of race." 15 U.S.C. § 1691(a).  ECOA defines a "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of the original creditor who participates in the decision to extend, renew, or continue credit."  15 U.S.C. § 1691a(e); FAC ¶ 508.  An ECOA violation can be established through a theory of "reverse redlining," which is defined as "the practice of extending credit on unfair terms because of the plaintiff's race and geographic area."  *Steed v. EverHome Mortg. Co.*, 208 F. App'x 364, 368 (11th Cir. 2009) (quoting *Hargraves v. Cap. City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000) (internal quotation marks omitted)). [10]  To prove a reverse redlining claim, a plaintiff must show 1) that defendants' lending practices and loan terms were unfair and predatory, and 2) that the defendants either intentionally targeted on the basis of race or created a

---

[10] Although *McDonnell Douglas* involved a Title VII claim, Courts apply the same analytical framework when evaluating numerous other anti-discrimination statutes, including the Fair Credit Reporting Act, Fair Housing Act, ECOA, and Title VI.  *See Taylor v. Farm Credit of No. Fla., ACA*, No. 4:20-cv-59-AM-MJF, 2021 WL 5148022, at *4 (N.D. Fla. Oct. 6, 2021) (collecting cases); *see, e.g., Hall v. Johanns*, 208 F. App'x 726, 726 (11th Cir. 2006); *Cooley v. Sterling Bank*, 280 F. Supp. 2d 1331, 1338 (M.D. Ala. 2003) (finding that "the Eleventh Circuit has unflinchingly applied Title VII's analytical framework to a host of anti-discrimination statutes").

disparate impact based on race. *Id.* Courts evaluating such claims of discrimination apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804 (1973), which requires a plaintiff to establish a *prima facie* case of discrimination with specific evidentiary factors. *See Molina v. Aurora Loan Servs., LLC*, 635 F. App'x 618, 625 (11th Cir. 2015) (citing *Sec'y, United States Dep't of Hous. and Urban Dev., on Behalf of Herron v. Blackwell*, 908 F.2d 864, 870 (11th Cir. 1990)) (Fair Housing Act context); *see also Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1325 (11th Cir. 2011) (Title VII context).

At the motion to dismiss stage, however, a plaintiff asserting discrimination claims "need not allege specific facts establishing a *prima facie* case." *Molina*, 635 F. App'x at 625 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)). Indeed, before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of a *prima facie* case for discrimination*. See Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). Therefore, at this stage, the allegations in the FAC "should be judged by the statutory elements" of an ECOA claim "rather than the structure of the *prima facie* case." *Id.* (internal citation and quotation marks omitted). Accordingly, to plead a claim of discrimination under ECOA, Plaintiffs need allege only "enough factual matter (taken as true) to suggest" that Defendants discriminated on a prohibited basis with respect to any aspect of a credit transaction. *See Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. 666; 15 U.S.C. § 1691(a); *see also Molina*, 635 F. App'x at 625 (quoting *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008)).

The FAC alleges that HCI engaged in discrimination by targeting women of color, specifically Black women, with their predatory RN Program and lending practices. *See* FAC ¶¶ 4, 5, 14, 26(b), 26(e), 110–11, 136–38, 264, 277, 313, 331, 356, 380, 394, 416, 512. To support this claim, Plaintiffs allege that HCI prominently featured Black women as models in advertisements

and further targeted that minority group, as evidenced in part by the disproportionate number of Black students enrolled in HCI compared to the Black population in the surrounding communities. *Id.* ¶¶ 26(e), 113–14.  Plaintiffs further allege specific loan terms that were predatory—namely, the terms of the private retail installment contracts that "require immediate payment while students are in school," the lack of "income-sensitive repayment options," and a "risky acceleration clause that makes the entire balance due upon a single missed payment." *Id.* ¶¶ 162–64.  Lastly, Plaintiffs allege that other aspects of the "credit transaction" support their ECOA claim, such as the inflated cost of the product, Defendants' misrepresentations regarding the quality of the educational product, and Plaintiffs' inability to repay their loans. *See, e.g., id.* ¶¶ 171–292.  These extensive allegations plausibly plead discriminatory intent framed through the lens of reverse redlining and form the foundation of Plaintiffs' ECOA violation.

