UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cv-81883-Ruiz/McCabe

BRITTANY ROBERSON, et al.,

     Plaintiffs,

v.

HEALTH CAREER INSTITUTE LLC, et al.,

     Defendants.

_____/

## **MODIFIED REPORT & RECOMMENDATION**

THIS CAUSE came before the Court on Plaintiffs' Motion for Certification of a Rule 23 Class ("Motion"), which was referred to the undersigned by United States District Judge Rodolfo A. Ruiz, II.  (DE 203, DE 204, DE 229).  For the reasons set forth below, the undersigned **RECOMMENDS** that the Motion be **GRANTED IN PART AND DENIED IN PART**.

## I.      BACKGROUND

This is a putative class action against a for-profit nursing school.  The operative complaint (DE 93) alleges the following counts against the various Defendants, Health Career Institute LLC ("HCI"), its parent company, Florian Education Investors LLC ("Florian"), and the chief executive of both organizations, Steven W. Hart:

| | | |
|---|---|---|
| Count 1 | | Florida Deceptive & Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq*. Violation based on Grading and Advancement against all Defendants |
| Count 2 | | FDUTPA Violation based on Misrepresentation of Educational Services Provided against all Defendants |
| Count 3 | | FDUTPA Violation based on Unauthorized Retail Installment Contracts ("RIC") against all Defendants |
| Count 4 | | Breach of Contract based on Grading and Advancement against HCI and Florian |

Count 5        Breach of Contract based on Clinical Placement against HCI and Florian

Count 6        FDUTPA Violation based on "New" Registered Nurse ("RN") Program against all Defendants

Count 7        FDUTPA Violation based on Withholding Advancement and Transcripts from Students for Defendants' Financial Gain against all Defendants

Count 8        FDUTPA Violation based on Virtual-ATI ("VATI") Course against all Defendants

Count 9        Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.* against HCI

Count 10       Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. against HCI

(DE 93).

By way of this Motion, Plaintiffs seek to certify a primary class and multiple subclasses as follows:

| Class/Subclass | Named Plaintiffs | Counts |
| --- | --- | --- |
| All students who enrolled in the RN Program at HCI after September 1, 2019, and did not graduate (the "Primary Class"). | Ms. Roberson, Ms. Freeman, Ms. Viñas, Ms. King, and Ms. Thompson | 1 - 5 |
| All class members who enrolled in the RN Program operating under National Council Licensure Examination for Registered Nursing ("NCLEX") code 704146 (the "WPB Subclass"). | Ms. Roberson, Ms. Freeman, Ms. Viñas, and Ms. King | 6 |
| All class members who were denied advancement in the RN Program and/or had their transcripts or other HCI records withheld or delayed for any period of time as a result of their RIC balance, and paid any portion of their Tuition Options balance in order to advance in the RN Program and/or obtain their transcripts (the "Withholding Subclass"). | Ms. Roberson and Ms. Thompson | 7 |

2

| | | |
|---|---|---|
| All class members who enrolled in the Capstone nursing course and paid for Virtual-ATI ("VATI") after September 1, 2019 (the "VATI Subclass"). | Ms. Roberson, Ms. Freeman, and Ms. King | 8 |
| All Black class members who took out federal, private, and/or institutional student loans to pay for their education (the "Targeting Subclass"). | Ms. Roberson, Ms. King, and Ms. Thompson | 9 & 10 |

## II.    LEGAL STANDARD

Courts have "broad discretion in determining whether to certify a class." *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992).  To certify a class, the Court must first determine two threshold issues:  (a) at least one named class representative must have standing for each respective class, and (b) the proposed class must be adequately defined with "ascertainable" class members. *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015).

Once these threshold requirements have been satisfied, the Court turns to Rule 23(a), which requires the Court to make the following findings:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These prerequisites are commonly referred to as "numerosity, commonality, typicality, and adequacy of representation." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009).  Importantly, a plaintiff seeking class certification carries the burden of proof and

3

must "affirmatively demonstrate" that all the requirements of Rule 23(a) have been satisfied. *Brown v. Electrolux Home Products, Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016).

Once Rule 23(a) has been satisfied, the Court then turns to Rule 23(b), which requires the proposed class to satisfy at least one of three criteria. Here, Plaintiffs seek class certification under Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The party seeking class certification must satisfy at least one of the provisions of Rule 23(b) "through evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

The purpose of a class-certification ruling "is not to adjudicate the case," but "to select the method best suited to adjudication of the controversy." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (cleaned up). Although the Court should not determine the merits of a case at the certification stage, the Supreme Court has recognized that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (cleaned up). "The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351 (quoting *Falcon*, 457 U.S. at 160). Accordingly, the Court must conduct a "rigorous" analysis of the Rule 23 prerequisites that may overlap with the merits of a plaintiff's underlying claims. *Id.*; *Gilchrist v. Bolger*, 733 F.2d 1551, 1555 (11th Cir. 1984).

### III.   DISCUSSION

Defendants raise multiple arguments in opposition to class certification.  The Court will address each argument in turn.  Also, for the sake of completeness and for the benefit of the District Court, the undersigned will make recommendations on all issues raised, even where resolution of one issue renders others moot.

### A.   STANDING

Defendants first argue the class cannot be certified because the proposed class representatives lack standing.  (DE 211 at 14).  A plaintiff has standing to represent a class if he or she has individual Article III standing, is part of the class, possesses the same interest as the class members, and suffers the same injury as the class members.  *Fox v. Ritz-Carlton Hotel Co., L.L.C.*, 977 F.3d 1039, 1046 (11th Cir. 2020).  To establish individual Article III standing, a plaintiff must show (1) an injury-in-fact, (2) a causal connection between the injury and the challenged action, and (3) that the injury is capable of being redressed by a favorable judicial decision.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).  "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Id.* at 339 (cleaned up).  "For an injury to be particularized, it must affect the plaintiff in a personal and individual way."  *Id.* (cleaned up).  For the injury to be "concrete," it must be real and not abstract, though it need not be tangible.  *Id.* at 339-40.

"With respect to standards of proof, 'standing is not a mere pleading requirement, but rather an indispensable part of the plaintiff's case, and each element must be supported in the same way as any other matter on which plaintiff bears the burden of proof, *i.e.*, with the manner and degree

of evidence required at the successive stages of the litigation.'" *Wasser v. All Mkt., Inc.*, 329

F.R.D. 464, 470 (S.D. Fla. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)

(cleaned up); *see also Dapeer v. Neutrogena Corp.*, No. 14-22113, 2015 WL 10521637, at *12

(S.D. Fla. Dec. 1, 2015) (noting that, at the class certification stage, "[t]he bar is simply higher

than a pleading standard and it is the Plaintiff's burden to prove injury-in-fact.").

Here, Defendants argue that Plaintiffs have failed to demonstrate standing with respect to

every count of the operative complaint.  The Court will address each count in turn.

### 1.      Count 1 (FDUTPA Violation based on Grading and Advancement)

Count 1 alleges that Defendants committed an unfair and deceptive practice by changing,

without notice, the standards for passage previously stated in enrollment agreements and course

catalogs in order to force students to retake, and pay again, for courses.  (DE 93 ¶ 493).

Specifically, Plaintiffs complain of two changes.  First, in or around the summer of 2021,

Defendants enacted a new rule known as the "50% Rule."  Prior to enactment of the new rule, the

student enrollment agreements and course catalogs required students to achieve an 80% grade on

all written and practical exams.  (DE 203 at 16; DE 204 at 16; DE 211 at-16 at 7, 13; DE 211-17

at 7, 13, 20; DE 211-18 at 48, 74).  Following implementation of the new policy, students faced

the additional hurdle of scoring at least 50% in every subcategory of all exams.  (DE 93 ¶ 241, DE

204-2 at 160-66).  According to Plaintiffs, the 50% Rule made it extremely difficult to pass exams

and advance through the program.

Second, in or around the Fall of 2021, HCI ceased using the ATI Predictor exam as its final

exit exam for the program and instead switched to another exam known as the HESI.  (DE 93 ¶¶

264-65).  Prior to the switch, student enrollment agreements and course catalogs required students

to pass the ATI Predictor with a minimum score, with an opportunity to re-take the exam in the event of a non-passing score.  (DE 203-2 at 906; DE 211-16 at 7, 13; DE 211-17 at 7).  According to Plaintiffs, the new test was extremely difficult to pass, as students had not prepared for it.  (DE 93 ¶¶ 267-71).  Also, unlike the previous ATI Predictor, Defendants allowed no opportunity to retake the HESI exam in the event of a non-passing score.  (DE 93 ¶¶ 267-71).

The Court has reviewed the record and finds that the Named Plaintiffs for the Primary Class have standing as to Count 1.  Each Named Plaintiff in the Primary Class suffered injury-in-fact when she took on loans and made tuition payments for the RN Program.  (DE 203-2 at 214-245).  The Court finds a causal connection between the injury and the challenged action, i.e., the alleged changing, without notice, of the standards for passage previously stated in enrollment agreements and course catalogs.  The Court also finds that the injury is capable of being redressed by a favorable decision.

The Court has considered, but finds unpersuasive, Defendants' argument that Plaintiffs suffered no injury-in-fact because they merely took on debt.  (DE 211 at 15).  According to Defendants, debt does not constitute "actual damages," a necessary element for a FDUTPA claim. The Court disagrees for two reasons.  First, the concept of injury-in-fact does not always equate to legally cognizable damages.  *See Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084 (11th Cir. 2019) (cautioning against "conflat[ing] Article III's requirement of injury in fact with a plaintiff's potential cause of action, for the concepts are not coextensive."); *Varner v. Domestic Corp.*, No. 16-22482-CIV, 2017 WL 3730618, at *6 (S.D. Fla. Feb. 7, 2017) (finding the named plaintiffs have standing to bring suit because "whether recovery for such a claim is permitted under

governing law is a separate question; it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered.") (cleaned up).

