UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

| | |
|---|---|
| BRITTANY ROBERSON, REBECCA FREEMAN, BIANCA VIÑAS, TIFFANY KING, and TRESHA THOMPSON, individually and on behalf of others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>HEALTH CAREER INSTITUTE LLC (dba HCI COLLEGE LLC and HCI ACQUISITION LLC), FLORIAN EDUCATION INVESTORS LLC, and STEVEN W. HART,<br><br>*Defendants*. | Civil Action No. 9:22-cv-81883-RAR<br><br>District Judge: Rodolfo A. Ruiz, II<br>Magistrate Judge: Ryon M. McCabe |

**PLAINTIFFS' OBJECTIONS TO REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Defendants engaged in a scheme, applying common policies and centralized decisions that deprived each and every student enrolled in HCI's Associate of Science in Nursing Program (the "RN Program") of the core promise of the program: providing class members with a viable pathway to nursing licensure. And that scheme had one goal—to increase HCI's NCLEX passage rates no matter the cost, to pave the way for the sale of HCI and to reap huge financial rewards for its owner, private investors, and senior administrators. Regardless of any later-occurring events, the Defendants harmed each member of the class by causing them to enroll in the RN Program under false pretenses. Because of the wealth of core common issues, class treatment is warranted.

1

The revised Report and Recommendation, ECF No. 254 ("Revised R&R"), recommends class certification for two of the ten counts set forth in the Plaintiffs' Second Amended Complaint, ECF No. 93 ("SAC"), *id.* at 51–52, but denies certification as to the remaining counts. Pursuant to Federal Rule of Civil Procedure 72(a), Plaintiffs hereby object to the following findings and conclusions in the Revised R&R:

1. Individual issues predominate as to Count 1 (FDUTPA as to grading and advancement) because Plaintiffs cannot establish causation on a class-wide basis, ECF No. 254 at 38;

2. The definition of the class under Count 2 (FDUTPA as to educational services provided) is overly broad and not ascertainable, and individual issues predominate, because Plaintiffs cannot establish exposure to misrepresentations on a class-wide basis, *id.* at 18;

3. Individual issues predominate as to Count 4 (breach of contract as to grading and advancement) because Plaintiffs cannot establish causation on a class-wide basis, *id.* at 43;

4. Individual issues predominate as to Count 6 (FDUTPA as to "new" program) because Plaintiffs cannot establish causation on a class-wide basis, *id.* at 45–46;

5. Individual issues predominate as to Count 9 (ECOA) and Count 10 (Title VI) because students' experience differed, *Id.* at 47–48; and

6. Class treatment is inferior to other methods of adjudicating Counts 1, 2, 4, 6, 9, and 10, *id.* at 51.

Plaintiffs ask this Court to consider their objections against two critical backdrops: the mandate that Courts "liberally construe FDUPTA," *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015), and the "broad remedial goals" of the Equal Credit Opportunity Act ("ECOA"), *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1208 (11th Cir. 2019) (Rosenbaum, J., concurring in part) (quoting *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1211 n.6 (6th Cir. 1997)).

**1. <u>Individual Issues Do Not Predominate as to Count 1 (FDUTPA as to grading and advancement)</u>**

### a. The Revised R&R Ignores that the Harm to Class Members Occurred at the Point of Sale.

The Revised R&R erroneously concludes that each class member will have to show how the changed grading and advancement requirements affected them in order to establish that they were injured and thus entitled to damages. ECF No. 154 at 38–39.[1] This inquiry is plainly irrelevant. The injury alleged by Plaintiffs is that, at the time they enrolled in the RN Program, it was the nursing-licensure equivalent of a lemon. The value of the RN program was negated at the point of sale by Defendants' concealed decision to prevent all but a handful of the students it enrolled from ever taking the licensure exam, as stated in the Renewed Motion for Class Certification. ECF No. 20 ("Motion"), at 25.