Defendants argue that "Plaintiffs fail to identify any aspect of a credit transaction that is allegedly discriminatory based on race or any specific loan term they allege was unfair or predatory." Mot. at 33.  They also argue that the FAC "is devoid of any allegations that Defendants engaged in any marketing or advertising activities in geographic areas with predominately Black communities."  Reply at 16.  And the ads in the FAC are "insufficient to plead intentional race-based targeting." *Id.* at 20.

Defendants not only ignore the long list of factual allegations cited above, but also completely disregard the burden at the motion to dismiss stage.  In addition to accepting the complaint's allegations as true, the court must draw all inferences in Plaintiffs' favor when determining if a complaint states a claim to relief. *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017).  Plaintiffs have clearly alleged sufficient factual allegations to plead an ECOA

claim based on a reverse redlining theory.   Nonetheless, the Court will address Defendants'
arguments below.

Defendants argue that the Court should take a narrow reading of ECOA and find that it
only covers discrimination with respect to the written loan terms themselves.   They cite a case
where a district judge granted a motion to dismiss an ECOA claim by a plaintiff proceeding *pro
se* because she did not "explicitly describe . . . any aspects of the credit transaction (as opposed to
[the school's] fraudulent enrollment tactics) that she believe[d] were discriminatory."   *Brook v.
Sistema Universitario Ana G. Mendez, Inc.*, No. 17-cv-171, 2017 WL 1743500, at *3 (M.D. Fla.
May 4, 2017).   The *Brook* court expressed skepticism that plaintiff would be able to show that her
federal loan terms were unfair.   *Id.*   In short, the court simply held that the plaintiff had failed to
connect the discrimination to an aspect of a credit transaction (whether that aspect be the loan
terms themselves or any other aspect).   Plaintiffs here have clearly alleged that connection, as
described above and in the FAC.

The Court's interpretation is supported by the plain language of ECOA.   To state a claim
under ECOA, a plaintiff must allege that a defendant engaged in discrimination "with respect to
*any aspect* of a credit transaction."   15 U.S.C. § 1691(a) (emphasis added).   The word "any" means
"all."   *Regions Bank v. Legal Outsource P.A.*, 936 F.3d 1184, 1194 (11th Cir. 2019).   Similarly,
the word "aspect" means that the challenged conduct "need not *itself* be a credit transaction so
long as it is an '*aspect* of a credit transaction.'"   *See FirstMerit Bank, N.A. v. Ferrari*, 71 F. Supp.
3d 751, 758 (N.D. Ill. 2014) (emphasis in original) (interpreting the language of ECOA).   In line
with the statutory text, Regulation B, which implements ECOA, prohibits discrimination
"regarding any aspect of a credit transaction," 12 C.F.R. § 1002.4(a), and defines a "credit
transaction" as "*every aspect* of an applicant's dealings with a creditor regarding an application

for credit or an existing extension of credit (including, but not limited to, information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of credit information; revocation; alteration, or termination of credit; and collection procedures)," *id.* § 1002.2(m) (emphasis added).  Thus, the Court finds that the text of ECOA and its implementing regulations includes any aspect of a credit transaction, not just the terms of credit.

Here, Plaintiffs allege that HCI misrepresented program requirements—and consequentially, the length, and therefore the cost of the program—to convince students to take out credit to pay tuition for the nursing program. *See* FAC ¶¶ 131–33, 137, 139, 141–42, 162, 165, 203–291, 507–19.  HCI allegedly steered students into illicit retail installment contracts, even while other, more favorable financing options existed, and often extended the loans immediately after Plaintiffs signed the Enrollment Agreement. *See id.* ¶¶ 162–64, 255, 262, 309.  HCI allegedly imposed new grading policies and graduation requirements, which coerced students into repeating semesters they had already completed and increased the amount of time and money it took to finish the RN Program. *See id.* ¶¶ 203, 235, 250.  The Court finds that Plaintiffs have adequately pled that those who were unable to meet these new requirements or pay for additional courses were forced to withdraw from the program, saddled with debt, unable to transfer credits, barred from campus, and denied transcripts due to outstanding loan balances. *See id.* ¶¶ 165–69, 291, 345–46, 439–41.