Second, and at any rate, contrary to Defendants' argument, the incursion of debt qualifies as actual damage under FDUTPA. *See Sharon v. Royal Caribbean Cruises Ltd.*, No. 17-CV-22323, 2017 WL 11220344, at *4 (S.D. Fla. Oct. 6, 2017) (finding damages sufficiently pled where a plaintiff has "alleged to be indebted an actual sum of money as a result of fraudulent and deceptive actions"); *Culver v. PHH Mortgage Corp.*, No. 6:20-CV-2292-PGB-EJK, 2021 WL 2659796, at *7 (M.D. Fla. June 28, 2021) (finding damages sufficiently alleged where plaintiff's claim involved the increase of actual debt owed caused by defendant). Moreover, the record contains evidence that the Named Plaintiffs paid a portion of their debt. (DE 203-2 at 214-245, DE 242-2 at 3-42).

### 2. Count 2 (FDUTPA Violation based on Misrepresentation of Educational Services Provided)

Count 2 alleges that Defendants committed an unfair and deceptive practice by making a variety of misrepresentations including the following:

- making misrepresentations and/or omissions regarding the quality and qualifications of instructors;

- violating regulations pertaining to "ethical practices and procedures in the recruitment of students" by using, for example, high-pressure sales tactics to recruit students;

- advertising Defendants' RN Program as offering clinical experience required by Fla. Stat. § 464.019(1) when such experience was not available.

- offering an insufficient product that trapped students in debt.

8

(DE 93 ¶ 499).

The Court has reviewed the record and finds that the Named Plaintiffs for the Primary Class have standing as to Count 2.  Each Named Plaintiff in the Primary Class suffered injury-in-fact when they took on loans and made tuition payments for the RN Program.  (DE 203-2 at 214-245).  The Court finds a causal connection between the injury and the challenged action, i.e., the alleged misrepresentations regarding educational services provided.  The Court also finds that the injury is capable of being redressed by a favorable decision.

### 3.    Count 3 (FDUTPA Violation based on Unauthorized RICs)

Count 3 alleges that Defendants committed an unfair and deceptive practice by entering into retail installment contracts ("RICs") with students without first obtaining the necessary license required under Florida law to enter into such contracts.  (DE 93 ¶¶ 503-09).  The Court has reviewed the record and finds the Named Plaintiffs for the Primary Class have standing as to this count.  Each Named Plaintiff suffered injury-in-fact when she took on loans and made tuition payments for the RN Program.  (DE 203-2 at 214-245).  The Court finds a causal connection between the injury and the challenged action, i.e., the allegedly illegal RICs.  The Court also finds that the injury is capable of being redressed by a favorable decision.

The Court has considered, but finds unpersuasive, Defendants' argument that Plaintiffs lack standing because Florida's Retail Installment Sales Act, Fla. Stat. § 520.01, *et seq*. ("RISA") limits a plaintiff's remedies, in the case of unlicensed RICs, solely to "an amount equal to any finance charge and any fees charged to the buyer by reason of delinquency, plus attorney's fees and costs incurred by the buyer to assert rights under this part."  Fla. Stat. § 520.12.  According to Defendants, the record shows Defendants never charged, and Plaintiffs never paid any interest,

finance charges, or other fees in connection with the RICs.  (DE 211 at 17).  Hence, Defendants argue, Plaintiffs lack standing because they have no right to any recovery under RISA.

The Court disagrees for two reasons.  First, Count 3 does not allege a claim under RISA. Instead, it alleges a claim under FDUTPA, with the underlying RISA violation serving as a predicate per se violation of FDUTPA.  (DE 93 ¶¶ 504, 506).  Under FDUTPA, Plaintiffs are not limited to the damages available under the predicate statute, but rather to "actual damages."  *See* Fla. Stat. § 501.211(2); *Chastain v. N.S.S. Acquisition Corp.*, No. 08-81260-CIV, 2009 WL 1971621, at *7 (S.D. Fla. July 8, 2009), *aff'd,* 378 F. App'x 983 (11th Cir. 2010) ("The Florida Supreme Court has emphasized that the remedies of the FDUTPA 'are in addition' to other remedies available under state or local law.'") (quoting *Pinellas County Department of Consumer Affairs v. Castle*, 392 So.2d 1292, 1293 (Fla.1980)).

Second, as previously explained, the concept of injury-in-fact does not always equate to legally cognizable damages.  *See Debernardis*, 942 F.3d at 1084; *Varner*, 2017 WL 3730618, at *6.  Accordingly, the Court finds standing as to Count 3.

### 4.      Count 4 (Breach of Contract – Grading & Advancement)

Count 4 alleges that Defendants committed a breach of contract by changing, without notice, the standards for passage previously stated in enrollment agreements and course catalogs in order to force students to retake, and pay again, for courses.  (DE 93 ¶¶ 510-58).  The Court has reviewed the record and finds the Named Plaintiffs for the Primary Class have standing.  Each of the Named Plaintiffs for the Primary Class suffered injury-in-fact when she took on loans and made tuition payments for the RN Program.  (DE 203-2 at 214-245).  The Court finds a causal connection between the injury and the challenged action, i.e., the changing, without notice, of the

standards for passage previously stated in enrollment agreements and course catalogs.  The Court also finds that the injury is capable of being redressed by a favorable decision.

### 5.      Count 5 (Breach of Contract – Clinical Placement)

Count 5 alleges that Defendants committed a breach of contract by failing to provide students with adequate clinical placements as required by Florida law and as promised in student enrollment agreements and course catalogs.  (DE 93 ¶¶ 519-30).  The Court has reviewed the record and finds the Named Plaintiffs for the Primary Class have standing.  Each of the Named Plaintiffs for the Primary Class suffered injury-in-fact when she took on loans and made tuition payments for the RN Program.  (DE 203-2 at 214-245).  The Court finds a causal connection between the injury and the challenged action, i.e., the alleged breaches of contract regarding clinical placement.  The Court also finds that the injury is capable of being redressed by a favorable decision.

### 6.      Count 6 (FDUTPA Violation based on "New" RN Program)

Count 6 alleges that Defendants committed an unfair and deceptive practice by making a variety of misrepresentations regarding the "new" RN program, including the following:

- applying for a new NCLEX code for the West Palm Beach campus after being placed on probation and after failing to receive programmatic accreditation;

- marketing and presenting the new NCLEX code as a new nursing program;

- making misrepresentations about and/or failing to disclose the status of Defendants' RN Program's accreditation;

- making misrepresentations about and/or failing to disclose Defendants' RN Program's probationary status with the Board of Nursing ("BON"); and

- making misrepresentations about and/or failing to disclose Defendants' RN Program's graduates' NCLEX passage rates.

(DE 93 ¶ 532).

The Court has reviewed the record and finds the Named Plaintiffs for the WPB Subclass have standing.  These Named Plaintiffs suffered injury-in-fact when she took on loans and made tuition payments for the RN Program.  (DE 203-2 at 214-239).  The Court finds a causal connection between the injury and the challenged action, i.e., the alleged misrepresentations regarding the "new" RN Program.  The Court also finds that the injury is capable of being redressed by a favorable decision.

The Court has considered, but finds unpersuasive, Defendants' argument that Plaintiffs lack standing because the Motion "is devoid of any actual evidence to support the contention that the new program is the same as the old program and therefore, no Plaintiff can demonstrate injury in fact."  (DE 211 at 17).  The Court rejects this argument as it goes to the merits of the FDUTPA claim rather than to standing.  Plaintiffs have demonstrated injury-in-fact by way of their loans and tuition payments.  Whether they will ultimately prevail on the merits of Count 6 remains for later stages of the case.

### 7.  Count 7 (FDUTPA Violation based on Withholding Advancement and Transcripts from Students)

Count 7 alleges that Defendants committed an unfair and deceptive practice by refusing to let students progress through the RN program and/or obtain their transcripts until they paid the balances on their RICs.  (DE 93 ¶ 538).  The Court has reviewed the record and finds the Named Plaintiffs for the Withholding Subclass have standing.  These Named Plaintiffs suffered injury-in-fact when they took on loans and made tuition payments for the RN Program.  (DE 203-2 at 214-

12

220, 240-45).  The Court finds a causal connection between the injury and the challenged action, i.e., the alleged withholding of advancement and transcripts from students pending RIC payments. The Court also finds that the injury is capable of being redressed by a favorable decision.  For reasons previously discussed in part III.A.3 above, the Court rejects Defendants' argument that Plaintiffs lack standing due to the limited remedies available under RISA.  (DE 211 at 16).

### 8.      Count 8 (FDUTPA Violation based on VATI Program)

Count 8 alleges that Defendants committed an unfair and deceptive practice by charging class members over $4,000 to enroll in a required "Capstone" course when, in reality, the course consisted of little more than an online program offered by a third party, VATI, available to the public for only $525.  (DE 93 ¶¶ 543-48).  The Court has reviewed the record and finds the Named Plaintiffs for the VATI Subclass have standing.  The Named Plaintiffs suffered injury-in-fact when they took on loans and made tuition payments for the Capstone Course.  (DE 203-2 at 214-227, 234-39).  The Court finds a causal connection between the injury and the challenged action, i.e., the offering of the VATI.  The Court also finds that the injury is capable of being redressed by a favorable decision.

The Court has considered, but finds unpersuasive, Defendants' argument that Plaintiffs have only "theoretical" standing because "there is no evidence to substantiate their claim even at this stage in the proceedings."  (DE 211 at 17-18).  The Court rejects this argument as it goes to the merits of the FDUTPA claim rather than to standing.  Plaintiffs have demonstrated injury-in-fact by way of their payment for the Capstone Course.  Whether they will ultimately prevail on the merits of Count 8 remains for later stages of the case.