Plaintiffs' claims do not stem from a few students getting tripped up by technical changes to Defendants' RN Program. This is a case in which Defendants made a conscious and deliberate decision to impose barriers to graduation, not for the students' benefit, but with the goal of lining their own pockets and those of private investors and senior administrators through a multi-million dollar sale of HCI—a sale that would only be possible if HCI's NCLEX passage rates soared to levels not naturally achievable given the subpar nursing education offered to the students intentionally targeted and recruited by Defendants.

---

[1] Significantly, the Revised R&R also focuses exclusively on the 50% Rule, ignoring the other changes to grading and advancement requirements described in the SAC and the Motion. The SAC describes how Defendants abruptly changed the exit exam given at the end of the last course in the RN Program to formats students had never seen and for were not prepared for, specifically Kaplan and HESI. ECF No. 93 ¶¶ 262–70, 274. As will be shown through expert testimony at the merits stage of this case, students whose RN Program instruction centered around material published by a different company, ATI, would be ill-prepared to take an exit exam published by Kaplan or HESI. Further, operative Enrollment Agreements stated that students would be given an opportunity to retake their exams; however, class members were not permitted a second attempt, which further increased Defendants' success of dropping individuals from the RN Program before they could graduate and sit for the NCLEX. *See id.* at ¶ 271.

The Revised R&R fails to consider key evidence in its analysis that establishes the systemic and uniform nature of Defendants' practices and the harm it caused Plaintiffs and class members. The evidence demonstrates the correlation between the imposition of the new requirements and a dramatic increase in drops.[2] ECF No. 203 at 12–13 (discussing evidence), 25–26 (same). Further



relevant evidence is reflected in the above chart, based on Exhibits 55 and 56 to the Motion, which shows the inverse relationship between the RN Program's graduation rate and HCI's NCLEX passage rates.[3] In short, the more students failed to graduate, the higher HCI's NCLEX passage rate climbed—as Defendants intended. *See, e.g.*, ECF No. 203-2 at 251 (Plaintiffs' Exhibit 26) (July 2021 Executive Committee notes reading, "What else can we do to tighten the grad exit process to better ensure text success? Do we change exams or reduce repeats? Concerns: Student

---

[2] For example, data made available in interrogatory responses showed that in the five semesters preceding implementation of the 50% Rule, on average, all but 28% of enrollees in the Nursing 1 course at HCI-WPB advanced to Nursing 2 at the end of the semester. After implementation of the 50% Rule, 58% of enrollees in Nursing 1 at HCI-WPB failed to advance to Nursing 2 at the end of the semester. Similarly, in the three semesters preceding the change in exit exam policy, on average, only 18% of Capstone enrollees failed to graduate after completing the course. In stark contrast, 65% of Capstone enrollees failed to graduate during the first three semesters after the exit exam policy changed. ECF No. 203-2 at 910–24 (Plaintiffs' Exhibit 53); *id.* at 939–41 (Plaintiffs' Exhibit 55); *id.* at 958–59 (Plaintiffs' Exhibit 56).

[3] This analysis is for HCI-WPB. Data from HCI-FTL shows a similar inverse relationship and timing of unlawful practices.

unrest? FBON problems? Lawsuits?"); *id.* at 927 (Plaintiffs' Exhibit 54) (May 2022 communication from HCI's CEO stating "Attrition has impacted the WPB campus mainly because of the 50% structure").

The Revised R&R's focus on downstream harm was erroneous—the point of sale is the locus of Plaintiffs' and class members' injury. *See Nuwer v. FCA US LLC*, 552 F. Supp. 3d 1344, 1354 (S.D. Fla. 2021) ("The injury alleged in this case is not the deployment of the AHR; it is the purchase of a vehicle with a latent defect. The alleged injury occurred at the time of purchase."); *see also id.* (collecting cases).