In sum, Plaintiffs allege discrimination with respect to multiple aspects of a credit transaction—including the contract terms (i.e. repayment terms), the cost of the product and the amount of credit needed to pay for it, the likely ability of students to repay the credit, the consequences of nonpayment, and the quality of educational services obtained with the credit. This is consistent with the text of ECOA, its implementing regulations, and the manner in which

other courts have applied the statute.  *See, e.g.*, *Hargraves*, 140 F. Supp. 2d at 20, 23; *Carroll v. Walden Univ., LLC*, No. 1:22-cv-00051-JRR, 2022 WL 17252556 at *9, *21 (D. Md. Nov. 28, 2022); *Ferrari*, 71 F. Supp. 3d at 758.

### VII.    Plaintiffs State a Plausible Title VI Claim Against Defendant HCI

Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving Federal financial assistance.  42 U.S.C. § 2000d; *see Alexander v. Sandoval*, 532 U.S. 275, 278 (2001).  Section 2000d-4a(2)(A) defines a "program or activity" as "a college, university, or other postsecondary institution, or a public system of higher education any part of which is extended Federal financial assistance."

Like the standard described above in the ECOA context, a plaintiff alleging a Title VI violation "need not plead a *prima facie* case of discrimination" under the *McDonnell Douglas* framework to survive a motion to dismiss.  *See Swierkiewicz*, 534 U.S. at 515.  Instead, a plaintiff must only provide "enough factual matter (taken as true) to suggest" intentional race discrimination.  *See Coca-Cola Bottling*, 516 F.3d at 974 (quoting *Twombly*, 550 U.S. at 556).  As with their ECOA claim, Plaintiffs allege that HCI violated Title VI via reverse redlining.  FAC ¶¶ 520–28.  HCI is subject to Title VI because it receives federal financial assistance within the meaning of 42 U.S.C. § 2000d.  *Id.* ¶ 525.  In connection with offering federal student loans for enrollment in HCI's RN Program, Defendants' acts, policies, and practices intentionally discriminated against Black people.  *Id.* ¶ 527.  And by targeting Black people, Plaintiffs allege, Defendants engaged in reverse redlining in violation of Title VI.  *Id.*

Defendants argue that Plaintiffs "fail to sufficiently identify any specific act, policy or practice of HCI that intentionally discriminates against Black people."  Mot. at 34–35.  Defendants argue that Plaintiffs need to allege a combination of targeted advertising and an allegedly "sham"

educational program for their Title VI discrimination claim to survive a motion to dismiss. *Id.* at 35. And Defendants maintain that HCI's educational offering was not a sham. *Id.*

Defendants' arguments, however, ignore the relevant pleading standard. At the motion to dismiss stage, Plaintiffs need only allege sufficient facts for the Court to infer intentional discrimination. *See Brook*, 2017 WL 1743500 at *3. Here, Plaintiffs have alleged sufficient factual material for the Court to reasonably infer intentional discrimination on the part of HCI. *See supra* at 31–34. To be clear, whether Plaintiffs can establish that HCI's educational offerings were a "sham" or "functionally valueless" will be determined at a later stage in this litigation. *See* Resp. at 30. But by providing factual allegations in the FAC that HCI's educational and financial offerings were deceptive, deficient, misleading, and predatory, Plaintiffs have plausibly pled a Title VI violation.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion [ECF No. 55] is **GRANTED IN PART** and **DENIED IN PART**.

2. In compliance with pleading requirements, *see Weiland*, 792 F.3d at 1323, Plaintiffs shall amend their First Amended Complaint to specify which Defendants are responsible for which acts or omissions, and which Defendants each of their claims are brought against.

3. Count 1 (FDUTPA—Grading and Advancement), Count 2 (FDUTPA—Misrepresentation of Educational Services Provided), Count 3 (FDUTPA—Unauthorized Retail Installment Contracts), and Count 6 (FDUTPA—The "New" Program) are **DISMISSED** *with leave to amend* as to Defendants Florian and Hart.

4. Count 7 (FDUTPA—Withholding Advancement and Transcripts from Students) is **DISMISSED** *with leave to amend* as to all Defendants.

5.  Count 8 (Unjust Enrichment) is **DISMISSED** as to Defendants HCI and Florian.

6.  Plaintiffs shall file a Second Amended Complaint in compliance with this Order within **fourteen (14) days** from the date of this Order.

**DONE AND ORDERED** in Miami, Florida, this 3rd of August, 2023.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**