### 9.      Count 9 (ECOA)

Count 9 alleges that Defendants committed a violation of ECOA by engaging in "reverse redlining," whereby Defendants intentionally used marketing, advertising, and recruiting techniques to target their nursing program to individuals on the basis of race with the understanding that such individuals were highly likely to require credit in order to pay for the nursing program. (DE 93 ¶¶ 549-61).  The Court has reviewed the record and finds that the Named Plaintiffs for the Targeting Subclass have standing.  The Named Plaintiffs suffered injury-in-fact when they took on loans and made tuition payments for the RN program.  (DE 203-2 at 214-220, 234-245).  The Court finds a causal connection between the injury and the challenged action, i.e., the alleged targeting by race.  The Court also finds that the injury is capable of being redressed by a favorable decision.

The Court has considered, but finds unpersuasive, Defendants' argument that Plaintiffs lack standing because they have not articulated any "injury in fact" that is "concrete and particularized" and "fairly traceable to the challenged action of the defendant."  (DE 211 at 18). As stated, the Court finds that each Named Plaintiff for the Targeting Subclass suffered injury-in-fact when she took on loans and made tuition payments for the RN program.  As such, the Court finds standing as to Count 9.

### 10.      Count 10 (Title VI of the Civil Rights Act of 1964)

Count 10 alleges that Defendants committed a violation of Title VI of the Civil Rights Act of 1964 by engaging in "reverse redlining," whereby Defendants intentionally used marketing, advertising, and recruiting techniques to target their nursing program to individuals on the basis of their race.  (DE 93 ¶¶ 562-70).  The Court has reviewed the record and finds the Named Plaintiffs for the Targeting Subclass have standing.  The Court finds that each Named Plaintiff suffered

14

injury-in-fact when they took on loans and made tuition payments for the RN program.  (DE 203-2 at 214-220, 234-245).  The Court finds a causal connection between the injury and the challenged action, i.e., the alleged "reverse redlining" to target Plaintiffs based on their race.  The Court also finds that the injury is capable of being redressed by a favorable decision.

### B.    CLASS DEFINITIONS & ASCERTAINABILITY

Defendants next argue the proposed class and subclasses cannot be certified because they lack precise definitions and/or because class members cannot be ascertained by objective criteria.  (DE 211 at 10).  "Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable."  *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (cleaned up).  A proposed class is ascertainable "if it is adequately defined such that its membership is capable of determination."  *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021).  In contrast, "[a] class is inadequately defined if it is defined through vague or subjective criteria."  *Id.* at 1302.  The identification of class members should be "a manageable process that does not require much, if any, individual inquiry."  *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014).  "A court should deny class certification where the class definitions are overly broad, amorphous, and vague, or where the number of individualized determinations required to determine class membership becomes too administratively difficult."  *Perez v. Metabolife Intern.*, Inc., 218 F.R.D. 262, 269 (S.D. Fla. 2003); *see also Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012) (affirming denial of class certification where class was not adequately defined or clearly ascertainable).

Defendants raise this argument as to each count of the operative complaint.  The Court will address each count in turn.

### 1.      Count 1 (FDUTPA Violation based on Grading and Advancement)

As to Count 1, Plaintiffs seek to certify the Primary Class, comprised of "[a]ll students who enrolled in the RN Program at HCI after September 1, 2019, and did not graduate." (DE 93 ¶ 474, DE 203 at 20, DE 204 at 20).  Defendants argue this class definition fails because it is overly broad and would include both injured and non-injured persons. (DE 211 at 11-12).  As a general rule, "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury[.]"  *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1276 (11th Cir. 2019).  By the same token, "the mere presence of uninjured class members does not necessarily preclude class certification."  *Simmons v. Ford Motor Co*., 592 F. Supp. 3d 1262, 1284 (S.D. Fla. 2022) (citing *Cordoba*, 942 F.3d at 1275-76); *MSP Recovery Claims, Series LLC v. Auto-Owners Ins. Co.*, 342 F.R.D. 347, 355 (S.D. Fla. 2022) (same).

Here, Defendants argue that the proposed class definition would include students who enrolled at different times, with different enrollment agreements and different course catalogs, giving rise to a hodgepodge of students who may or may not have legitimate claims arising from implementation of the 50% Rule or the abandonment of the ATI Predictor exam. (DE 211 at 11-12).  Also, Defendants point out that they did not implement the 50% Rule until on or after May 14, 2021 and did not abandon the ATI Predictor exam until the Fall of 2021.  As currently defined, therefore, the proposed class would include students who dropped out of school before the changes took effect.

The Court has reviewed the record and finds the proposed Count 1 class definition to be overly broad.  The record contains multiple versions of enrollment agreements, each bearing a footer to mark a new date of revision.  The record also contains multiple course catalogs.

Together, these documents make varying representations to students regarding the standards for passing exams and advancing through the curriculum.

The Court has considered, but finds unpersuasive, Plaintiffs' argument that, while these documents may have changed over time, they made uniform representations to students regarding passing rates and advancement.  The Court has reviewed the documents in question and finds them to be non-uniform.  As but one example, a student with an enrollment agreement marked "rev. 01/27/2020" would have agreed to the following:

> I understand that in order to graduate from the program ... I must … pass all written and practical examinations with a minimum score of 80% ....

(DE 211-16 at 13).  A student with this version of the enrollment agreement might rightly claim surprise to learn that, in addition to achieving a minimum score 80%, she also had to achieve a 50% on every subcategory of every exam.

On the other hand, a student with an enrollment agreement marked "rev. 07/14/2020" would have found herself in a very different position, as this version of the agreement omits any reference to an 80% passing rate and instead points to the course catalog as the source of passing rates:

> I understand that in order to graduate from the program ... I must … successfully complete the required number of scheduled credit / clock hours *as specified in the Catalog* ….

(DE 211-17 at 6) (emphasis added).  Under this version of the enrollment agreement, the student also agreed that the course catalog could be changed at any time – even without notice:

> I understand that the College reserves the right to modify the rules and policies outlined in the Catalog with or without notification.

(DE 211-17 at 6).

17

In short, class members might find themselves in very different positions with respect to Count 1, depending on which version of the enrollment agreement they signed. For this reason, the Court finds the proposed class definition to be overly broad. In its discretion, the Court will narrow the Count 1 class definition to the following:

> All students who were enrolled in the RN Program at HCI *on or after May 14, 2021, and who signed a version of the enrollment agreement with a revision date on or between 04/19/2019 and 01/27/2020.*

(emphasis added). The Court finds this modification necessary to account for the differing versions of enrollment agreements as well as the implementation date of the 50% Rule and abandonment of the ATI Predictor exam. The revised definition will ensure that all class members were exposed to a uniform set of representations regarding the standards for passing exams and advancing through the curriculum.

### 2. Count 2 (FDUTPA Violation based on Misrepresentation of Educational Services Provided)

As to Count 2, Plaintiffs again seek to certify the entire Primary Class. (DE 93 at 77). The Court has reviewed the record and finds the proposed Count 2 class to be overly broad and non-ascertainable. Count 2 does not identify specific, discrete misrepresentations communicated to class members on a widespread basis, but instead relies upon non-specific misrepresentations, communicated via the school's website and other means, regarding a series of subject matters, including qualifications of instructors, opportunities for clinical experience, and the value of tuition. (DE 93 ¶ 499).

The proposed class – consisting of all students who attended the school during a certain time but did not graduate – will necessarily include students who never encountered the misrepresentations at issue. *See PB Prop. Mgmt., Inc. v. Goodman Mfg. Co., L.P.*, No. 3:12-CV-

18

1366-HES-JBT, 2016 WL 7666179, at *21 (M.D. Fla. May 12, 2016) (noting that while reliance is not necessary under FDUTPA claims, "[p]laintiffs must still demonstrate exposure to the same misrepresentations or omissions").  Even if the Court were inclined to limit the class solely to persons who encountered the alleged misrepresentations, the class still would fail for lack of ascertainability, as it would be extremely difficult to ascertain which class members encountered the various misrepresentations at issue.  *See Bussey*, 562 F. App'x at 787 (noting that class members must be ascertainable through objective criteria via "a manageable process that does not require much, if any, individual inquiry").  For all of these reasons, the class cannot be certified as to Count 2.

### 3.    Count 3 (FDUTPA Violation based on Unauthorized RICs)

As to Count 3, Plaintiffs again seek to certify the entire Primary Class.  Defendants object to the Count 3 class definition, arguing that Count 3 is "not actionable" as a matter of law.   (DE 211 at 12).  In other words, Defendants dispute the merits of Count 3 and disagree with Plaintiffs over the proper interpretation of Florida's Retail Installment Act, Fla. Stat. § 520.39.  The Court finds this argument unpersuasive as it goes to the merits of the claim rather than to class definition or ascertainability.

The Court finds the proposed Count 3 class definition adequate with the following modification:

> All students who enrolled in the RN Program at HCI after September 1, 2019, *who also entered into a retail installment contract*, and who did not graduate.

(emphasis added).  The Court imposes this limitation to ensure the class does not encompass students who never entered into RICs.

### 4.    Count 4 (Breach of Contract – Grading & Advancement)

As to Count 4, Plaintiffs again seek to certify the entire Primary Class.  Defendants object to the proposed Count 4 class definition, repeating their arguments as to the Count 1 class definition, i.e., the class definition is overly broad because it includes both injured and non-injured persons.  (DE 211 at 11-12).  For the same reasons set forth in part III.B.1 above, the Court finds the Count 4 proposed class definition overly broad.  In its discretion, the Court will narrow the definition, applying the same modification previously made for Count 1.