### b. The Revised R&R Ignores the Common Link Between Causation and Damages in Count 1.

FDUTPA's causation requirement is satisfied by "demonstrat[ing] a causal link between the deceptive practice at issue and the damages suffered." ECF No. 154 at 35–36 (citing *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So.3d 207, 213 (Fla. 4th DCA 2019)). When viewed from the point of sale—not from the application of unfair policies to any particular class member—there is a clear, common, causal link between the injury (delivery of the lemon RN Program) and the damages sought (the cost of the lemon RN Program). *Accord* ECF No. 154 at 41 (discussing causation as to Count 3).

Contrary to the Revised R&R's contention, individual issues of injury and causation do not predominate, and *Carriuolo v. Gen. Motors Co.,* 823 F.3d 977 (11th Cir. 2016), provides no basis to deny certification. In that case, Plaintiffs sought damages "measured by the difference between the market value of a 2014 Cadillac CTS with perfect safety ratings and the market value of a 2014 Cadillac CTS with no safety ratings." ECF No. 154 at 38 (quotations omitted). *Carriulo* supports Plaintiffs' theory of class certification because Plaintiffs do in fact seek "to recover a uniform set of damages with a direct causal link between the false [representations and deceptive omissions]

5

and the exact damages claimed." ECF No. 254 at 38. The scope of the falsity, and thus the measure of damages, are just larger here than in *Carriulo*. There are many reasons that a consumer might purchase a Cadillac CTS. Some may care about the safety ratings, others may not. But Plaintiffs and class members had no reason to enroll in the RN Program but for its misrepresented benefit—the real possibility of a nursing degree and a shot at nursing licensure. The full-damages model that they propose is thus appropriate under FDUTPA. *See Collins v. Quincy Bioscience, LLC*, No. 19-CV-22864, 2020 WL 3268340, at *29 (S.D. Fla. Mar. 19, 2020) ("The full-refund damages model is . . . appropriate because consumers have no reason to purchase [the product at issue] except for its misrepresented benefit").

Just like in *Carriulo*, Plaintiffs propose to measure damages by the difference between the market value of an RN Program with grading and advancement criteria that were designed to help students become nurses and an RN Program with requirements that were designed to prevent them from doing so (i.e., a lemon RN Program). It is as if they were sold a Cadillac that was falsely labelled as having an engine and brakes. Whether or not the Court agrees with Plaintiffs that the lemon RN Program was worthless, this is necessarily a question common to the class—fair market value is objective.[4] *See* Value, Black's Law Dictionary (12th ed. 2024) ("fair market value" is "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect"); *see also Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 893 (11th Cir. 2023) ("At the class certification stage,

---

[4] Plaintiffs have retained a nursing education expert who will testify, at the merits stage, about the value of the RN Program in the state it was delivered. Because of the amendment of the scheduling order and the stay of discovery, her report was not completed in time to be submitted with the Motion.

6

all that the named plaintiffs had to prove was that a reliable damages methodology existed, not the actual damages plaintiffs sustained.").

Finally, if the Court were to adopt the Revised R&R's erroneous standard and require proof that each class member failed to graduate because of Defendants' practices, it could simply limit the class to individuals who would have advanced from one course to the next but for the 50% Rule and individuals who would have graduated but for the change in exit examination and/or retake policy. *See A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 321 F.R.D. 688, 696 (S.D. Fla. 2017) ("[T]he Court is empowered to amend an over-inclusive class definition."). Membership in this refined class is capable of determination: Defendants' records show which students were at an 80% overall in a course before they took the end-of-semester exam to which the 50% Rule was applied and which students failed each course each semester, and records subpoenaed from ATI show these individuals' performance on the end-of-semester exams, including who achieved the required 80% overall score but who received less than 50% in any particular category; likewise, Defendants' records show student performance on the final exit examination and the lack of retakes on that exam. Although such analysis may be time-consuming, it would satisfy ascertainability. *See Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1361 (11th Cir. 2021) ("[T]o meet [Rule 23's] ascertainability requirement, the party seeking certification need not establish its ability to identify class members in a convenient or administratively feasible manner.").