### 5.    Count 5 (Breach of Contract – Clinical Placement)

As to Count 5, Plaintiffs once again seek to certify the entire Primary Class.  Count 5 alleges Defendants breached their contractual promise to provide clinical experience as set forth in the enrollment agreement, course catalogs, and under state law.  The Court has reviewed all versions of enrollment agreements and course catalogs currently in the record.  All versions of enrollment agreements make the following common statement:

> Clinical Rotations: includes a combination of medical facility, simulation lab and other field experience.

(DE 211-16 at 2, 8; DE 211-17 at 2, 8; DE 40-4 at 1; DE 203-2 at 901, DE 243 at 4; DE 241-4 at 3, 15, 27).

Similarly, all versions of course catalogs include the following common representation:

> Upon Graduation, the student is awarded an Associate Degree in Nursing (ADA) and is eligible to take the National Council Licensure Exam (NCLEX) to become a registered nurse (RN) and subsequently seek employment in the field.

(DE 241-2 at 59; 203-2 at 158, 693, 795; DE 211-18 at 73, 254).  In Florida, an educational institution that wishes to conduct a nursing program for prelicensure education must offer a substantial component of clinical training.  *See* Fla. Stat. § 464.019(1)(b)(1) (requiring at least 50%

of the program's nursing curriculum to consist of clinical training); Fla. Stat. § 464.019(1)(c) (requiring that "[n]o more than 50 percent of the program's clinical training consists of clinical simulation").

Given that Defendants' enrollment agreements and course catalogs made a common set of representations to class members regarding the availability of clinical training, the Court finds the proposed class definition to be adequate and ascertainable.  The Court has considered, but finds unpersuasive, Defendants' argument that "there is absolutely no objective evidence presented by the Plaintiffs to substantiate any formal or concrete finding by any reviewing body that [Defendants] failed to uniformly offer adequate clinical placement."  (DE 211 at 12).  In other words, Defendants dispute the merits of Count 5 and disagree that Plaintiffs will be able to prove the claim.  A dispute over the ultimate merits of a claim does not amount to an objection to class definition or ascertainability.

### 6.      Count 6 (FDUTPA Violation based on "New" RN Program)

As to Count 6, Plaintiffs seek to certify a subclass comprised of "[a]ll class members who enrolled in the RN Program operating under NCLEX code 704146."  (DE 93 ¶ 474(ii)).  Count 6 does not identify specific, discrete misrepresentations communicated on a widespread basis, but instead relies upon non-specific, amorphous misrepresentations regarding a series of subject matters, including the marketing on the "new" RN program, the program's accreditation, the program's probationary status, and the NCLEX passage rates of program graduates.  (DE 93 ¶ 532).

At oral argument, Plaintiffs' counsel explained that Florida regulations required HCI to provide each student with a Form 609a, which each student was required to acknowledge and sign. Specifically, Fla. Admin. Code R. 6E-1.0032(11) requires:

> Prior to the initial enrollment or reentry of students into programs for the prelicensure education of professional or practical nurses, certified nursing assistant training programs, or any combination of such programs, an institution shall provide to each student each applicable disclosure form completed by the institution. The disclosure must be signed and dated by the prospective student and a school official, with a copy to be maintained in the student's file. Passage rates for first time test takers and probationary status of the program shall be provided for the most recent calendar year published by the Board of Nursing.

Plaintiffs' counsel clarified that Count 6 complains that Defendants engaged in an unfair and deceptive trade practice by presenting students with a Form 609a for the "new" RN program operating under NCLEX code 707146 without disclosing the poor exam passage rate and accreditation problems of the HCI-WPB RN Program that previously operated under NCLEX code 70755. Plaintiffs thus maintain that every student who received a Form 609a was exposed to a uniform set of misrepresentations.

Given this narrowed theory, focused on a uniform, widely distributed document, the Court finds the proposed class definition to be adequate and ascertainable, with the following modification:

> All class members who *received a CIE Form 609a* for the RN Program operating under NCLEX code 704146.

(emphasis added). The Court imposes this limitation to ensure the class does not encompass students who never encountered the alleged misrepresentations made on the Form 609a.

### 7.     Count 7 (FDUTPA Violation based on Withholding Advancement and Transcripts from Students)

As to Count 7, Plaintiffs seek to certify a subclass comprised of "[a]ll class members who were denied advancement in the RN Program and/or had their transcripts or other HCI records withheld or delayed for any period of time as a result of their RIC balance, *and paid any portion of their Tuition Options balance in order to advance in the RN Program and/or obtain their transcripts*." (DE 93 ¶ 474(iii), DE 216 at 4-5) (emphasis added).[1]

The Court finds the proposed class to be non-ascertainable.  The Court acknowledges that Defendants' books and records would likely show students who had outstanding balances on their RICs.  The proposed class definition goes further, however, and also requires the parties to ascertain the students who paid their outstanding balance "in order to" advance or receive transcripts.  Ascertaining these class members would necessarily involve an individual student-by-student inquiry of the type that makes the class non-ascertainable.  *See Bussey*, 562 F. App'x at 787 (noting that class members must be ascertainable through objective criteria via "a manageable process that does not require much, if any, individual inquiry").

### 8.     Count 8 (FDUTPA Violation based on VATI Program)

As to Count 8, Plaintiffs seek to certify a subclass comprised of "[a]ll class members who enrolled in the Capstone nursing course and paid for VATI after September 1, 2019." (DE 93 ¶

---

[1] As to the portion in emphasis, Plaintiffs included this language in their original motion for class certification (DE 161 at 2) but inadvertently omitted the language from their most recent Motion. Plaintiffs request permission to add the language back to the definition (DE 216 at 5), and the Court grants this permission.  *See Evans v. U.S. Pipe & Foundry Co*., 696 F.2d 925, 930-31 (11th Cir. 1983) ("It is within the district court's discretion... to undertake and shape the...class...as it deems proper."); *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 321 F.R.D. 688, 696 (S.D. Fla. 2017) ("[T]he Court is empowered to amend an over-inclusive class definition.").

474(iv), DE 203 at 21, DE 204 at 21).   The Court finds the class definition adequate and ascertainable.

The Court has considered, but finds unpersuasive, Defendants' argument that the class cannot be certified because Plaintiffs "owe more to HCI than what they were charged for the Capstone course, negating any damage as a result of any alleged impropriety." (DE 211 at 14).  In other words, Defendants dispute the merits of one or more claims of the individual class representatives, apparently based upon the affirmative defense of set-off.

The Court rejects this argument because the Eleventh Circuit has made clear that individual issues relating to damages do not defeat class certification.  *See Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("[T]he presence of individualized damages issues does not prevent a finding that the common issues in the case predominate."); *see also In re Checking Account Overdraft Litig.*, 307 F.R.D. 630, 651 (S.D. Fla. 2015) (noting that setoff and other damage-related affirmative defenses are not a barrier to class certification).  The Court finds the proposed Count 8 subclass definition to be adequate.

### 9.    Count 9 (ECOA)

As to Count 9, Plaintiffs seek to certify a subclass comprised of "[a]ll Black class members who took out federal, private, and/or institutional student loans to pay for their education." (DE 93 ¶ 474(v), DE 203 at 21, DE 204 at 21).  Defendants object to the Count 9 subclass definition on the grounds that "Plaintiffs have failed to actually articulate any particular harm to Black students." (DE 211 at 14).  This argument once again goes to the merits of Plaintiffs' ECOA claim rather than to the class definition itself or to ascertainability.  A dispute over the ultimate merits of

the claim does not amount to an objection to class definition or ascertainability.  The Court finds the proposed Count 9 class definition to be adequate.

### 10.      Count 10 (Title VI of the Civil Rights Act of 1964)

As to Count 10, Plaintiffs seek to certify a subclass identical to the one proposed for Count 9.  (DE 93 ¶ 474(v), DE 203 at 21, DE 204 at 21).   Defendants object to the proposed Count 10 class definition, repeating their arguments as to the Count 9 class definition.  (DE 211 at 14).  For the same reasons set forth in part III.B.9 above, the Court finds the Count 10 proposed class definition to be adequate.

### C.      RULE 23(a)

Having considered the threshold issues of standing, class definition, and ascertainability, the Court now turns to the requirements of Rule 23(a), i.e., (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  *See Bussey*, 562 F. App'x at 787 (noting that once a plaintiff satisfies the threshold issues, then the district court must conduct a rigorous analysis of the Rule 23 prerequisites).  Defendants argue that Plaintiffs have failed to meet their burden as to all four requirements.  The Court will address each requirement in turn.

### 1.      Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable.  "There is no specific threshold, and it is generally a low hurdle for a lead plaintiff to make an initial showing."  *Belin v. Health Ins. Innovations, Inc.*, 337 F.R.D. 544, 556 (S.D. Fla. 2021) (cleaned up); *see also Arnstein v. Phillips*, No. 21-cv-82516, 2023 WL 7129909, at *6 (S.D. Fla. Sept. 26, 2023) (same).  Though there is no specific threshold to establish numerosity, "generally less than twenty-one is inadequate, more than forty adequate, with numbers between

varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (cleaned up).  The focus of the numerosity inquiry, however, is not whether the number of proposed class members are "too few" to satisfy the Rule, but "whether joinder of proposed class members is impractical." *Armstead v. Pingree*, 629 F.Supp. 273, 279 (M.D. Fla. 1986).  The Court will address each class in turn.

### i.      Primary Class, Counts 1-5

The Court has reviewed the record and finds that Plaintiffs have satisfied the numerosity requirement as to the Primary Class.  The record shows that, from January 6, 2020 to May 8, 2023, 1,439 students enrolled in the RN Program and only 190 graduated.  (DE 204-2 at 1-18).  The Primary Class thus comprises at least 1,249 students and meets the requirement of Rule 23(a)(1).