## 2. **The Definition of the Class Under Count 2 (FDUTPA as to educational services provided) Is Not Overly Broad and Is Ascertainable.**

In Count 2, Plaintiffs allege that Defendants "made misrepresentations and/or failed to disclose material facts regarding the terms and conditions of the education they were providing, including the quality and qualifications of instructors" and "advertised HCI's RN Program as

7

offering clinical experience required by F.S. § 464.019(1) when such experience was not available." ECF No. 93 ¶ 499(a), (c). In the Motion, they explain that Defendants misrepresented in college catalogs and on HCI's website that the RN Program "fully complied" with relevant Florida regulations. ECF No. 203 at 6. Yet the Revised R&R inexplicably states that Count 2 "relies upon non-specific misrepresentations, communicated via the school's website and other means, regarding a series of subject matters," ECF No. 154 at 18, and concludes that the proposed class is overbroad because it "will necessarily include students who never encountered the misrepresentations at issue" and unascertainable because "it would be extremely difficult to ascertain which class members encountered the various misrepresentations at issue," *id.* at 18–19.

This conclusion is not only based on a misapprehension of Plaintiffs' allegations, but also on a misunderstanding of the law: it effectively mandates a showing of individual reliance. Illustratively, in *Nuwer v. FCA United States LLC,* No. 20-cv-60432, 2024 U.S. Dist. LEXIS 128767, at *9–10 (S.D. Fla. July 22, 2024), the defendant argued that the individual plaintiff could not establish causation because "he had not reviewed any advertisements or brochures before he purchased his vehicle; indeed, he knew the vehicle he wanted before he went to the dealership," and that a previously-certified class should be decertified "because the element of causation requires individual inquiries."[5] The district court rejected this argument, recognizing that a defendant's attempt to require class-wide proof of causation in a FDUPTA class action was "a thinly veiled attempt to incorporate a reliance element into FDUTPA." *Id.* at 10. It held that "it was not necessary under FDUTPA for [the p]laintiff or any class member to have reviewed

---

[5] In *Nuwer*, a class was certified on January 5, 2022; after the case went to a jury in January 2024, the defendant raised five grounds for judgment as a matter of law, including that "no reasonable jury could find class-wide causation." 2024 U.S. Dist. LEXIS 128767, at *1. This order, which denied that motion, is not yet available on Westlaw.

8

advertisements or brochures;" it was enough that the "[p]laintiff testified that he would not have purchased his . . . vehicle if the . . . defect had been disclosed." *Id*.

Indeed, FDUTPA's only exposure requirement is that the deception was available to class members, such that they could have been exposed to disclosure of the alleged defect. *See, e.g.*, *Cardenas v. Toyota Motor Corp.*, No. 18-CV-22798-CIV-FAM, 2021 WL 6926418, at *13 (S.D. Fla. Aug. 12, 2021) (narrowing class definition to include only individuals who purchased their vehicle from an authorized dealership would raise a permissible inference of common exposure, and "common evidence of causation may support the inference that class members would have been aware of a disclosure, if made, regarding the alleged . . . defect"); *Maor v. Dollar Thrifty Auto. Grp., Inc.*, No. 15-cv-22959, 2018 WL 4698512, at *6 (S.D. Fla. Sept. 30, 2018) ("While individual reliance is not required, the purported deception must be *available* to a reasonably objective consumer at the time he/she entered into the transaction."); *Justice v. Rheem* Mfg. Co., 318 F.R.D. 687, 697 (S.D. Fla. 2016) (finding that "[t]he issue of the causation element of FDUPTA appears to involve individual inquiry" where there was no reasonable presumption that entire class would have been exposed to disclosure of defect).[6]

As in *Nuwer*, Plaintiffs allege a deceptive omission, *i.e.*, the failure to disclose a material defect: Defendants "made misrepresentations and/or failed to disclose material facts regarding the terms and conditions of the education they were providing."[7] ECF No. 93 ¶ 499. Thus, the most

---

[6] The Revised R&R's reliance on *Justice* for its contrary conclusion, ECF No. 254 at 40, is misplaced: that case focused on the likelihood that class members could have been exposure to a disclosure of the alleged defect, not on whether class members *had* been exposed to misrepresentations. 318 F.R.D. at 697 ("Defendant has produced evidence that 'many consumers do not review central AC system product brochures or the websites of AC manufacturers, and thus would be unlikely to be exposed to a disclosure of an alleged defect.'").