### ii.     WPB Subclass, Count 6

As to the Count 6 WPB subclass, the Court has reviewed the record and finds that Plaintiffs have satisfied the numerosity requirement.  Plaintiffs reasonably estimate that the WPB Subclass includes a minimum of 632 students who enrolled in the RN Program at HCI-WPB from January 6, 2020 to May 8, 2023, and failed to graduate.  (DE 204-2 at 2-18).  As discussed previously, pursuant to Fla. Admin. Code R. 6E-1.0032(11), HCI was required to provide each of these students with a Form 609a, which each student was required to sign.  The WPB Subclass thus includes at least 632 students and meets the requirement of Rule 23(a)(1).

### iii.    Withholding Subclass, Count 7

As to the Count 7 Withholding Subclass, the Court has reviewed the record and finds that Plaintiffs have satisfied the numerosity requirement.  Plaintiffs reasonably estimate that the Withholding Subclass includes a significant portion of the Primary Class.  (DE 203 at 24, DE 204

at 24).  To achieve this estimate, Plaintiffs point to evidence that shows approximately 1,439 students enrolled in the RN Program, yet only 190 graduated.  (DE 204-2 at 1-18).  The evidence further shows that HCI entered into 1,251 RICs with nursing students between September 3, 2019 and July 10, 2023.  (DE 242-2 at 13-42).  In other words, nearly all of the students who enrolled in the RN Program on or after September 2019 entered into RICs.

Plaintiffs then point to evidence that shows, as of Defendants' August 4, 2023 response to Interrogatory 19, that 243 RICs had an outstanding balance of more than 50%, and 89 RICs had an outstanding balance of more than 90%.  (DE 242-2 at 13-42).  Given that the withholding policy was uniform, Plaintiffs therefore estimate that the Withholding Subclass includes a significant portion of the Primary Class.

The Court finds that Plaintiffs have made a "reasonable estimate" of the minimum number of subclass members, which is all that is required.  *See Brink v. Raymond James & Assocs., Inc.*, 328 F.R.D. 437, 444 (S.D. Fla. 2018).  "Parties seeking class certification do not need to know the precise number of class members, but they must make reasonable estimates with support as to the size of the proposed class." *Id.*

The Court has considered, but finds unpersuasive, two arguments raised in opposition to Count 7 numerosity.  Defendants first argue that the mere withholding of transcripts does not constitute "actual damage" under FDUTPA.  (DE 211 at 18).  The Court rejects this argument as it goes to the merits, not numerosity.  Moreover, the argument misconstrues the nature of Count 7, which complains not only that Defendants withheld transcripts and advancement, but that Defendants used these items as leverage to compel payments on otherwise illegal RICs.  As such,

the damage lies not in the withholding of transcripts and advancement but in the RIC payments themselves.

Defendants next argue that HCI never required payments on RICs in order to advance through the program or obtain transcripts.  (DE 211 at 18).  The Court rejects this argument as it goes to the merits of the count, not to numerosity.  To the extent necessary, the Court disagrees with Defendants' assessment of the evidence, which includes the following:

- HCI's CEO's testimony that Defendants "could not release students to the Florida Board of Nursing or send their transcripts if the students were, you know, in arrears in what they owed us [on their RICs]."  (DE 203-2 at 15);

- statements in Defendants' newsletters that "students will not be allowed to enter HCI College if they are past due on their tuition options [sic] payment plan," (DE 203-2 at 1111); and

- statements in course catalogs that "The Registrar will release official transcripts only when the student has met all their financial obligations to the school."  (DE 203-2 at 115, 645, 749).

### iv.    VATI Subclass, Count 8

As to Count 8, the Court has reviewed the record and finds that Plaintiffs have satisfied the numerosity requirement.  Plaintiffs reasonably estimate that the VATI Subclass includes, at minimum, the 276 class members who enrolled in the Capstone course between January 2020 and March 2023 at either HCI campus did not graduate.  (DE 203-2 at 921-23).  Plaintiffs contend that Defendants overcharged each of these students for a course that was little more than a publicly

available online VATI prep course.  The VATI Subclass thus includes at least 276 students and meets the requirement of Rule 23(a)(1).

<strong>v.        Targeting Subclass, Counts 9 & 10</strong>

As to Counts 9 and 10, the Court has reviewed the record and finds that Plaintiffs have satisfied the numerosity requirement.  Plaintiffs reasonably estimate that the Targeting Subclass includes at least the 697 Black or African American students who enrolled in the RN Program from January 6, 2020 to May 8, 2023, and failed to graduate.  (DE 204-2 at 2-18).  Plaintiffs contend that Defendants subjected these students to a racially targeted advertising campaign.  The Targeting Subclass thus includes at least 697 students and meets the requirement of Rule 23(a)(1).

<strong>2.        Commonality</strong>

The commonality requirement of Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "For purposes of commonality under Rule 23(a)(2) … Plaintiff[s] must only identify one issue whose resolution will affect all or a significant number of the putative class members."  *Bouton v. Ocean Properties*, Ltd., 322 F.R.D. 683, 698 (S.D. Fla. 2017).  "The commonality element is generally satisfied when a plaintiff alleges that defendants have engaged in a standardized course of conduct that affects all class members."  *Gibson v. Lynn Univ., Inc.*, No. 20-cv-81173, 2021 WL 1109126, at *4 (S.D. Fla. Mar. 23, 2021).  As with numerosity, the Eleventh Circuit has described the commonality requirement as a "low hurdle" or a "light" burden, as commonality "does not require that all questions of law and fact raised be common."  *Alhassid v. Bank of Am., N.A.*, 307 F.R.D. 684, 696 (S.D. Fla. 2015) (quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009)).

The Court has reviewed the record and finds that Plaintiffs have satisfied the commonality requirement. Common issues include, but are not limited to, the following:

| Count | Common Issues |
|---|---|
| Count 1<br>(FDUTPA Violation based on Grading and Advancement) | Whether Defendants committed an unfair and deceptive trade practice by imposing, without notice, the 50% Rule. |
| Count 2<br>(FDUTPA Violation based on Misrepresentation of Educational Services Provided) | Whether Defendants committed an unfair and deceptive trade practice by making misrepresentations regarding teacher qualifications and clinical opportunities. |
| Count 3<br>(FDUTPA Violation based on Unauthorized Retail Installment Contracts) | Whether Fla. Stat. § 520.39 required Defendants to obtain a license before offering retail installment contracts to students.<br><br>Whether the failure to become licensed under Fla. Stat. § 520.39 qualified as a per se FDUTPA violation. *See Kurimski v. Shell Oil Co.*, No. 21-80727-CV, 2022 WL 2913742, at *8-11 (S.D. Fla. June 30, 2022) (discussing standard for per se FDUTPA claims). |
| Count 4<br>(Breach of Contract – Grading & Advancement) | Whether Defendants committed a breach of contract by imposing, without notice, the 50% Rule. |
| Count 5<br>(Breach of Contract – Clinical Placement) | Whether Defendants committed a breach of contract by failing to offer adequate clinical placements. |
| Count 6<br>(FDUTPA Violation based on "New" RN Program) | Whether Defendants committed an unfair and deceptive trade practice by failing to disclose, on the CIE Form 609a for the RN Program operating under NCLEX code 707146, the poor passage rates and probation status of the RN Program previously operating under NCLEX code 70755. |
| Count 7 | Whether Defendants committed an unfair and deceptive trade practice by withholding |

| (FDUTPA Violation based on Withholding Advancement and Transcripts from Students) | transcripts and advancement until students paid the balance on their RICs. |
|---|---|
| Count 8 (FDUTPA Violation based on VATI Program) | Whether Defendants committed an unfair and deceptive trade practice by offering the Capstone course for $5,000 when the course consisted of little more than the online VATI course available to the public for only $500. |
| Count 9 (ECOA) | Whether Defendants targeted African Americans in their marketing and advertising. |
| Count 10 (Title VI of the Civil Rights Act of 1964) | Whether Defendants targeted African Americans in their marketing and advertising. |

### 3.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "The typicality requirement is permissive: representative claims are typical if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Alhassid*, 307 F.R.D. at 697 (cleaned up).

To demonstrate typicality, a plaintiff must establish that a "sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001); *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012).  Put another way, "[t]he claim of a class representative is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Williams*, 568 F.3d at 1356-57 (cleaned up).

"[E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000). "If proof of the representatives' claims would not necessarily prove all the proposed class members' claims, the representatives' claims are not typical of the proposed members' claims." *Alhassid*, 307 F.R.D. at 698.

The Court has reviewed the record and finds that Plaintiffs have satisfied the typicality requirement. In the Court's view, Plaintiffs have demonstrated typicality by showing a "sufficient nexus" between the legal claims of the Named Plaintiffs and those of the rest of the class. *Ault*, 692 F.3d at 1216.

The Court has considered, but finds unpersuasive, Defendants' argument that Plaintiffs cannot satisfy typicality due to differing enrollment agreements and course catalogs during the relevant time period. Defendants argue that at least three different enrollment agreements exist among the five Named Plaintiffs, meaning the Plaintiffs' claims are not even typical of each other, let alone the wider putative classes. (DE 211 at 19). Defendants also argue that course catalogs changed materially throughout the class period. (DE 211 at 19).

The Court finds this issue moot in light of the Court's decision, at part III.B.1 and III.B.4, to narrow the scope of the class definitions for Counts 1 and 4. By narrowing those definitions to encompass a common set of enrollment agreements with uniform representations, the Court has resolved typicality problems for those counts. As to the remaining counts and classes, the Court finds that the differing versions of enrollment agreements and course catalogs make no material difference to the legal claims asserted in those counts. In other words, the differing versions of

enrollment agreements and course catalogs do not render plaintiffs non-typical for purposes Counts 2, 3, 5, 6, 7, 8, 9 or 10.