[7] Notably, Plaintiffs' Counts 1, 2, and 6 of the SAC are styled as "Violation of the Florida

9

that FDUTPA requires is that class members would have been exposed to a disclosure of the fact that the RN Program failed to meet state standards, had it been made. Plaintiffs have presented evidence that statements regarding compliance with those standards were made in college catalogs that were universally distributed, *see* ECF No. 242, Plaintiffs' Notice of Filing of Supplemental Information Requested by the Court in the July 30 Hearing, at ¶ 3, and have argued that the Court can reasonably infer common exposure, *see* ECF No. 238, Plaintiffs' Notice of Filing of Plaintiffs' Chart Clarifying the Application of Rule 23(b) to Each Count in the Operative Complaint, at 3. That is all they need to show. *See Nuwer*, 2024 U.S. Dist. LEXIS 128767, at *10; *Cardenas*, 2021 WL 6926418, at *13; *Justice*, 318 F.R.D. at 697. Holding otherwise would be reversible error. *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1300 (11th Cir. 2021) (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1305 (11th Cir. 2012)) ("A district court abuses its discretion 'if it applies an incorrect legal standard' in its analysis of class certification.").

Because it relied on a misunderstanding of Plaintiffs' allegations and of the relevant law, the Revised R&R's predominance analysis is limited to the issue of exposure to misrepresentations. ECF No. 254 at 40. For the reasons stated in the Motion, common issues predominate as to Count 2: whether the statements regarding compliance with relevant state law requirements were inaccurate, whether those misrepresentations constitute unfair and deceptive trade practice, and damages—the difference between the fair market value of a program that

---

Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. Based on Deceptive *Omissions* and Unfair Trade Practices." ECF No. 93 at 76, 77, 82 (emphasis added). Further, the Revised R&R failed to perform an analysis of Defendants' practices as *unfair* acts and practices, which are not based on misrepresentations but rather on practices that are injurious to consumers. *Matthews v. Am. Honda Motor Co.*, No. 12-cv-60630, 2012 WL 2520675, at *2–3 (S.D. Fla. June 6, 2012) (quoting *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773, 777 (Fla. 2003)).

complies with those requirements and one that does not—are questions common to the class. *See* ECF No. 203 at 25–26, 28–29.

### 3. Individual Issues Do Not Predominate as to Count 4 (breach of contract as to grading and advancement)

In Count 4, Plaintiffs allege that "Defendants HCI and FEI breached their contracts with Plaintiffs and Class Members by making arbitrary and capricious changes to testing and grading requirements." ECF No. 93 ¶ 516. Referring to its flawed analysis of Count 1, the Revised R&R concludes that individual issues would predominate because "class members must show a causal link between the grading changes at issue and the exact damages suffered," and some class members may not be able to prove that the changes caused their damages. ECF No. 254 at 43. As explained *supra* Part 1.a, this analysis misunderstands Plaintiffs' allegation. Defendants promised an RN Program whereby class members could achieve "graduation upon completion of specific requirements," ECF No. 93 ¶ 518; when grading requirements were changed to preclude class members from graduating, the contract was breached. Whether Defendants' breach was material, thus entitling class members to restitution, is a merits question common to the class. *See Porcell v. Lincoln Wood Prod., Inc.*, 713 F. Supp. 2d 1305, 1310 (D.N.M. 2010) (materiality of breach is common question).

If, however, the Court agrees with the Revised R&R that class members must establish that they would have advanced and/or graduated *but for* the changes, Plaintiffs ask the Court to exercise its discretion and limit the class to individuals who would have advanced from one course to the next but for the 50% Rule and individuals who would have graduated but for the change in exit examination and/or retake policy, information which is readily available. *See A&M Gerber Chiropractic LLC*, 321 F.R.D. at 696; *supra* Part 1.b.