### 4.      Adequacy of Representation

Rule 23(a)(4) requires that the representative parties "fairly and adequately protect the interests of the class." The "adequacy of representation analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (cleaned up).

Defendants do not challenge the adequacy of class counsel and instead challenge only the adequacy of the Plaintiffs themselves.  (DE 211 at 20).  The Court has reviewed the record and finds this requirement satisfied.  The Court finds no conflict between the interests of the Plaintiffs and the other members of the putative class or their counsel.  (DE 203-2 at 219, 226, 233, 239, 245, 1071).  All class members have the same interest in obtaining compensatory, declaratory, and injunctive relief for injuries caused by the alleged deceptive acts of Defendants.

Moreover, the Named Plaintiffs have demonstrated their willingness and ability to vigorously represent the class. All have appeared for depositions, participated in extensive interviews with counsel during the drafting of the complaint and the preparation of the present motion, actively participated in the extensive discovery process, and have communicated with Plaintiffs' counsel regularly regarding the progress and strategy of this case.  (DE 203-2 at 219, 226, 233, 239, 245, 1071).

### D.    RULE 23(b)(3) - PREDOMINANCE

Once Rule 23(a) has been satisfied, the Court must turn to Rule 23(b), which requires the proposed class to satisfy at least one of three criteria.  Here, Plaintiffs seek class certification under Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

"Rule 23(b)(3)'s predominance requirement is far more demanding than Rule 23(a)'s threshold requirement that there are questions of law or fact common to the class."  *Carter v. City of Montgomery*, No. 21-12468, 2024 WL 3544059, at *3 (11th Cir. July 26, 2024) (cleaned up). "Common issues of fact and law predominate within the meaning of Rule 23(b)(3) if they have a direct impact on every class member."  *Id.*  "By contrast, the predominance prerequisite is not satisfied if, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points."  *Id.*; *Tershakovec v. Ford Motor Co., Inc.*, 79 F. 4th 1299, 1306 (11th Cir. 2023) ("A common issue is one that will likely be proved using the same evidence for all class members; an individualized issue, by contrast, is one that will likely be proved using evidence that varies from member to member.") (cleaned up).

Rule 23(b)(3)'s predominance inquiry requires a "pragmatic assessment of the entire action and all the issues involved."  *Carter*, 2024 WL 3544059, at *3 (quoting *Cordoba*, 942 F.3d at 1274).  "Pertinent considerations include the claims, defenses, relevant facts, and applicable substantive law at issue in the case."  *Id.* (cleaned up).  "Among others, whether the putative class members can show that they suffered an injury fairly traceable to the defendant's misconduct—

which runs to their standing to sue, their ability to prove a legal violation, and their right to relief—is a relevant factor that a district court must consider when deciding whether the predominance requirement is satisfied." *Id.* (cleaned up) (quoting *Cordoba*, 942 F.3d at 1273). "Additionally, predominance looks to whether significant questions concerning ultimate liability remain after the resolution of any common issues." *Id.* (cleaned up). This is true "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

Here, Defendants challenge predominance as to every count of the operative complaint. The Court will address each count in turn.

### 1.    Count 1 (FDUTPA Violation based on Grading and Advancement)

Count 1 alleges a FDUTPA claim based on changes to grading and advancement. To establish a consumer claim for damages under FDUTPA, a plaintiff must show (1) an objectively deceptive act or unfair practice, (2) causation, and (3) actual damages. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016). A deceptive act or practice is one "that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Millennium Commc'ns & Fulfill., Inc. v. Office of the Att'y Gen.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000) (cleaned up).

As to causation, "FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct." *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009); *see also Davis v. Powertel, Inc.*, 776 So.2d 971, 973 (Fla. 1st DCA 2000) ("A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue."). Instead, a plaintiff must simply prove that "the alleged practice was likely

to deceive a consumer acting reasonably in the same circumstances." *Cold Stone Creamery, Inc.*, 332 F. App'x at 567. Nevertheless, a plaintiff must still demonstrate a causal link between the deceptive practice at issue and the damages suffered. *See Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So.3d 207, 213 (Fla. 4th DCA 2019) (noting that FDUTPA causation must be "direct, rather than remote or speculative").

As to damages, FDUTPA measures damages based on the difference in value between what was promised and what was delivered. *Dem. Rep. Congo v. Air Capital Grp., LLC*, 614 F. App'x 460, 472 (11th Cir. 2015) (citing *Rollins, Inc. v. Heller*, 454 So.2d 580, 585 (Fla. 3d DCA 1984)). "A notable exception to the rule may exist when the product is rendered valueless as a result of the defect—then the purchase price is the appropriate measure of actual damages." *Id.* In this case, Plaintiffs allege that the grading changes at issue in Count 1 rendered their tuition worthless because the grading changes prevented class members from passing courses and advancing through the curriculum. As such, Plaintiffs seek to recover the full cost of attendance for all class members. (DE 93 ¶ 497).

The Court has reviewed the record and finds the common issues and individual issues can be summarized as follows:

| Common Issues | Individual Issues |
|---|---|
| Whether the enrollment agreements and course catalogs represented that students would be required to achieve an 80% grade on exams in order to advance through the program. | As to each class member, whether Defendants will be able to prove waiver of contractual provisions by way of signed syllabi or other actions inconsistent with the enrollment agreements and course catalogs. |
| Whether the enrollment agreements and course catalogs represented that students would be required to pass the ATI Predictor exam, with one opportunity to retake the exam in the event of a non-passing score. | As to each class member, whether the grading changes at issue in Count 1 caused the class member to fail classes and/or fail to advance through the curriculum. |

| | |
|---|---|
| Whether Defendants committed an unfair and deceptive trade practice by imposing, without notice, the 50% Rule, requiring students to achieve a 50% on every subcategory of every exam.<br><br>Whether Defendants committed an unfair and deceptive trade practice by abandoning, without notice, the ATI Predictor exam.<br><br>Whether Defendants' implementation of the 50% Rule was likely to deceive a reasonable consumer acting under the same circumstances.<br><br>Whether Defendants' abandonment of the ATI Predictor exam was likely to deceive a reasonable consumer acting under the same circumstances. | If so, whether the educational products and services each class member received were effectively worthless, such that damages should equal the full cost of attendance.<br><br>If setoffs are available, the amount of any setoff of damages for any class member who was able to transfer credits to another school. |

After careful review, the Court finds that individual issues predominate as to Count 1, even with the modified class definition.  In particular, the Court finds that individual causation issues overwhelm the common issues.  The Court recognizes that FDUTPA plaintiffs need not prove individual reliance to satisfy causation.  *See, e.g.*, *Davis*, 776 So.2d at 973.  In the Court's view, however, reliance does not end the causation inquiry as plaintiffs must still demonstrate a causal link between the deceptive practice at issue and the damages suffered.  *See Kurimski*, 2022 WL 2913742, at *10-12 (dismissing FDUTPA claim for lack of causation, separate and apart from reliance).

The Court has considered class action FDUTPA cases such as *Carriuolo*, 823 F.3d at 985, where the defendant affixed a sticker to a certain brand of vehicle, the Cadillac CTS, claiming a five-star safety rating when in fact the vehicle had not yet been rated.  In that case, the Eleventh

Circuit affirmed class certification, rejecting defense arguments that individual issues predominated over common ones. *Id.* at 986-89.  Under FDUTPA, the court reasoned, "[a] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *Id.* at 985 (cleaned up).  As such, it made no difference whether individual class members purchased the vehicle in reliance on its five-star safety rating.  As the court noted, under FDUTPA, "the mental state of each class member is irrelevant." *Id.*

Of significance here, however, the *Carriuolo* class members sought to recover damages measured by the difference between "the market value of a 2014 Cadillac CTS with perfect safety ratings" and "the market value of a 2014 Cadillac CTS with no safety ratings." *Id.* at 986.  In other words, the class members sought to recover a uniform set of damages with a direct causal link between the false safety rating and the exact damages claimed.

This case is different.  The class members here do not seek to recover the difference between "the market value of tuition for a class with a 50% Rule" and "the market value of tuition for a class without such a rule."  Instead, they seek to recover the entire cost of attendance, contending that the grading and advancement changes prevented them from passing classes and advancing through the curriculum, thereby rendering their tuition worthless.  (DE 93 ¶ 497).  In the Court's view, this necessarily requires the class members to demonstrate a causal link – separate and apart from reliance – between the exact grading changes at issue and the exact damages claimed.

Some class members may well be able to prove that the 50% Rule prevented them from passing classes. This will require individual proof, potentially including review of individual examinations and scoring.  Other class members may never be able to show causation, either

38

because they studied so diligently that they passed all classes despite the grading changes, or because they studied so poorly that they would have failed even without the grading changes. Other class members may have dropped out of nursing school for reasons completely unrelated to the grading changes, such as a decision to pursue another career. For all of the above reasons, the Court finds that individual causation issues predominate as to Count 1, making the claim inappropriate for class resolution.