### 4. Individual Issues Do Not Predominate as to Count 6 (FDUTPA as to "new" program)

In Count 6, Plaintiffs allege that Defendants made misrepresentations and deceptive omissions about, and conducted unfair practices related to, the "new" RN Program at HCI's West Palm Beach campus ("HCI-WPB"). ECF No. 93 ¶ 532. The Motion explains that "Defendants made systemic misrepresentations and omissions about the history of the RN Program at HCI-WPB and students' performance in the program." ECF No. 203 at 26. As this Court observed in its Order on Defendants' Motion to Dismiss the First Amended Complaint, "[p]rospective students acting rationally with access to . . . information" regarding "HCI's lack of programmatic accreditation, probationary status, and low NCLEX exam passage rates . . . would likely refrain from enrolling in such a school." ECF No. 84 ("Order on Defendants' MTD"), at 28.

The Revised R&R again erroneously concludes that proving causation would "require individual, student-by-student proof as to the reasons various class members failed to pass classes and/or advance through the curriculum." ECF No. 254 at 45. As explained *supra* Part 1.a, this misunderstands the injury: Plaintiffs were harmed when they were delivered a program that was inferior to what was promised. "The alleged injury occurred at the time of purchase." *Nuwer*, 552 F. Supp. 3d at 1354.

That the Revised R&R applies the erroneous injury analysis here, where the allegations concern HCI-WPB's poor performance and Defendants' efforts to deceive class members about it and where the allegations have nothing to do with the new grading and advancement requirements, underscores its repeated error. Where the allegations concerned the new requirements, the Revised R&R's impulse to examine the effects of those requirements was perhaps understandable, if ultimately mistaken. But to require Plaintiffs to prove that they could have advanced through the

RN Program to establish that the program was deceptively marketed *on other grounds* is entirely untenable.

Plaintiffs allege that, given its true graduate NCLEX performance and approval history, the RN Program was worthless. If the Court disagrees, the question of the fair market value of the RN Program as it was described to class members and as it was delivered to them is still a question common to the class. *See supra* Part 1.b.

5. **Individual Issues Do Not Predominate as to Counts 9 (ECOA) and 10 (Title VI)**

Counts 9 and 10 allege that Defendant HCI engaged in reverse redlining when it targeted Black students with its predatory product. ECF No. 93 ¶ 554 (Count 9), ¶ 569 (Count 10). The Motion explains that "Plaintiffs allege discrimination with respect to multiple aspects of a credit transaction: predatory RIC terms, changes to the cost of the product and the amount of credit needed to pay for it, the likely ability of students to repay the credit, the consequences of nonpayment, and the predatory nature of the product itself—a worthless education." ECF No. 203 at 32.

The Revised R&R does not address "*every aspect*" of Plaintiffs' dealings with HCI in relation to credit transactions. *See* Consumer Financial Protection Bureau, Statement of Interest in Support of Plaintiffs at 8, ECF No. 58-1 ("SOI"). It does not even address the most obviously predatory aspect of the credit transaction between Defendants and Plaintiffs—the illegal retail installment contracts ("RICs")—despite granting class certification for a FDUTPA claim based on them. These RICs are in fact a "uniform lending contract or lending practice that applied equally to all class members," ECF No. 254 at 49. And the predatory nature of the product is highlighted by the fact that Defendants acknowledge that class members will not pay their RICs once they leave the school. *See* ECF No. 203 at 14 (citing evidence).