### 2.    Count 2 (FDUTPA Violation based on Misrepresentation of Educational Services Provided)

Count 2 alleges a FDUTPA claim based on misrepresentations concerning teacher qualifications and opportunities for clinical placement. The Court has reviewed the record and finds the common issues and individual issues can be summarized as follows:

| Common Issues | Individual Issues |
|---|---|
| Whether Defendants made misrepresentations on its website and elsewhere regarding teacher qualifications and clinical placement. | As to each class member, whether the class member encountered the misrepresentations at issue. |
| Whether teacher qualifications and clinical placement matched the representations made. | As to each class member, whether the class member sustained damages causally related to the misrepresentations at issue. |
| Whether Defendants committed an unfair and deceptive trade practice by making misrepresentations on its website and elsewhere, regarding teacher qualifications and clinical placement. | If setoffs are available, the amount of any setoff of damages for any class member who was able to transfer credits to another school. |
| Whether Defendants' misrepresentations were likely to deceive a reasonable consumer acting under the same circumstances. | |

After careful review, the Court finds that individual issues predominate as to Count 2. In particular, Count 2 does not identify specific, discrete misrepresentations, but instead relies upon

various misrepresentations communicated via Defendants' website and elsewhere regarding teacher qualifications and clinical placement opportunities. Given the current record, the Court cannot be certain whether any of the proposed class members ever heard or encountered the misrepresentations at issue. To adjudicate this count, therefore, the fact finder will have to engage in a student-by-student inquiry to determine which representations reached which students. A class cannot be certified under these circumstances. *See Justice v. Rheem Mfg. Co.*, 318 F.R.D. 687, 696-97 (S.D. Fla. 2016) (noting the difference between cases where it may be fair to assume all of putative class members were exposed to similar materials containing the same misrepresentations with cases where most putative class members may not have been exposed to alleged misrepresentations).

### 3. Count 3 (FDUTPA Violation based on Unauthorized RICs)

Count 3 alleges a per se FDUTPA claim based on an underlying violation of RISA, Fla. Stat. § 520.39. The Court has reviewed the record and finds the common issues and individual issues can be summarized as follows:

| Common Issues | Individual Issues |
|---|---|
| Whether Fla. Stat. § 520.39 required Defendants to obtain a license before offering RICs to students.<br><br>If so, whether Defendants obtained a license to offer RICs.<br><br>Whether Defendants committed a per se FDUTPA violation by offering RICs to students without the appropriate license to do so. *See Kurimski*, 2022 WL 2913742, at *8-11 (S.D. Fla. June 30, 2022) (discussing standard for per se FDUTPA claims). | As to each class member, the calculation of individual damages. |

| | |
|---|---|
| Whether Defendants' practices were likely to deceive a reasonable consumer acting under the same circumstances.<br><br>Whether the FDUTPA violation at issue caused the damages claimed, i.e., all amounts paid or owed pursuant to the allegedly improper RICs as well as any associated fees. (DE 93 ¶ 509).<br><br>Whether class members can seek damages beyond the damages allowed by RISA itself, i.e., refund of the interest and fees paid. | |

After careful review, the Court finds that common issues predominate as to Count 3. The Court has considered, but rejects, Defendants' argument that Plaintiffs failed to supply any evidence that would demonstrate the applicability of RISA to any of the RICs. (DE 211 at 25). In the Court's view, this argument goes to the merits of Count 3, not the appropriateness of class certification.

The Court has considered whether individual causation issues predominate as to Count 3, but the Court finds they do not. Unlike Count 1, Plaintiffs do not seek to recover the entire cost of attendance in Count 3. Instead, they seek to recover solely "the amounts [class members] paid pursuant to the illegal [RICs], any amounts [class members] purportedly owe on such [RICs], and any associated fees." (DE 93 ¶ 509). Unlike the damages claimed in Count 1, these damages bear a direct causal link to the FDUTPA violation at issue in the count, namely, the allegedly illegal nature of the RICs. As such, in the Court's view, individual causation issues do not predominate.

The Court recognizes that the calculation of damages remains an individual issue. Some class members may have borrowed more money pursuant to RICs than other class members. The Eleventh Circuit has previously acknowledged, however, that "the presence of individualized

damages issues does not prevent a finding that the common issues in the case predominate." *See Allapattah Servs., Inc.*, 333 F.3d at 1261; *see also In re Checking Account Overdraft Litig.*, 307 F.R.D. 630, 651 (S.D. Fla. 2015) (noting that setoff and other damage-related affirmative defenses are not a barrier to class certification).

### 4.     Count 4 (Breach of Contract – Grading & Advancement)

Count 4 alleges breach of contract based on grading and advancement.  To establish a breach-of-contract claim in Florida, a plaintiff must show "(1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2d DCA 2006).

"In Florida, a student's relationship with his or her private university is contractual in nature." *Dixon v. Univ. of Mia.*, 75 F.4th 1204, 1208 (11th Cir. 2023).  The terms of such a contract "may be derived from university publications such as the student handbook and catalog." *Id.* Moreover, "[i]t is generally accepted that the terms and conditions for graduation are those offered by the publications of the college at the time of enrollment." *Jallali v. Nova Se. Univ., Inc.*, 992 So. 2d 338, 342 (Fla. 4th DCA 2008).  Therefore, "implicit in the student's contract with a private university is the notion that if the student complies with the terms prescribed by the university, the student will obtain a degree." *Id.* (cleaned up).

The Court has reviewed the record and finds the common issues and individual issues can be summarized as follows:

| Common Issues | Individual Issues |
|---|---|
| Whether the enrollment agreements and course catalogs amounted to a contract that students would be required to achieve an 80% grade on | As to each class member, whether HCI will be able to prove waiver of contractual provisions by way of signed syllabi or other actions inconsistent with the contract. |

| | |
|---|---|
| exams in order to advance through the program. | As to each class member, whether and to what extent the grading changes at issue in Count 4 caused damages. |
| Whether the enrollment agreements and course catalogs amounted to a contract that students would be required to pass the ATI Predictor exam, with one opportunity to retake the exam in the event of a non-passing score. | If so, whether the educational products and services each class member received were effectively worthless, such that damages should equal the full cost of attendance. |
| Whether Defendants committed a breach of contract by imposing, without notice, the 50% Rule, requiring students to achieve a 50% on every subcategory of every exam. | If setoffs are available, the amount of any setoff of damages for any class member who was able to transfer credits to another school. |
| Whether Defendants committed a breach of contract by abandoning, without notice, the ATI Predictor exam. | |
| Whether these breaches were material. | |

After careful review, the Court finds that individual issues predominate as to Count 4, even with the modified class definition. As discussed in part III.D.1 above, class members must show a causal link between the grading changes at issue and the exact damages suffered. Some class members may be able to prove that the 50% Rule caused them to fail to advance through the curriculum, thereby rendering their education worthless. Other class members may not be able to prove causation for reasons that vary based on their individual circumstances. In the Court's view, these individual issues overwhelm the common issues, making this count inappropriate for class treatment.

### 5.    Count 5 (Breach of Contract – Clinical Placement)

Count 5 alleges breach of contract based on clinical placement opportunities. The Court has reviewed the record and finds the common issues and individual issues can be summarized as follows:

| Common Issues | Individual Issues |
|---|---|
| Whether the enrollment agreements and course catalogs formed a contract between Defendants and the students.<br><br>Whether the terms of the contract incorporated the BON requirements for clinical placement.<br><br>Whether Defendants committed a breach of contract by failing to offer sufficient clinical placement opportunities.<br><br>Whether that breach was material. | As to each class member, whether Defendants will be able to prove waiver of contractual provisions by way of the signed syllabi or other actions inconsistent with the contract.<br><br>As to each class member, whether the class member received clinical placement opportunities in accord with the contract.<br><br>As to each class member, whether the alleged breach caused damages.<br><br>If setoffs are available, the amount of any setoff of damages for any class member who was able to transfer credits to another school. |

After careful review, the Court finds that individual issues predominate as to Count 5. In particular, resolution of the breach issue will require the fact finder to conduct a student-by-student inquiry to determine the type, quantity, and quality of clinical opportunities offered to each student. The issue of damages will likewise involve individual inquiry by comparing the value of clinical opportunities received by each student versus the value of the opportunities promised. In the Court's view, these individual issues will overwhelm the common issues, making this count inappropriate for class treatment.

### 6.    Count 6 (FDUTPA Violation based on "New" Program)

Count 6 alleges a FDUTPA claim based on the new RN Program. The Court has reviewed the record and finds the common issues and individual issues can be summarized as follows:

| Common Issues | Individual Issues |
|---|---|
| Whether the HCI-WPB RN Program operating under NCLEX code 707146 was materially different from the HCI-WPB RN Program that | As to each class member, whether the FDUTPA violation at issue in Count 6 caused the class member to suffer damages. |

44

| | |
|---|---|
| previously operated under NCLEX code 70755 and was shut down for failure to achieve programmatic accreditation.<br><br>Whether Defendants committed an unfair and deceptive trade practice by offering students a Form 609a for the "new" RN program operating under NCLEX code 707146 without disclosing the poor exam passage rate and accreditation problems of the HCI-WPB RN Program that previously operated under NCLEX code 70755.<br><br>Whether Defendants' practices were likely to deceive a reasonable consumer acting under the same circumstances. | If so, whether the educational products and services each class member received were effectively worthless, such that damages should equal the full cost of attendance.<br><br>If setoffs are available, the amount of any setoff of damages for any class member who was able to transfer credits to another school. |

After careful review, the Court finds that individual issues predominate as to Count 6.  In particular, for all of the reasons discussed in part III.D.1 above, the Court finds that individual causation issues overwhelm the common issues.  As with Count 1, Plaintiffs seek to recover, via Count 6, the entire cost of attendance for all class members.  (DE 93 ¶ 535).  In the Court's view, therefore, individual class members will need to demonstrate a causal link – separate and apart from reliance – between the exact misrepresentations at issue and the exact damages claimed.  This will require individual, student-by-student proof as to the reasons various class members failed to pass classes and/or advance through the curriculum.  These issues will overwhelm the common issues, making this count inappropriate for class treatment.