Instead, the Revised R&R concludes that "the 'product' at issue consisted of an educational experience that necessarily varied from one student to another, affecting different students in different ways[,] . . . create[ing] individual issues as to causation, damages, and whether the educational experience can be deemed 'predatory' or 'illusory.'" ECF No. 254 at 49. As this Court recognized in its Order on Defendants' MTD, this is not what Plaintiffs allege. *See* ECF No. 84 at 34 ("Plaintiffs allege that HCI misrepresented program requirements—and consequentially, the length, and therefore the cost of the program—to convince students to take out credit to pay tuition for the nursing program."); *see also* SOI at 10 ("HCI engaged in a bait and switch—enticing Plaintiffs to enter into credit transactions for federal and private loans based on false representations about the amount of credit needed."). Regardless, ECOA does not look to effect—it looks to the nature of the product targeted to the protected class. *See, e.g.*, *Carroll v. Walden Univ., LLC*, 650 F. Supp. 3d 342, 362 (D. Md. 2022) (on motion to dismiss, finding that "by misleading students and the public about the nature of the [Doctor of Business Administration] program and the resulting costs[,] . . . when Walden markets the DBA, it is marketing a predatory product"); *McGlawn v. Pennsylvania Hum. Rels. Comm'n*, 891 A.2d 757, 770–72 (Pa. Commw. Ct. 2006) (finding that loans were "predatory and unfair" under ECOA because of their terms, including pre-payment penalties and high interest rates, without analyzing effect on plaintiffs, such as ability to pay).

Further, the Revised R&R erroneously states that an ECOA plaintiff must show actual damages. ECF No. 254 at 48 (citing 15 U.S.C. § 1691e(a)). Statutory punitive damages are available "regardless of proof of actual damages" in cases of wanton or reckless conduct on the part of a creditor. *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 148 (5th Cir. 1983).

14

Finally, to state a claim for reverse redlining under Title VI, a plaintiff may allege that a covered entity deliberately targeted a protected class for a fraudulent scheme. *Brook v. Sistema Universitario Ana G. Mendez, Inc.*, No. 17-cv-171, 2017 WL 1743500, at *3 (M.D. Fla. May 4, 2017). Plaintiffs have alleged such a scheme; its effects on individual class members cannot predominate.

6. <u>**Class Treatment is Inferior to other Methods of Adjudicating Plaintiffs' Claims.**</u>

In deciding that class treatment was inferior to individual actions as to Counts 1, 2, 4, 6, 9, and 10, the Revised R&R fails to meaningfully engage in a superiority analysis. Instead, it merely states that "for reasons previously discussed" it "finds class treatment inferior to other available methods" as to all but Counts 3 and 8. ECF No. 254 at 51. But the superiority requirement of Rule 23(b)(3) requires "two forms of comparison": (1) "would a class action create more manageability problems than its alternatives?" and (2) "how do the manageability concerns compare with the other advantages or disadvantages of a class action?" *Cherry*, 986 F.3d at 1304–05. Both comparisons mandate a finding that class treatment would be superior as to the aforementioned counts—even if the individual issues wrongly identified by the Revised R&R did, in fact, predominate.

As to the first form of comparison, a class action with some individualized issues of causation would be more manageable than hundreds of individual actions. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004). ("[W]e are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives (including, most notably, 600,000 separate lawsuits by the class members)."); *see also Rivera v. Equifax Info. Servs., LLC*, 341 F.R.D. 328, 346 (N.D. Ga. 2022) (rejecting the defendant's argument, and magistrate judge's conclusion, that "the administrative difficulties of ascertaining whether all of the proposed class members' injuries were traceable to [the

defendant's actions] is untenable"). Rather than including thousands or millions of individuals, the class sizes in this case include, at most, 1,250 individuals—individuals for which Plaintiffs have already received, reviewed, and analyzed a variety of centralized data. Additional data needed to analyze class members' claims resides with Defendants. As described *supra* Part 1.D, the Court could easily apply a simple formula to this data[8] to make the causation determination created by the Revised R&R, without requiring individual testimony or analysis. By contrast, individual actions would require repeated litigation of the same issues; each plaintiff would seek and present the same evidence to establish that Defendants committed objectively deceptive and unfair acts, then present the same dataset to show that they meet the erroneous causation standard.