### 7. Count 7 (FDUTPA Violation based on Withholding Advancement and Transcripts from Students)

Count 7 alleges a FDUTPA claim based on withholding advancement and transcripts from students until they paid their outstanding RIC balances.  The Court has reviewed the record and finds the common issues and individual issues can be summarized as follows:

| Common Issues | Individual Issues |
|---|---|
| Whether Defendants withheld advancement and transcripts from students until they paid their outstanding RIC balances. | As to each class member, whether the class member had their advancement and/or transcripts withheld until they paid their outstanding RIC balances. |
| Whether Defendants committed an unfair and deceptive trade practice by withholding advancement and transcripts from students until they paid their outstanding RIC balances. | As to each class member, whether the class member decided to make payments on an outstanding RIC balance in order to obtain advancement and/or transcripts. |
| Whether Defendants' practices were likely to deceive a reasonable consumer acting under the same circumstances. | |

After careful review, the Court finds that individual issues predominate as to Count 7. In particular, resolution of this count will require the fact finder to conduct a student-by-student inquiry to determine (1) whether the class member had their advancement and/or transcripts withheld until they paid their outstanding RIC balances, and (2) whether the member decided to make payments on an outstanding RIC balance in order to obtain advancement and/or transcripts. In the Court's view, these individual issues will overwhelm the common issues, making this count inappropriate for class treatment.

### 8.  Count 8 (FDUTPA Violation based on VATI Program)

Count 8 alleges a FDUTPA claim based on the VATI program. The Court has reviewed the record and finds the common issues and individual issues can be summarized as follows:

| Common Issues | Individual Issues |
|---|---|
| Whether the Capstone course that Defendants offered for $5,000 consisted of little more than the VATI course sold online for only $500. | Whether class members sustained damages based on the number of times they paid for the Capstone course. |

| | |
|---|---|
| Whether Defendants committed an unfair and deceptive trade practice by offering the Capstone course to class members for $5,000.<br><br>Whether Defendants' practices were likely to deceive a reasonable consumer acting under the same circumstances.<br><br>As to damages, the difference between the amount charged by Defendants for the Capstone course and the amount for which class members could have purchased the VATI online course. | |

After careful review, the Court finds that common issues predominate as to Count 8.  By way of this count, Plaintiffs seek to recover "the difference between the cost of the VATI program and the amount Defendants charged for the Capstone course."  (DE 93 ¶ 548).  As in *Carriuolo*, 823 F.3d at 986, therefore, Plaintiffs seek to recover a uniform set of damages with a direct causal link between the FDUTPA violation at issue and the exact damages claimed.   The Court finds this count suitable for class treatment.

### 9.    Count 9 (ECOA)

Count 9 alleges a claim under ECOA, which makes it unlawful "for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... on the basis of race, color, religion, national origin, sex or marital status, or age."  15 U.S.C. § 1691(a)(1).  An ECOA violation can be established through a theory of "reverse redlining," which is defined as "the practice of extending credit on unfair terms because of the plaintiff's race and geographic area."  *Roberson v. Health Career Inst. LLC*, No. 22-CV-81883-RAR, 2023 WL 4991121, at *15 (S.D. Fla. Aug. 3, 2023) (cleaned up).  To prove a reverse redlining claim, a plaintiff must show (1) that the defendant's lending practices and loan terms were unfair and predatory, and (2) that

the defendant either intentionally targeted on the basis of race or created a disparate impact based on race. *Id.* A plaintiff must also show actual damages caused by the unfair and predatory practice. *See* 15 U.S.C. § 1691e(a) ("Any creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.").

In this case, Plaintiffs allege that HCI committed unlawful reverse redlining by extending credit and arranging for the extension of credit to support the sale of a "predatory product," namely, the "illusory" nursing program that HCI sold to class members. (DE 93 ¶¶ 553-56). Although Count 9 does not specify the reasons HCI's program was "illusory" or "predatory," the count presumably refers to the SAC's earlier allegations regarding the myriad of false representations, failures of clinical opportunities, changes to grading standards, and other measures designed to prevent students from passing courses and advancing through the curriculum, thereby trapping students in debt.

The Court has reviewed the record and finds the common issues and individual issues can be summarized as follows:

| Common Issues | Individual Issues |
|---|---|
| Whether HCI qualifies as a "creditor" within the meaning of ECOA.<br><br>Whether HCI intentionally targeted its marketing and advertising toward African Americans, or alternatively, whether HCI's marketing and advertising had a disparate impact on the basis of race. | As to each class member, whether HCI engaged in a predatory or unfair lending practices by arranging for the financing of a "predatory product" in the form of an "illusory" nursing program.<br><br>As to each class member, whether the ECOA violation at issue caused the damages claimed. (DE 93 ¶ 560). |

After careful review, the Court finds that individual issues predominate as to Count 9. In particular, Count 9 does not rest upon a uniform lending contract or lending practice that applied equally to all class members. Instead, the count rests upon a theory of arranging financing to support the sale of an allegedly predatory and illusory product that HCI sold to class members. (DE 93 ¶¶ 553-56). The "product" at issue consisted of an educational experience that necessarily varied from one student to another, affecting different students in different ways. Some students may have encountered the misrepresentations described in the SAC while others did not. Some students may have received clinical opportunities while others did not. Some students may have been adversely affected by grading changes while others were not. Some students may have dropped out of nursing school altogether because they wanted to pursue other careers. In the Court's view, these varying factors create individual issues as to causation, damages, and whether the educational experience can be deemed "predatory" or "illusory," as Plaintiffs allege. For all of these reasons, the Court finds Count 9 inappropriate for class treatment.

### 10.    Count 10 (Title VI of the Civil Rights Act of 1964)

Count 10 alleges a claim under Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d. Title VI defines "program or activity" to include "a college, university, or other postsecondary institution, or a public system of higher education any part of which is extended Federal financial assistance." 42 U.S.C. § 2000d-4a(2)(A). Plaintiffs allege that HCI violated Title VI by engaging in reverse redlining. (DE 93 ¶¶ 566-70). Plaintiffs again rest their reverse-redlining claim upon the legal theory that HCI financed or arranged financing to support the sale of a "predatory" product, namely, the nursing program that HCI sold to class members. (DE 93 ¶ 569).

The Court has reviewed the record and finds the common issues and individual issues can be summarized as follows:

| Common Issues | Individual Issues |
|---|---|
| Whether HCI received financial assistance from the federal government.<br><br>Whether HCI intentionally targeted its marketing and advertising toward African Americans or alternatively, whether HCI's marketing and advertising had a disparate impact on the basis of race. | As to each class member, whether HCI engaged in a predatory or unfair lending practices by arranging for the financing of a "predatory" product.<br><br>As to each class member, whether the Title VI violation at issue caused the damages claimed. (DE 93 ¶ 570). |

After careful review, the Court finds that individual issues predominate as to Count 10. As with Count 9, the "predatory product" at issue in Count 10 consisted of an educational experience that necessarily varied from one student to another, affecting different students in different ways. For all of the reasons discussed in part III.D.9 above, the Court finds these varying factors create individual issues as to causation, damages, and whether the educational experience that HCI sold to each class member can be deemed "predatory." For these reasons, the Court finds Count 10 inappropriate for class treatment.

### E.     RULE 23(b)(3) – SUPERIOR METHOD

In addition to predominance, Rule 23(b)(3) also requires Plaintiffs to demonstrate "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) sets forth four specific, but not exclusive, considerations pertinent to a superiority finding: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) desirability or undesirability of concentrating the

litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)–(D).

As to Counts 3 and 8, the Court finds class action treatment superior to other available methods for fairly and efficiently adjudicating this controversy.  As to these counts, the class members' claims are predicated on a common set of facts, concerning common allegedly deceptive practices.  In the Court's view, the class members have an interest in litigating these claims in one venue with common counsel.  In the Court's view, it would be burdensome and wasteful to force the class members to litigate each of these cases individually.  *See Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983) ("Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts."); *Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 675 (S.D. Fla. 2012) (noting that the "economic reality is that many of the class members would never be able to prosecute their claims through individual lawsuits").

As to the remaining counts, the Court reaches the opposite conclusion.  For reasons previously discussed, the Court finds that class member claims will likely vary from one class member to another depending upon the individual educational experience of each class member.  As to Counts 1, 2, 4, 5, 6, 7, 9, and 10, therefore, the Court finds class treatment inferior to other available methods for fairly and efficiently adjudicating this controversy.

## IV.    RECOMMENDATION & NOTICE OF RIGHT TO OBJECT

For the reasons stated above, the undersigned **RECOMMENDS** that the Motion (DE 203, DE 204) be **GRANTED IN PART AND DENIED IN PART** as follows:

1.    As to Count 1, the Court recommends that no class be certified.

2.    As to Count 2, the Court recommends that no class be certified.

3.      As to Count 3, the Court recommends the following modified class be certified: All students who enrolled in the RN Program at HCI after September 1, 2019, who also entered into a retail installment contract, and who did not graduate.

4.      As to Count 4, the Court recommends that no class be certified.

5.      As to Count 5, the Court recommends that no class be certified.

6.      As to Count 6, the Court recommends that no class be certified.

7.      As to Count 7, the Court recommends that no class be certified.

8.      As to Count 8, the Court recommends the following class be certified:  All class members who enrolled in the Capstone nursing course and paid for VATI after September 1, 2019.

9.      As to Count 9, the Court recommends that no class be certified.

10.     As to Count 10, the Court recommends that no class be certified.

The parties shall have fourteen (14) days from the date of being served with a copy of this Modified Report and Recommendation within which to file written objections, if any, with United States District Judge Rodolfo A. Ruiz, II.  Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1.

**IF A PARTY DOES NOT INTEND TO OBJECT TO THIS REPORT AND RECOMMENDATION, THE PARTY SHALL FILE A NOTICE TO THAT EFFECT WITHIN FIVE (5) DAYS.**

**RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach in the Southern District of Florida, this 21st day of August 2024.

RYON M. MCCABE
U.S. MAGISTRATE JUDGE