Further, the claims at issue in this case are complex and discovery on them will require resources not typically available in individual actions. For example, an expert witness will be needed to opine on whether the changes to grading and advancement requirements were arbitrary and capricious and whether the qualification of instructors and clinical offerings satisfied state standards. Expert witnesses may also be required to opine on Defendants' marketing strategies and to conduct a regression analysis pertaining to Plaintiffs' disparate impact claims under ECOA. These are not the kind of litigation techniques required in most individual actions, as the cost of litigation would quickly outweigh the recovery sought by each class member.

As to the second form of comparison, the benefits of class treatment in this case overcome any minor manageability concerns. One of the primary purposes of Rule 23 is to "vindicate the rights

---

[8] For determining the effect of the 50% Rule, Plaintiffs have already begun the process of determining which students achieved the required overall score of 80% but who achieved less than 50% in any one category. Comparing this list of students against the list of students who failed each course each semester will identify those students who failed as a direct result of the 50% Rule. For determining the effect of the final exit exam, the analysis would be even less complex: any student who took the exit examination had necessarily completed all other graduation requirements.

of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc.,* 521 U.S. at 617 (internal quotations and citation omitted). The class members here are working people burdened with debt; they are unlikely to have the time or resources to bring individual actions. Indeed, out of over a thousand members of the proposed class, none has filed a separate action. *See Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 337 (S.D. Fla. 1996).

Finally, for the FDUTPA and targeting claims, analysis of the individual causation issues wrongly identified by the Revised R&R would necessarily follow a class-wide determination of core liability: that Defendants committed objectively deceptive and unfair acts, and that Defendants engaged in racial targeting. The individual issues are really damages issues. In the Revised R&R's view, a class member who was blocked from advancing through the RN Program by the 50% Rule or from graduating by the new exit exam policy may be entitled to a full tuition refund, while a class member who dropped out for personal reasons is entitled to nothing. *See* ECF No. 254 at 38–39. This is wrong—both class members were injured when they received a product materially different from and inferior to what they were promised, and both are entitled to the difference in the products' fair market value. But were it right, it would mean that bifurcation into liability and damages stages would be a more appropriate solution. *See Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("[T]he presence of individualized damages issues does not prevent a finding that the common issues in the case predominate."); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1309 (N.D. Fla. 2017) (where "common issues of law and fact as to causation and liability predominate over the issues requiring individualized proof, . . . the need to bifurcate and allow individual trials as to damages does not preclude certification of a class for these common issues").

"Rule 23(b)(3) does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Sihler*, 2024 WL 3771717, at *8 (cleaned

up) (quoting *Amgen Inc.*, 568 U.S. at 469). And while class certification requires consideration of the need for individual proof, "this exercise is not 'bean counting' – the relative importance of the questions matter too." *Id.* (internal quotation omitted). Here, the question is whether Rule 23 favors using judicial resources to once and for all resolve the claims of hundreds of consumers wronged by the same defendants, over the same period of time, in substantially the same way, or whether Rule 23 favors requiring each putative class member to find individual counsel, file their own action, engage in the same discovery disputes that have plagued this litigation, and consume tremendous judicial resources through motion briefing and trial. As demonstrated herein and in the Motion, Rule 23 must favor the former.

## CONCLUSION

For the foregoing reasons, the Court should decline to adopt the Revised R&R's predominance analysis as to Counts 1, 2, 4, 6, 9, and 10 and its overbreadth and ascertainability analysis as to Count 2 and should grant class certification as to each of those counts.

Dated: September 4, 2024

Respectfully submitted,

*/s/ Jennifer Thelusma*
JENNIFER THELUSMA
Florida Bar No. 1019776
jthelusma@ppsl.org
REBECCA EISENBREY (*pro hac vice*)
reisenbrey@ppsl.org
VICTORIA ROYTENBERG (*pro hac vice*)
vroytenberg@ppsl.org
**Project on Predatory Student Lending**
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
(617) 322-2843

NICOLE MAYER
Florida Bar No. 012035
Nicole@MayerLawFlorida.com

**Mayer Law**
171 Dommerich Drive
Maitland, Florida 32751
(352) 494-3657

*Attorneys for Plaintiffs*